**Terry BOZEMAN, Plaintiff,**

v.

**PER–SE TECHNOLOGIES, INC.; Per–Se Transaction Services, Inc., William M. Dagher; Charles Moore; and Phillip M. Pead, Defendants.**

**No. 1:03–CV–3970–RLV.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 16, 2006.

Christopher Garrett Moorman, Office of Christopher G. Moorman, Richard Wayne Hendrix, Finch McCranie, Atlanta, GA, for Plaintiff.

Alicia P. Starkman, Matthew J. Gilligan, Robert P. Riordan, Alston & Bird, Atlanta, GA, for Defendants.

## ORDER

VINING, Senior District Judge.

The plaintiff's Motion to Exceed Page Limitation and Correct Record Testimony [Doc. No. 300] is GRANTED; the defendants' Motion for Leave to Increase Page Limit [Doc. No. 301] is GRANTED.

After making a de novo review of the record and after carefully considering the report and recommendation of the magistrate judge, together with the objections thereto, the court receives it with approval and adopts it as the opinion and order of this court.

FELDMAN, United States Magistrate Judge.

Attached is the Report and Recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636(b)(1), Fed.R.Civ.P. 72(b), and this Court's Local Rule 72. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within ten (10) days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court. If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review. *United States v. Slay*, 714 F.2d 1093 (11th Cir.1983), *cert. denied* 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984).

The Clerk is directed to submit the Report and Recommendation with objections, if any, to the district court after expiration of the above time period.

## MAGISTRATE JUDGE'S FINAL REPORT, RECOMMENDATION AND ORDER

*History of the Case*

*Part One*

This is a civil rights employment discrimination case filed pursuant to Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e *et seq.*) (hereinafter "Title VII") by Terry Bozeman (hereinafter "the Plaintiff"), who was employed as the Human Resources Director of Per–Se Technologies, Inc. in the eHealth Solutions Division, against defendants Per–Se Technologies, Inc. and Per–Se Transaction Services, Inc. (hereafter collectively referred to as "Per–Se"), and Per–Se employees Phillip M. Pead (hereaf-

ter referred to as "Pead"), Charles Moore (hereafter referred to as "Moore"), and William N. Dagher (hereafter referred to as "Dagher").[1] In his Second Amended Complaint filed on June 23, 2004[2] [Doc. 43], the Plaintiff alleges that the defendants violated his civil rights by (1) retaliating against him in violation of Title VII (i.e., causing him to suffer adverse employment actions including threats, harassment, intimidation, humiliation, reduction and/or elimination of job functions, reduction in status and constructive discharge) because of (a) his participation in investigations of alleged discrimination committed by the defendants against other company employees [Doc. 43, ¶¶ 18–19, 21–29], and (b) alleging that Per–Se filed inaccurate required federal employer reports and concealed evidence of its commitment to equal employment opportunity laws from the Government [Id. at ¶¶ 20, 54, 71]; (2) intentionally inflicting emotional distress upon him in violation of Georgia law [Id. at ¶¶ 106–121]; (3) negligently supervising, retaining, and hiring employees in violation of Georgia law [Id. at ¶¶ 122–130]; and (4) violating the Sarbanes–Oxley Act (18 U.S.C. § 1514A) by retaliating against him for reporting financial irregularities to the Securities and Exchange Commission ("SEC") [Id. at ¶¶ 131–143].[3]

On July 9, 2004, the defendants filed their Answer to the Plaintiff's Second Amended Complaint [Doc. 48]. In their Answer, Per–Se Technologies, Inc. and Per–Se Transaction Services, Inc. asserted three Counterclaims against the Plaintiff, to wit: (1) damages for computer theft and computer trespass in violation of O.C.G.A. § 16–9–93; (2) conversion; and (3) attorney's fees and expenses of litigation incurred in bringing these Counterclaims. See [Doc. 48, pp. 48–53].

Presently pending before the undersigned are (1) the Plaintiff's February 1, 2006 Motion for Partial Summary Judgment, Brief in Support thereof, Statement of Material Facts as to Which There Exists No Genuine Issue to be Tried [Doc. 210], and supporting exhibits [Doc. 211] (hereafter referred to as "PX-"), including a copy of the parties' Stipulation of facts (PX–1); excerpts from the depositions of Karen Baker ("Baker Depo.") (PX–2), Dan Swaine ("Swaine Depo.") (PX–3), Charles Moore ("Moore Depo.") (PX–4), William Dagher ("Dagher Depo.") (PX–5), Liesl Rowe ("Rowe Depo.") (PX–6), Jackie Jackson ("Jackson Depo.") (PX–7), Phil Pead ("Pead Depo.") (PX–8), and Kellen Jameson ("Jameson Depo.") (PX–9); and the Plaintiff's Affidavit[4] ("Pl.Aff.") (PX–10). On March 9, 2006, the defendants filed their (2) Response in Opposition to Plaintiff's Motion for Partial Summary Judgment [Doc. 262], including their Response to Plaintiff's Statement of Material Facts

---

1. Defendants Per–Se, Pead, Moore, and Dagher will hereafter be referred to collectively as "the defendants."

2. The Plaintiff filed his original Complaint on December 22, 2003 [Doc. 1], and his First Amended Complaint on January 30, 2004 [Doc. 11].

3. The Plaintiff only asserts two claims against defendants Pead and Dagher (i.e., retaliation in violation of Sarbanes–Oxley and intentional infliction of emotional distress), and only one

claim against defendant Moore (i.e., intentional infliction of emotional distress). In addition, the Plaintiff seeks punitive damages as a result of the alleged retaliation by the defendants.

4. The Plaintiff's Affidavit also contains sixty-four (64) attachments in support of his chronology of events, which will hereafter be referred to as "Att." See [Doc. 220].

as to Which There Exists No Genuine Issue to be Tried [Doc. 263], and (3) their Notice of Objection to the Plaintiff's Affidavit, and Motion to Strike the Plaintiff's Affidavit with an incorporated Brief in Support thereof [Doc. 261]. On March 23, 2006, the Plaintiff filed his (4) Response to Defendants' Motion to Strike the Plaintiff's Affidavit and Brief in Opposition thereto [Doc. 265], to which the defendants (5) replied on April 10, 2006 [Doc. 276][5].

Also pending before this Court are (6) Per–Se's February 6, 2006 Motion for Summary Judgment, Brief in Support thereof, and Statement of Material Facts as to Which There is No Genuine Issue to be Tried [Docs. 223, 227]. In addition, on February 6, 2006, defendants Pead, Moore, and Dagher filed individual ((7),(8), (9)) Motions for Summary Judgment and Briefs in Support thereof [226, 229, 225, 230, 224, 231].[6] The defendants also filed a joint Appendix in Support of their Mo-

tions for Summary Judgment [Doc. 228] with supporting exhibits (hereafter referred to as "DX–"), including the deposition excerpts of Terry Bozeman ("Pl. Depo.") (DX–1), William Dagher ("Dagher Depo.") (DX–2), Charles Moore ("Moore Depo.") (DX–3), Kellen Jameson ("Jameson Depo.") (DX–4), Karen Baker ("Baker Depo.") (DX–5), Dan Swaine ("Swaine Depo.") (DX–6), Jennifer Bender ("Bender Depo.") (DX–7), Liesl Rowe ("Rowe Depo.") (DX–8), Tracy Fried ("Fried Depo.") (DX–9), and Patrick Coleman, M.D. ("Coleman Depo.") (DX–10); the declarations of Dan Swaine ("Swaine Decl.") (DX–11), Maria Dress ("Dress Decl.") (DX–12), Karen Baker ("Baker Decl.") (DX–13), Matthew Myers ("Myers Decl.") (DX–14), and Kellen Jameson ("Jameson Decl.") (DX–15); Plaintiff's Responses to Defendant Per–Se Technologies, Inc.'s Amended First Interrogatories to Plaintiff (DX–16); and the Plaintiff's Responses to

---

5. The defendants contend that the Plaintiff's Affidavit, his attached "Chronology of Events," and supporting documents should be stricken because, *inter alia*, he lacks personal knowledge in support of the statements made in his "Chronology of Events," the supporting documents constitute inadmissible hearsay and have not been properly authenticated or identified, and many statements in his "Chronology of Events" directly contradict and mischaracterize the documents that the statements reference [Doc. 261]. In response, the Plaintiff contends that the attached "Chronology of Events" is merely a summary exhibit offered under Fed.R.Evid. 1006 to assist this Court and not "to demonstrate the truth of the contents of every single exhibit." *See* [Doc. 265, p. 6].

Because this affidavit and the attachments are to be considered by the Court in conjunction with the Plaintiff's Motion for Partial Summary Judgment, not a jury, and because the Court is fully capable of considering only the admissible relevant and proper portions of the submissions, the Court will deny the defendants' Motion to Strike. However, this Court will, naturally, give such weight and

credence to the affidavit and attachments as the law permits. Thus, any portion of Plaintiff's Affidavit, "Chronology of Events," and supporting documents which do not constitute personal knowledge, constitute inadmissible hearsay, or rely on unauthenticated documents will be disregarded in connection with this Court's determination of the Motions for Summary Judgment. *See Tidwell–Williams v. Northwest Georgia Health System,* 1998 WL 1674745, at \*6 (N.D.Ga.1998) (No. 1:97–CV–1726A–JEC).

**IT IS THEREFORE ORDERED** that the defendants' Notice of Objection to Plaintiff's Affidavit and Motion to Strike [Doc. 261] is hereby **DENIED.**

6. Defendants Pead, Moore, and Dagher also each filed a Statements of Material Facts as to Which There is No Genuine Issue to be Tried incorporating Per–Se's Statement of Material Facts as to Which There is No Genuine Issue to be Tried [Doc. 227] as their Statements of Material Facts. *See* [Docs. 229, 230, 231].

Defendant Per–Se Technologies, Inc.'s First Request for Admissions (DX–17).

Subsequent thereto, (10) the Plaintiff filed his February 21, 2006 Response to defendants Moore, Dagher, and Pead's individual Motions for Summary Judgment and Brief in Opposition thereto [Doc. 237], his March 15, 2006 Memorandum in Response to the Defendants' Motions for Summary Judgment [Doc. 255], Responses to Defendants' Statement of Material Facts as to Which There is No Genuine Issue to be Tried [Doc. 257], and his own Statement of Material Facts in Support of the Denial of Defendants' Motions for Summary Judgment [Doc. 256], and (11) his February 24, 2006 Cross–Motion for Summary Judgment as to Per–Se Technologies, Inc.'s Counterclaim, Brief in Support thereof, and Statement of Material Facts as to Which There Exists No Genuine Issue to be Tried [7] [Docs. 240–1, 240–2].

On March 20, 2006, (12) the defendants filed a Motion to Strike Plaintiff's Cross–Motion for Summary Judgment with respect to Defendant Per–Se Technologies, Inc.'s Counterclaim, and Brief in Support thereof [Docs. 259–1, 259–2], and (13) their Response in Opposition to the Plaintiff's Cross–Motion for Summary Judgment (as to Defendant Per–Se Technologies, Inc.'s Counterclaim) [Doc. 260]. On March 23, 2006, (14) the Plaintiff filed his Response to Defendants' Motion to Strike his own Cross–Motion for Summary Judgment and Brief in Opposition thereto [Doc. 264], to which (15) the defendants replied on April 10, 2006 [Doc. 277]. Furthermore, (16) on April 7, 2006, the defendants filed their Response to Plaintiff's Statement of Material Facts in Support of Denial of Defendants' Motions for Summary Judgment [Doc. 275], and (17) their Reply Briefs in Support of their Motions for Summary Judgment [Docs. 274, 271, 272, 273].[8]

### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In his Motion for Partial Summary Judgment, the Plaintiff contends that he is entitled to summary judgment on his (1) Title VII retaliation claims because under the authority of *Desert Palace v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), he can make out a *prima facie* case showing that a retaliatory motive played a part in the defendants' adverse employment actions taken against him (i.e., a mixed-motive theory); and his (2) constructive discharge claim under the authority of *Penn. State Police v. Suders,* 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204

---

**7.** Plaintiff's Statement of Material Facts as to Which There Exists No Genuine Issue to be Tried [Doc. 240–2] incorporates his Affidavit [Doc. 240–3] filed on February 24, 2006 as his Statement of Facts.

**8.** Also pending before this Court is the Plaintiff's February 1, 2006 Motion to Bifurcate the Trial and Brief in Support thereof [Doc. 208], to which the defendants responded on February 21, 2006 [Doc. 235]. On February 8, 2006, this Court deferred the Plaintiff's Motion to Bifurcate to the District Court for a ruling.

It also appears that the Plaintiff's March 15, 2006 Motion for Leave to Increase Page Limit for Response to Defendants' Motion for Summary Judgment [Doc. 254] is still pending before this Court. As the Plaintiff has already filed his response and is at present being considered by this Court on its ruling on the pending Motions for Summary Judgment, it is hereby **ORDERED** that the Plaintiff's Motion for Leave to Increase Page Limit for Response to Defendants' Motion for Summary Judgment [Doc. 254] is hereby **DENIED** as moot.

(2004).[9] *See* [Doc. 210].

## PER–SE'S MOTION FOR SUMMARY JUDGMENT

In their joint Motion for Summary Judgment (hereinafter "MSJ"), Per–Se contends that (I) the Plaintiff cannot make out a *prima facie* case of retaliation under Title VII and Sarbanes Oxley because (a) he has failed to establish that he suffered any actionable adverse employment action, (b) he has failed to establish that his alleged protected activity contributed to Per–Se's employment actions, and (c) Per–Se would have taken the same actions against the Plaintiff even in the absence of the Plaintiff's alleged protected activity. In addition, Per–Se further contends that (II) it had legitimate, nondiscriminatory reasons ("LNDR") for its employment actions; (III) the Plaintiff cannot show that Per–Se's legitimate, nondiscriminatory reasons for its employment actions were pretexts for retaliation; (IV) the Plaintiff's Title VII retaliatory hostile work environ-ment claim fails as a matter of law because he has failed to establish a hostile work environment; (V) the Plaintiff's constructive discharge claim fails because his working conditions were not so intolerable that a reasonable person would have felt compelled to resign; (VI) the Plaintiff cannot make out a *prima facie* case of intentional infliction of emotional distress against Per–Se pursuant to state law because, *inter alia,* he failed to: (a) show that Per–Se engaged in "extreme or outrageous" conduct, (b) show that he suffered severe emotional distress, and (c) establish Per–Se's liability for its employees' actions under a theory of respondeat superior; and (VII) the Plaintiff cannot make out a *prima facie* case of negligent retention in violation of Georgia state law.[10]

## PEAD, MOORE, AND DAGHER'S MOTIONS FOR SUMMARY JUDGMENT

In their Motions for Summary Judgment, Pead and Dagher contend that (I)

9. In the Plaintiff's Motion for Partial Summary Judgment, he states that he is moving "for partial Summary Judgment on liability under his Title VII and Sarbanes–Oxley claims against the Defendants." [Doc. 210, p. 1]. However, the Plaintiff failed to present any argument in his supporting brief on his Sarbanes–Oxley claim. Therefore, this Court will consider his Motion for Partial Summary Judgment as only pertaining to his Title VII retaliation claims.

10. Per–Se also asserts an after-acquired evidence defense, presenting evidence that it discovered that the Plaintiff lied on his employment application and would have been terminated if Per–Se had discovered the misrepresentation during his employment [Doc. 227, pp. 60–64]. This defense relates to damages and, as such, is not relevant at the summary judgment stage. Likewise, Per–Se also contends that the Plaintiff failed to satisfy the standard for obtaining punitive damages under Title VII or Georgia state law. In addition, Per–Se contends that punitive damages are not recoverable under Sarbanes–Oxley.

However, damages are a remedy and this Court will not address the damages issue at this time.

Furthermore, in its Brief in Support of their Motion for Summary Judgment, Per–Se argued that the Plaintiff's negligent retention claim should be dismissed. [Doc. 227, pp. 57–60]. The Plaintiff failed to respond to this argument. Accordingly, this Court will deem the Plaintiff's negligent retention claim against Per–Se abandoned. *See Richardson v. Dougherty,* 2006 WL 1526064, at *2 (11th Cir. June 5, 2006) (No. 05–16370) (citation omitted); *Snyder v. Time Warner, Inc.,* 179 F.Supp.2d 1374, 1385 (N.D.Ga.2001) (finding that plaintiff's failure to respond to defendant's arguments regarding the propriety of attorneys fees and punitive damages constituted abandonment of those claims) *Marion v. DeKalb County,* 821 F.Supp. 685, 689 n. 4 (N.D.Ga.1993) (finding that plaintiff's failure to respond to defendant's argument of sovereign immunity constituted an abandonment of that claim).

the Plaintiff's claim for intentional infliction of emotional distress fails because: (a) Pead and Dagher are not liable for the actions of their fellow employee Moore, and (b) Moore's conduct, was not, in any event, "extreme or outrageous"; and (II) the Plaintiff's retaliation claim, in violation of Sarbanes–Oxley, fails because, *inter alia,* he: (a) failed to exhaust his administrative remedies, (b) failed to make out a *prima facie* case of retaliation because (1) he cannot establish that Pead knew that the Plaintiff had engaged in any alleged protected activity by the Plaintiff while the Plaintiff was employed with Per–Se, (2) Dagher has established that all employment actions taken by Per–Se with regard to the Plaintiff would have been taken by Per–Se in the absence of any alleged protected activity by the Plaintiff, (3) the Plaintiff failed to establish that he suffered any actionable adverse employment action, and (4) the Plaintiff failed to establish a causal connection between any alleged protected activity which the Plaintiff took, and

any alleged adverse employment actions taken against him [Docs. 229, 231].

In his Motion for Summary Judgment, Moore contends that (I) the Plaintiff's intentional infliction of emotional distress claim fails because the Plaintiff, *inter alia,* failed to (a) show that Moore engaged in any "extreme or outrageous" conduct against the Plaintiff, and (b) show that he suffered severe emotional distress [Doc. 230].[11]

### PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT AS TO PER–SE TECHNOLOGIES, INC.'S COUNTERCLAIM

In his Cross–Motion for Summary Judgment, the Plaintiff contends that Per–Se Technologies, Inc.'s[12] Counterclaims should be dismissed because Per–Se Technologies, Inc. has failed to state a valid cause of action for the alleged deletion of information from the Plaintiff's company-issued laptop computer [Doc. 240–1].[13]

11. Pead, Dagher, and Moore also contend that the Plaintiff failed to satisfy the standard for obtaining punitive damages in connection with his intentional infliction of emotional distress claim, and Pead and Dagher also contend that punitive damages are not recoverable under Sarbanes–Oxley. As mentioned above, damages are a remedy and this Court will not address the damages issue at this time.

12. The Plaintiff only moved for summary judgment as to defendant Per–Se Technologies, Inc.'s Counterclaims, and did not move for summary judgment as to Per–Se Transaction Services, Inc.'s identical Counterclaims asserted against him.

13. As previously noted, the Plaintiff filed a Statement of Material Facts as to Which There is No Genuine Issue to be Tried [Doc. 240–2] in which he incorporates his Affidavit containing fourteen numbered paragraphs [Doc. 240–3] as his Statement of Material

Facts. On March 20, 2006, Per–Se Technologies, Inc. filed a Motion to Strike Plaintiff's Cross–Motion for Summary Judgment, a Brief in Support thereof, and a Response in Opposition to Plaintiff's Cross–Motion for Summary Judgment [Docs. 259–1, 259–2, 260]. On March 23, 2006, the Plaintiff filed his Response to Per–Se Technologies, Inc.'s Motion to Strike [Doc. 264], to which Per–Se Technologies, Inc. replied on April 10, 2006 [Doc. 277].

At the outset, this Court notes that the Plaintiff has failed to properly brief his allegation as he failed to cite to any legal authority within his argument and failed to properly cite to the record in support of his factual assertions. This Court will not cull through the materials submitted by the Plaintiff searching for evidence which creates a disputed issue. That is the obligation of Plaintiff's counsel. *See United States v. Adkinson,* 135 F.3d 1363, 1378–80 (11th Cir.1998); *Johnson v. City of Ft. Lauderdale,* 126 F.3d 1372, 1373 (11th Cir.1997); *Dickson v. Amoco Perform-*

*The Issues*

*Part Two*

I. Whether the Plaintiff can make out a *prima facie* case of retaliation against Per–Se under Title VII.

II. Whether Per–Se has articulated legitimate, nondiscriminatory reasons (LNDR) in support of its employment actions.

III. Whether the Plaintiff has proved or created a disputed material issue of fact as to whether Per–Se's legitimate, non-discriminatory reasons were pretexts for retaliation.

IV. Whether the Plaintiff can make out a *prima facie* case of retaliatory constructive discharge against Per–Se in violation of Title VII.

V. Whether the Plaintiff has failed to exhaust his administrative remedies with regard to his Sarbanes–Oxley Act claims against Pead and Dagher.

VI. Whether the Plaintiff can make out a *prima facie* case of retaliation against Per–Se in violation of the Sarbanes–Oxley Act.

VII. Whether the Plaintiff can make out a *prima facie* case of intentional infliction of emotional distress against the defendants under Georgia law.

*The Facts*

*Part Three*

In support of their respective positions, the parties have submitted, *inter alia*, their Statements of Disputed and Undisputed facts as required by Local Rule 56.1(B), N.D.Ga., from which properly supported material facts of this matter are culled. The defendants have filed Statements of Material Undisputed Facts [Docs. 227, 229, 230, 231] in support of their Motions for Summary Judgment, and the Plaintiff has filed his Responses to their

---

*ance Products, Inc.*, 845 F.Supp. 1565, 1570 (N.D.Ga.1994) ("It should be the party's responsibility to direct the court's attention separately to each portion of the record which supports each of the party's distinct arguments."). In addition, this Court notes that it is not sufficient for the Plaintiff to simply refer to a multi-page affidavit as a citation. In his Cross–Motion for Summary Judgment, the Plaintiff does not provide the proper paragraph numbers from his affidavit to support his contentions. Therefore, this Court will only consider the information that is properly supported by evidence, both factual and legal.

This Court need not decide whether it should consider the Plaintiff's Cross–Motion for Summary Judgment for failure to comply with this District's Local Rules for filing Motions for Summary Judgment because the Plaintiff filed his Cross–Motion eighteen days after the deadline to file such dispositive motions had passed without Plaintiff moving this Court for an extension of time; and, is therefore, untimely (i.e., he filed his Cross–Motion on February 24, 2006 after the deadline of February 6, 2006). This Court finds the Plaintiff's arguments that he was not required to file his Cross–Motion for Summary Judgment until such time as the defendants filed their Motions for Summary Judgment uncompelling. The deadline of February 6, 2006 applied to all dispositive motions [Doc. 201]. Accordingly, Per–Se Technologies, Inc.'s Motion to Strike [Doc. 259–1] is hereby **GRANTED**; and the Plaintiff's Cross–Motion for Summary Judgment and supporting documents (i.e., affidavit and Statement of Material Facts) are hereby ordered **DISMISSED** as untimely; and, thus, will not be further considered by this Court. *See Mosley v. MeriStar Management Co., LLC*, 137 Fed.Appx. 248, 250 (11th Cir.2005) (finding that the district court did not abuse its discretion in striking plaintiff's opposition and accompanying affidavits where such opposition was 4 days late and plaintiff's cross-motion for summary judgment was 18 days late and plaintiff neither asked for an extension of time, nor explained why her opposition was tardy).

Statements of Material Facts as to Which There are No Genuine Issues to be Tried [Doc. 257]. The Plaintiff has also filed a Statement of Material Facts in support of the denial of defendants' Motions for Summary Judgment [Doc. 256], and the defendants have filed their Response to the Plaintiff's Statement of Material Facts [Doc. 275]. In addition, the Plaintiff filed his Statement of Material Facts as to Which There Exists No Genuine Issue to be Tried [Doc. 210] in support of his Motion for Partial Summary Judgment, and the defendants have filed their Response to Plaintiff's Statement of Material Undisputed Facts [Doc. 263].

In SubPart I, this Court sets out the Undisputed Facts as drawn from the defendants' Statements of Material Facts as to Which There are No Genuine Issues to be Tried to the extent that the Plaintiff has not properly disputed these facts. To the extent that they are not duplicative or disputed by the defendants, in SubPart II, this Court sets out the Plaintiff's Facts as Drawn from his Statements of Material Facts. This Court must deem admitted those facts in the party's statement that are uncontroverted by the opposition. LR 56.1 B(2) NDGa. In SubPart III, this Court sets out the Disputed Facts. To the extent possible, except for clarity, this Court will use the parties' own wording.

I. *The Undisputed Facts*

1. Per-Se is engaged generally in the business of providing medical billing and collection services technology to hospitals, physician groups, and individual physicians. (Second Amended Complaint (hereafter "S.A. Compl."), [Doc. 43, ¶ 12] ).

2. During the Plaintiff's active employment with Per-Se, Per-Se operated primarily through three subsidiaries, often referred to as "divisions," to wit: (1) eHealth Solutions Division; (2) Physician Services Division; and (3) Application Software Division. (Swaine Decl., [Doc. 228, ¶ 4] ). The eHealth Solutions Division was in fact the corporate subsidiary known as Per-Se Transaction Services, Inc. (hereafter "PSTS"). (*Id.*) [14]

3. At the time of his resignation with Per-Se, the Plaintiff was the Director of Human Resources (hereafter "HR") for the eHealth Division. (*Id.*) At that time, eHealth Division was based in Atlanta and had field offices in several cities, including, *inter alia*, Cleveland, Ohio; Columbus, Ohio; Cincinnati, Ohio; Southfield, Michigan; Elgin, Illinois; Indianapolis, Indiana; and Lawrenceville, Georgia. (*Id.* at ¶ 5).[15]

4. Throughout the Plaintiff's employment, Per-Se maintained well-publicized policies prohibiting unlawful discrimination or harassment in its workplace. (*Id.* at ¶ 34, Ex. 9).

5. Throughout the Plaintiff's employment, Per-Se also maintained well-publicized standards of conduct that required, *inter alia*, compliance with all laws and regulations applicable to Per-Se's business. (*Id.*, Ex. 10).

6. Throughout the Plaintiff's employment, Per-Se further maintained well-pub-

---

**14.** Plaintiff disputes this Statement of Fact by improperly citing to his Complaint (i.e., the evidence ostensibly supporting his dispute), rather than to set out the evidence creating the dispute, in violation of LR 56.1(B)(1) and (B)(2), N.D.Ga., as it is not supported with a citation to evidence, but rather it is only sup- ported by a citation to a pleading (i.e., Plaintiff's Complaint). Thus, it is deemed admitted.

**15.** *Ibid.*

licized procedures establishing multiple forums through which its employees could report concerns about unlawful discrimination or harassment in its workplace, or about illegal or fraudulent conduct (including alleged financial improprieties). (*Id.*, Exs. 9, 10).

7. Throughout the Plaintiff's employment, Per–Se further maintained well-publicized policies prohibiting retaliation against persons who complained about or otherwise raised concerns about perceived unlawful discrimination or harassment in its workplace, or any illegal or fraudulent conduct (including alleged financial improprieties). (*Id.* at ¶ 34, Exs. 9, 10).

8. Defendant Philip Pead (hereafter "Pead") is the President and Chief Executive Officer ("CEO") of Per–Se Technologies, Inc.

9. Defendant William Dagher (hereafter "Dagher") was, at the time of Plaintiff's employment with Per–Se, the President of the eHealth Division.

10. Defendant Charles "Chip" Moore (hereafter "Moore") was, during 2000 until November 2004, a Senior vice-president ("VP") for Per–Se. (Moore Depo., [Doc. 214, pp. 7, 13] ). Initially, Moore was Sen-

ior VP for the eHealth Division and was also the General Manager ("GM") of Per–Se's Cleveland, Ohio office. (*Id.* at p. 13; Swaine Decl., [Doc. 228, ¶ 6] ). In this position, Moore reported directly to Dagher, the President of eHealth. (Moore Depo., [Doc. 214, p. 13]; Dagher Depo., [Doc. 216, p. 10] ).[16]

11. Because the Cleveland office (where Moore was GM) was part of the eHealth Division, the Plaintiff had general responsibility to provide HR support to that office. (Swaine Decl., [Doc. 228, ¶ 6] ).[17]

12. In or about July 2003, Moore was reassigned to a new Senior VP position with different responsibilities (i.e., product management) and was no longer the GM of the Cleveland office. (Swaine Depo., [Doc. 219, p. 175] ).[18]

13. The Plaintiff did not report directly to Moore, and Moore had no authority to take personnel actions (i.e., promotion, pay raises, termination, disciplinary actions) with respect to the Plaintiff. (Moore Depo., [Doc. 214, pp. 52, 65, 79–80, 121, 221]; Kellen Jameson Depo. (hereafter "Jameson Depo."), [Doc. 217, pp. 72, 90–91, 169–70] ).[19]

14. On or about February 13, 2001, the Plaintiff applied for employment with Per–

---

16. While the Plaintiff admits that Moore was a Senior VP for the eHealth Division of Per–Se, the Plaintiff improperly responds to the remaining allegations by stating that he is without sufficient knowledge to either admit or deny the remainder of this Statement of Fact. However, under LR 56.1 B(2)(a)(4), a "response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of Fed.R.Civ.P. 56(f)." Since the Plaintiff has failed to comply with Fed.R.Civ.P. 56(f), the remainder of this Statement of Fact is deemed admitted.

17. *See* FN 14.

18. The Plaintiff improperly responds to this Statement of Fact by stating that he is without sufficient knowledge to either admit or deny the allegations. However, under LR 56.1 B(2)(a)(4), a "response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of Fed.R.Civ.P. 56(f)." Since the Plaintiff has failed to comply with Fed.R.Civ.P. 56(f), this Statement of Fact is deemed admitted.

19. Plaintiff improperly disputes this Statement of Fact because the cited evidence does not, in fact, dispute the defendants' contentions. Thus, it is deemed admitted.

Se. (Karen Baker Decl. (hereafter "Baker Decl."), [Doc. 228, ¶ 3, Ex. 2] ). As required by Per–Se, the Plaintiff submitted both an employment application and a current Resume. (*Id.*)

15. Karen Baker (hereafter "Baker") was the Per–Se manager with authority to hire the Plaintiff. (Baker Decl., [Doc. 228, ¶ 3] ). Baker relied on the Plaintiff's application and Resume when deciding whether to hire him. (*Id.*)[20]

16. On his application for employment with Per–Se, the Plaintiff stated that during the period from May 1997 to January 1999, he was employed as a HR Manager by Nationwide Credit. (*Id.* at ¶ 4, Exs. 2,3; Pl. Depo., [Doc. 292, pp. 107–108, Ex. 2] ).

17. In addition, the Plaintiff also stated on his application for employment with Per–Se that his final salary with Nationwide was $36,000. (*Id.*)

18. Moreover, the Resume the Plaintiff submitted in connection with his application indicated that he was employed by Nationwide Credit in various capacities from May 1997 to January 1999. (*Id.* at ¶ 4, Ex. 3; Pl. Depo., [Doc. 292, p. 125] ).

19. According to representatives at Nationwide Credit, there is no record that the Plaintiff ever worked as an employee (or in any form as an independent contractor) for Nationwide Credit during the period claimed by the Plaintiff. (Matthew Myers Decl. (hereafter "Myers Decl."), [Doc. 228, ¶¶ 4–7] ).[21]

20. On his federal and state income tax returns in 1997–1999, the Plaintiff reported no income from Nationwide Credit. (Pl. Resp. to Per–Se's First Req. for Admissions, [Doc. 228, ¶¶ 4, 7, 11] ).

21. In his September 14, 2004 response to Per–Se's Interrogatory No. 11 (i.e., a request for a description of his work history), the Plaintiff did not list Nationwide Credit at all, but rather indicated that he worked for Sun Healthcare Group from August 1997 until February 1999. (Pl. Resp. to Per–Se's First Amend. Interrog. No. 11, [Doc. 228] ).[22]

22. On his federal and state income tax returns for 1997–1999, the Plaintiff reported no income from Sun Healthcare Group, any of its affiliates, or any similarly named entity. (Pl. Resp. to Per–Se's First Req. for Admissions, [Doc. 228, ¶¶ 4, 7, 11] ).[23]

23. The Plaintiff testified that he graduated from college in May 1997, moved to

---

**20.** Plaintiff improperly disputes this Statement of Fact by failing to cite to any evidence in support of his dispute. Thus, it is deemed admitted.

**21.** Plaintiff improperly disputes this Statement of Fact. First, as previously noted, this Court finds that it is not sufficient for the Plaintiff to just refer to a multi-page affidavit as a citation. Second, a review of the cited evidence in support of the Plaintiff's dispute reveals that Myers Declaration does not, in fact, support the Plaintiff's contentions. Thus, this Statement of Fact is deemed admitted.

**22.** While the Plaintiff admits this Statement of Fact, he did, as he notes in his Response to

defendants' undisputed facts [Doc. 257, p. 5], testify that he held many part time jobs while also attending college and could not recall all of the part-time jobs that he has worked, and therefore, only listed those jobs he could recall at the time and that were relevant to his work history. *See* (Pl.Depo., [Doc. 292, pp. 85–86, 109, 120–21] ).

**23.** The Plaintiff improperly disputes this Statement of Fact by failing to cite to evidence supporting his position in violation of LR 56.1(B)(2)(a)(2)(i), N.D.Ga. This Court is not required to scrutinize the Plaintiff's evidence to determine whether it actually disputes the defendants' facts. This Court's review of the cited evidence in support of the Plaintiff's dispute reveals that the Plaintiff ad-

Florida, and worked in Florida for Marketing by Innovation. (Pl.Depo., [Doc. 292, pp. 70–72] ).

24. Various policies in effect at Per–Se at the time it hired the Plaintiff made it clear that falsifying an employment application was a terminable offense. (Swaine Decl., [Doc. 228, ¶ 7, Ex. 1] ).

25. Per–Se's Corrective Action Policy states that "Falsifying, making misleading statements, or making a material omission on an employment application ..." is an infraction that may result in termination without warning. (*Id.*) Similarly, the Employee Conduct and Work Rules policy in the Per–Se Employee Handbook states that falsifying an employment application may result in immediate termination. (*Id.* at ¶ 7, Ex. 2).

26. Per–Se would have terminated the Plaintiff's employment if management had learned prior to his resignation that he had provided false information regarding his employment history on his employment application prior to his employment in March 2001. (*Id.* at ¶ 8; Baker Decl., [Doc. 228, ¶ 6] ).[24]

27. Per–Se hired the Plaintiff in March 2001 as the HR Manager for its eHealth Division. (Baker Decl., [Doc. 228, ¶ 3] ).

28. As the HR Manager, the Plaintiff was responsible for managing and offering advice about personnel-related aspects for eHealth Division's business, including, *inter alia*, hiring and dismissals, HR policy implementation and compliance, and related matters. (Swaine Decl., [Doc. 228, ¶ 7] ).[25]

29. Initially, the Plaintiff reported to Karen Baker, the eHealth Division Director of Finance. (Baker Decl., [Doc. 228, ¶ 5] ).

30. Baker reported directly to the President of eHealth, William Dagher. (*Id.*)

31. In October 2002, in connection with a change in the Director of Finance position, the Plaintiff began reporting to Kellen Jameson (hereafter "Jameson"), the new eHealth Director of Finance. (Jameson Depo., [Doc. 217, p. 131]; Baker Depo., [Doc. 215, p. 27] ). As of October 2002, the Plaintiff no longer reported to Baker. (Baker Depo., [Doc. 215, p. 102] ).

32. Instead of reporting to the eHealth President (i.e., defendant Dagher), Jameson reported directly to Chris Perkins (hereafter "Perkins"), the Per–Se Technologies Chief Financial Officer ("CFO"). (Jameson Depo., [Doc. 217, pp. 59, 97] ).[26]

33. In December 2001, the Plaintiff hired Tracy Fried (hereafter "Fried") to

mitted that he did, in fact, report income from Sun Healthcare, Inc. on his Georgia income tax return for the year 1999. *See* (Pl. Resp. to Per–Se's First Req. for Admissions, [Doc. 228, ¶ 11] ). The remainder of this Statement of Fact is deemed admitted.

**24.** The Plaintiff admits that he would have been terminated if he had provided false information on his employment application; however, he denies that he submitted false information on the employment application he submitted to Per–Se. (Pl.Depo., [Doc. 292, pp. 85–86, 109, 120–21] ).

**25.** While the Plaintiff admits that most of the contentions in this Statement of Fact are true, he adds that he was instructed by Karen Baker to be a "brick wall" when it came to assuring that managers were in compliance with Per–Se's policies and the law regarding personnel-related matters. *See* (Baker Depo., [Doc. 215, p. 64] ).

**26.** Plaintiff improperly disputes this Statement of Fact. Furthermore, while the Plaintiff cites to Baker and Dagher's depositions, the evidence ostensibly supporting his dispute, the cited evidence does not, in fact, support the Plaintiff's contentions in support of his

work as an HR Representative under his supervision in the corporate office in Atlanta. (Fried Depo., [Doc. 288, pp. 17–18]).[27]

34. During the Plaintiff's employment, the HR Director for the Physicians Services Division was Jennifer Bender (hereafter "Bender"). (Swaine Depo., [Doc. 219, p. 10]). The HR Director for the Applications Software Division was Liesl Rowe (hereafter "Rowe"). (*Id.*)

35. By the Spring of 2002, Baker, the Plaintiff's direct supervisor, observed that the Plaintiff seemed "very nervous with senior management" and had a difficult time verbally communicating his thoughts (including "cutting off his thought and jumping to the next thought" and using "incomplete sentences"). (Baker Depo., [Doc. 215, pp. 36–38]).[28]

36. By the Spring of 2002, the Plaintiff's next level supervisor, eHealth President Dagher, also observed that the Plaintiff (1) was unable to articulate clear and concise thoughts (including using incomplete and incoherent sentences); and (2) was a poor business advocate (i.e., he had difficulty applying HR policy in a business setting). (Dagher Depo., [Doc. 216, p. 108]).[29]

37. During the following six months (between the Spring and Fall of 2002), Baker perceived that the Plaintiff seemed unable to "handle all [of] the responsibilities" of his job. (Baker Depo., [Doc. 215, p. 36]) [30]

38. By the Fall of 2002, Baker further perceived that the Plaintiff seemed "incapable of fully handling the job." (*Id.*).

39. During the Fall of 2002, Dagher continued to receive complaints from several senior managers regarding the Plaintiff's lack of responsiveness regarding HR support. (Dagher Depo., [Doc. 216, pp. 39–40]).

40. During the period of 2001–2003, Moore traveled to Per–Se's Corporate Headquarters in Georgia about once or twice per month, and each visit typically lasted about one or one and a half days. (Moore Depo., [Doc. 214, p. 202]).[31]

41. Moore regularly attended division meetings at Per–Se's Georgia offices; and the Plaintiff was also in attendance thereat on about five to eight occasions during 2001–2003. (*Id.* at pp. 202–03).

42. Moore perceived that the Plaintiff had a tendency to "start and stop tasks," often failed to complete tasks, was incon-

---

dispute, or, in fact, dispute the defendants' contentions. Indeed, Karen Baker, the other Director of Finance and Accounting, simply testified that she reported to Dagher, not that the Director of Finance reported to Dagher. (Baker Depo., [Doc. 215, pp. 27–28]). Furthermore, a review of Dagher's testimony reveals that he, in fact, did not specifically refer to Jameson as a "manager that reports to me." (Dagher Depo., [Doc. 216, pp. 46–63]). Thus, *it is deemed admitted.*

27. Plaintiff improperly disputes this Statement of Fact. Furthermore, while the Plaintiff cites to his own deposition as well as Fried's and Baker's depositions, the evidence ostensibly supporting his dispute, the cited evidence does not, in fact, support the Plaintiff's con-

tentions in support of his dispute or, in fact, dispute the defendants' contentions. Thus, it is deemed admitted.

28. Plaintiff improperly disputes this Statement of Fact. Furthermore, while he cites to evidence ostensibly supporting his dispute, the cited evidence does not, in fact, dispute the defendants' contentions. Thus, it is deemed admitted.

29. *See* FN 28.

30. *Ibid.*

31. *See* FN 18.

sistent in his approach to resolving tasks, was inaccurate in his work, and consistently failed to give sufficient HR support to the Cleveland operation. (*Id.* at pp. 54, 56, 150).[32]

43. Moore also perceived that the Plaintiff made poor personnel-related decisions. (*Id.* at p. 68). For example, on one occasion, the Cleveland office had recently undergone a difficult Reduction in Force (hereafter "RIF") where several employees had been terminated. (*Id.*) Very soon after the RIF ended, the Plaintiff sent an e-mail to several employees requesting their job descriptions. (*Id.*) Given the uncertainty and stress already faced by his employees as a result of the RIF, Moore believed that the Plaintiff's e-mail consti-

tuted very bad timing and reflected the Plaintiff's inability to understand the psyche of Moore's personnel. (*Id.*)[33]

44. On one occasion in the Fall of 2002, the Plaintiff made a presentation during a management meeting regarding various employment statistics and personnel-related matters. (*Id.* at p. 66). Moore believed that the Plaintiff's presentation contained inaccurate information. (*Id.*) After the meeting, Moore approached the Plaintiff and stated, "If this is the kind of stuff you are going to produce and you're not going to take the time to make sure that it is accurate, this could affect your job." (*Id.*)[34]

45. Moore also believed that when the company made personnel-related decisions

**32.** While the Plaintiff admits that this was Moore's testimony, he denies the truthfulness of the allegations by mischaracterizing much of the testimony he cites as evidence in support of his contentions. In addition, some of the Plaintiff's "facts" in support of his contentions are actually legal conclusions. Pursuant to LR 56.1(B)(1)(c), N.D.Ga., this Court has omitted these "facts." *See also The Lovable Co. v. Honeywell, Inc.*, 431 F.2d 668, 674 (5th Cir.1970) (affidavit setting forth legal conclusions cannot be treated as factual support for party's position on pending motion). Furthermore, portions of the Plaintiff's response is based on mere speculation and conjecture. Thus, this Court will disregard those portions.

**33.** The Plaintiff admits that this was Moore's testimony, but states that the job questionnaires were sent out at that time to employees who had not completely filled them out before or had improperly filled them out. *See* (Pl. Aff., [Doc. 220, Att.22]). He further contends that Per–Se's EEO–1 reports were "an absolute mess" as employees were mis-categorized and tied to job titles which were "in no way related to what they actually did." For example, minorities were listed as a professional or manager when they were really clerks. (Fried Depo., [Doc. 288, pp. 168–70]). The Plaintiff began trying to correct the job titles in January 2002. On January 20, 2002, he sent an e-mail to all managers requesting a copy of every employee's application. On

April 11, 2002, he sent an e-mail to Moore, Dress, and Ray Delbrocco (hereafter "Delbrocco") regarding job classification concerns. On April 23, 2002, he directed Fried to send all managers a form to complete regarding job descriptions. On June 13, 2002, he sent another e-mail to Moore, Dress, and Delbrocco stressing the urgency of finalizing the placement of employees into correct classifications so that he could properly respond to requests for information in association with a complaint of discrimination filed with the Ohio Civil Rights Commission. Some of the questionnaires sent back were not completely filled out. Thereafter, the Plaintiff sent an e-mail to eHealth supervisors and managers advising them that those employees would be receiving another application. *See* (Pl.Aff., [Doc. 220, Atts.8, 11,12, 15, 22]).

**34.** Plaintiff improperly attempts to dispute this Statement of Fact by relying on mere speculation and conjecture. Furthermore, as the Plaintiff did not have access to Moore's thought processes, his testimony about why Moore was upset constitutes speculation. Moreover, the Plaintiff has provided absolutely no evidence to support his contentions in this regard, except his own self-serving, conclusory suspicions. The Eleventh Circuit has consistently held that a party's conclusory allegations, without more, are insufficient to enable the non-moving party to withstand

(i.e., hiring, firing, RIF's, promotions), it was important for the decision maker to first focus on the proper business decision, that is, to base personnel decisions principally on what was best for the company. (*Id.* at pp. 51–55, 110–11, 113–14). To Moore, if business was the focus, decisions would be impartial and legally proper without regard to an employee's race, gender, or other protected classification. (*Id.* at pp. 144–45). As an example, when deciding who to terminate among a group of employees being subjected to a RIF, Moore believed that their respective work performances should be the deciding factor irrespective of race, gender, or any other protected class. (*Id.*) [35]

46. Moore also believed that after the company determined the best course of action from a business perspective, the HR professional needed to review the proposed action to determine if the company was in compliance with laws, or whether its proposed actions might have adverse ramifications (i.e., if the decision might result in perceived unfairness, the HR professional needed to identify this concern and work with the operations managers to make the most of the appropriate decision). (*Id.* at pp. 52–55, 110–11, 113–14, 138). [36]

47. The Plaintiff, Moore believed, "always went directly to a protected class discussion" before thinking through the business decision. (*Id.* at p. 52). For example, rather than focus on an employee's work performance or conduct, the Plaintiff only cared about the employee's protected class instead of making an impartial decision based on neutral factors (i.e., work performance, conduct). In Moore's opinion, the Plaintiff wanted to let an employee's race, gender, or other classification drive the personnel decision. (*Id.* at pp. 144–45). [37]

48. During 2002, Moore complained to the Plaintiff's supervisor, Baker, about the Plaintiff's "work product" and his lack of "responsiveness." (Baker Depo., [Doc. 215, pp. 44–45]).

49. On several occasions during the Fall of 2002, Moore also complained to Dagher about the Plaintiff's work performance, noting that he had difficulty "communicating clear and concise thoughts," had difficulty applying "HR policy ... to the nuances that business managers experience in the real world," and lacked "business savvy." (Dagher Depo., [Doc. 216, pp. 40, 45]). [38]

50. By late 2002, eHealth President Dagher had received several complaints

---

summary judgment. *E.g. Holifield v. Reno,* 115 F.3d 1555 (11th Cir.1997); *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990) (conclusory, self-serving, or uncorroborated allegations in affidavit could not create issue of fact sufficient to defeat well supported summary judgment). Thus, this Statement of Fact is deemed admitted.

**35.** Plaintiff improperly disputes this Statement of Fact because the "facts" included therein by the Plaintiff are actually stated as an issue and legal conclusions. Therefore, pursuant to LR 56.1(B)(1)(c), NDGa, this Court will not consider Plaintiff's Response to this Statement of Fact. Furthermore, most of the Plaintiff's statements in support of his dispute actually mischaracterize the actual

deposition testimony he cites in his response. Thus, this Statement of Fact is deemed admitted.

**36.** *See* FN 35.

**37.** *See* FN 35.

**38.** While the Plaintiff admits that this was Dagher's testimony, he improperly attempts to dispute this Statement of Fact by relying on statements that are stated as an issue and legal conclusions. Furthermore, most of the Plaintiff's statements in support of his dispute actually mischaracterize the actual deposition testimony he cites in his response. Thus, this Statement of Fact is deemed admitted.

from senior managers that the Plaintiff was not being responsive to requests for HR support. (*Id.* at pp. 47–49).[39]

51. Dagher requested both the Plaintiff and Jameson (as Plaintiff's direct supervisor) to attend a meeting held in December 2002. (S.A. Compl., [Doc. 43, ¶ 66]; Jameson Depo., [Doc. 217, pp. 55, 65]). Moore also joined the conference via speaker phone from his office in Ohio. (*Id.* at ¶ 66; *Id.* at p. 65).[40]

52. Moore recalls that during the meeting, he told the Plaintiff that it would be "very difficult to work with him" unless he improved his ability to understand and support the business side of personnel-related decisions. (Moore Depo., [Doc. 214, p. 52]).[41]

53. At the end of this meeting, the Plaintiff agreed to work with the various business units and to provide better HR support. (*Id.* at p. 64).[42]

54. After the meeting, Jameson had a follow-up meeting with the Plaintiff. (Jameson Depo., [Doc. 217, p. 69]). Jameson counseled the Plaintiff on his deficiencies as highlighted during the meeting, encouraged him to improve, and helped him to develop a plan to be more responsive to senior management. (*Id.*)[43]

55. During the Plaintiff's employment with Per–Se, the eHealth Division operated a facility in Elgin, Illinois (i.e., the "Elgin Exchange"). (*Id.* at p. 73).

56. As the HR Director for eHealth, the Plaintiff was responsible for providing HR support to the Elgin Exchange. (Swaine Decl., [Doc. 228, ¶ 5]).

57. The Elgin Exchange was responsible for processing all company claims transactions. (Jameson Depo., [Doc. 217, pp. 73–74]). This function made Elgin a "critical piece" in Per–Se's business operations. (*Id.*)

58. The Elgin facility employed about fifty to fifty-five employees. (*Id.* at p. 80; Fried Depo., [Doc. 288, p. 41]).

59. The senior manager with overall responsibility for the Elgin Exchange was Senior VP John George (hereafter "George"). (*Id.* at p. 73). The second manager in charge of Elgin was VP Mubarak Chouhdry (hereafter "Chouhdry"). (*Id.*)

60. In late 2002 and early 2003, the eHealth Division was considering shutting down the Elgin Exchange and moving its operation to Lawrenceville, Georgia. (*Id.* at pp. 79–80).[44]

61. The Elgin project would be expensive, and would require approval from senior leadership at Per–Se. (*Id.* at pp. 79–81).[45]

---

**39.** *See* FN 18.

**40.** *See* FN 14. Furthermore, although the Plaintiff cites to his own deposition, the evidence ostensibly supporting his dispute, the cited testimony does not, in fact, dispute the defendants' contentions.

**41.** *See* FN 14.

**42.** *Ibid.*

**43.** *Ibid.*

**44.** Plaintiff improperly disputes this Statement of Fact. Furthermore, while the Plaintiff cites to Fried's deposition, the evidence ostensibly supporting his dispute, the cited evidence does not, in fact, dispute the defendants' contentions. Thus, it is deemed admitted.

**45.** *See* FN 18.

62. In early 2003, although the Elgin project had not yet been approved, the eHealth managers were planning and operating it as if it would be approved. (*Id.*)[46]

63. If the Elgin Exchange was closed, it would require a substantial reduction in force at the Elgin Exchange (i.e., most of the fifty-five plus employees would be terminated). (Fried Depo., [Doc. 288, p. 41]; Jameson Depo., [Doc. 217, p. 80] ).

64. As a result, in early 2003, the Elgin facility was experiencing "a lot of turmoil" and several HR-related issues needed to be addressed. (*Id.* at pp. 42–43; *Id.* at pp. 78–79).[47]

65. In late 2002 and early 2003, Tracy Fried, an HR assistant who reported to the Plaintiff, started providing regular HR support to Elgin managers as they dealt with the difficult issues associated with the possibility of closing the facility. (*Id.* at pp. 42–45; *Id.* at p. 76).[48]

66. By early 2003, senior managers in charge of the Elgin Exchange (i.e., George and Chouhdry) started to rely primarily on Fried for HR support to Elgin. (*Id.* at p. 42).

67. In addition, by early 2003, Fried was traveling to Elgin to provide HR support at least twice a month. (*Id.* at pp. 43–44).[49]

68. Although Fried became the primary provider of HR support for the Elgin Exchange, the Plaintiff was still her supervisor. (Jameson Depo., [Doc. 217, pp. 78–79] ).[50]

69. Senior managers in charge of the Elgin Exchange (i.e., George and Chouhdry) were dissatisfied with the Plaintiff's HR support, and believed he was an obstacle to the excellent support they were receiving from Fried. (*Id.* at pp. 76–77).[51]

70. By early 2003, George and Chouhdry were "bombarding" Jameson about a

46. *See* FN 44.

47. The Plaintiff admits that there were HR-related issues that would need to be addressed, but asserts that the turmoil the Elgin facility was experiencing was a result of a high turnover rate of the Vice Presidents in charge of managing the office. (Fried Depo., [Doc. 288, pp. 41–42] ). A review of the cited deposition testimony reveals that the turnover of Vice Presidents as well as rumors of the office closing at Elgin were both causes of the turmoil at Elgin. Thus, as the Plaintiff's assertions do not, in fact, dispute the defendants' Statement of Fact, this Statement of Fact is deemed admitted.

48. Plaintiff improperly disputes this Statement of Fact. Furthermore, while the Plaintiff cites to his own deposition testimony as well as Fried's deposition, the evidence ostensibly supporting his dispute, the cited evidence does not, in fact, dispute the defendants' contentions. Thus, it is deemed admitted.

49. The Plaintiff attempts to dispute this Statement of Fact by citing to Fried's deposition

testimony in which she testified that she only began traveling to the Elgin office a couple of times a month during the three to four-month period before she resigned her employment with Per–Se. (Fried Depo., [Doc. 288, pp. 21–22, 43] ). However, Fried's testimony does not, in fact, dispute defendants' Statement of Fact, but rather supports it as Fried went on approved FMLA leave in June 2003 and upon her return to Per–Se, resigned in July or August 2003. (*Id.* at pp. 17, 125–26, 129, 131). Therefore, Fried would have been traveling a couple of times a month during the three to four-month period prior to taking approved FMLA leave (i.e., early 2003).

50. *See* FN 48.

51. Plaintiff improperly disputes this Statement of Fact. Furthermore, while the Plaintiff cites to his own deposition, the evidence ostensibly supporting his dispute, the cited evidence does not, in fact, dispute the defendants' contentions. Thus, it is deemed admitted.

"crisis" at the Elgin Exchange because of "all kinds of personal issues." (*Id.* at pp. 73, 76–77).[52]

71. George and Chouhdry informed Jameson that the Plaintiff "was an obstacle to keeping that operation successful ... because [Fried] was making decisions and helping, but the decisions would get withdrawn by [the Plaintiff]." (*Id.* at pp. 76–77).[53]

72. George and Chouhdry also informed Jameson that when Fried spent some time in Elgin, "the temperature of the office just cooled down instantaneously." (*Id.* at pp. 77–78). However, they further informed Jameson that the Plaintiff continued to be an obstacle to Fried, precluding her from providing the support they needed. (*Id.* at p. 78).[54]

73. On January 27, 2003, George sent an e-mail to Jameson in which he (1) expressed his dissatisfaction with the Plaintiff's support of the Elgin Exchange; and (2) requested that Jameson allow Fried to provide direct support to Elgin. (Jameson Decl., Doc. 228, ¶ 4, Ex. 1). George stated to Jameson:

> I really need [Fried] to spend some time up at [Elgin] with [Choudhry]'s team. With everything about to happen in the way HR issues are handled up

there, she is a real asset to [Chouhdry]. I'm looking for a commitment from [the Plaintiff] on how much time per month she can spend there [but] I haven't gotten anything from him ... I'm actually tired of dealing with [the Plaintiff] on this and just need an answer.[55]

74. On January 29, 2003, Chouhdry sent an e-mail to Jameson noting that "HR issues [would] continue to be a challenge" as the Elgin project moved forward, and requested that Fried be permitted to provide direct HR support for the Elgin Exchange. (*Id.* at ¶ 5, Ex. 2).[56]

75. By March 2003, based on complaints he was receiving from the senior managers at Elgin and others, Jameson believed that the Plaintiff's responsiveness to senior management was seriously deficient. (Jameson Depo., [Doc. 217, pp. 78–79] ). Jameson perceived that the Plaintiff was increasingly non-responsive to management, was difficult to find, was often missing from the workplace, and was becoming an obstacle to HR support to Elgin. (*Id.* at pp. 76, 78–79). Meanwhile, Jameson also perceived that Fried was doing a "wonderful job" of "diffusing a time bomb" situation in Elgin. (*Id.* at p. 84).[57]

76. In early February 2003, an employee at the Elgin Exchange, Corine Morrow

---

52. *See* FN 18.

53. *Ibid.*

54. *Ibid.*

55. The Plaintiff admits that the e-mail was sent, but adds that there were also budgetary concerns regarding all of the travel time and hotel expense associated with Fried traveling more frequently to the Elgin facility. (Fried Depo., [Doc. 288, pp. 203–04] ). In addition, the Plaintiff contends that he required her assistance with responsibilities in the Atlanta office, responsibilities that George and

Chouhdry probably would not know about. (*Id.*)

56. A review of the cited evidence does, in fact, reveal, as the Plaintiff contends, that the e-mail does not indicate a request that Fried provide direct HR support, but merely indicates a need for her to visit the location on a regular basis. *See* (Jameson Decl., [Doc. 228, ¶ 5, Ex. 2] ).

57. *See* FN 48.

(hereafter "Morrow"), was terminated for poor performance. (Fried Depo., [Doc. 288, p. 81]). Following her termination, Morrow began sending harassing e-mails and making harassing phone calls to Elgin employees. (*Id.* at pp. 81–82, Exs. 2, 4).[58]

77. Morrow, *inter alia,* contacted employees and made defamatory allegations about her former supervisor; invited employees to hold a "roast" of her former supervisor; sent harassing greeting cards to her former supervisor; sent e-mail messages to employees falsely claiming their job positions were posted in another city (i.e., implying that these employees were being terminated); and contacted company clients to make derogatory comments about Per–Se. (*Id.*)[59]

78. Elgin management sensed that, in light of the tentative plan to close Elgin and the inevitable rumors moving through the workplace, the actions of Morrow were causing a potential for significant employee morale problems. (*Id.* at pp. 82–85, Exs. 2, 4). Elgin management, therefore, wanted immediate action to quell the situation. (*Id.*)[60]

79. On February 21, 2003, Fried (who was providing substantially all of the HR support to Elgin by this point) provided to the Plaintiff a proposed letter to be sent to Morrow. The letter would instruct Morrow not to contact Per–Se employees during business hours via company-owned media; inform Morrow that she was interfering with company operations and causing undue stress to employees; and warn Morrow that, if she continued, Per–Se may take legal action against her. (*Id.* at p. 82, Ex. 2).

80. Later that day on February 21, 2003, the Plaintiff sent an e-mail to Fried instructing her not to send the letter to Morrow because he was "concerned of several laws that may be at risk" by sending the letter. (*Id.*)

81. As of March 4, 2003, the Plaintiff still had not approved sending the above referenced letter to Morrow. (*Id.*) Also on March 4, 2003, Fried contacted George and informed him that the Plaintiff still had not approved the letter to Morrow. (*Id.*)

82. Later that day on March 4, 2003, George sent an e-mail to the Plaintiff's supervisor, Jameson, complaining about the Plaintiff's lack of responsiveness regarding the Morrow situation. (*Id.;* Jameson Decl., [Doc. 228, ¶ 6, Ex. 3]). George stated to Jameson:

> This is the type of issue with [the Plaintiff] that I have a problem with. He never follows thru [sic]. We are having a problem with [Morrow] contacting people in our office and possibly some clients. I wanted a letter to go to her. [Fried] created something but [the Plaintiff] put it on hold for review. He talks about it here [referencing the Plaintiff's earlier e-mail] but it's March 4th and I never got any information

---

**58.** A review of the cited evidence does, in fact, reveal, as the Plaintiff contends, that Fried testified that she did not fully recall the reasons for Morrow's termination, but thought it included insubordination as well as performance issues. *See* (Fried Depo., [Doc. 288, p. 81]). She further testified that she remembered Morrow calling other Per–Se employ-

ees, but did not characterize the calls as harassing. (*Id.*)

**59.** *See* FN 18.

**60.** *Ibid.*

from him or update as to where it is at.[61]

83. On March 5, 2003, Chouhdry sent an e-mail to the Plaintiff describing his dissatisfaction with his support to the El-gin Exchange, particularly with respect to the Morrow situation. (Jameson Decl., [Doc. 228, ¶ 7, Ex. 4] ). George then for-warded this e-mail to Jameson. (*Id.*) Chouhdry stated to the Plaintiff:

> What we need is to receive support from you and I feel you are not providing that support. I know that [Fried] has been very forthright in describing the issues and challenges relating to the Exchange to all [of] us. Since September, I have asked you on numerous occasions to visit the Exchange to evaluate the HR relat-ed issues. Several times you indicated that you would visit but you have not follow[ed] thru [sic]. I truly appreciate that [Fried] was able to spend time at the Exchange to evaluate and provide the needed assistance whenever possi-ble. We are all dealing with a complex process which requires assistance from the whole team.

84. On or about March 6, 2003, George and Chouhdry contacted the Plaintiff by telephone and insisted that he take some action with respect to the Morrow situa-tion. (Fried Depo., [Doc. 288, p. 84, Ex. 4] ).

85. Subsequently, on or about March 6, 2003, the Plaintiff contacted Morrow to address her conduct. (*Id.*) Fried wit-nessed the telephone call. (*Id.*)

86. On March 10, 2003, Chouhdry sent another e-mail to the Plaintiff's supervisor, Jameson, regarding his dissatisfaction with the Plaintiff's support to the Elgin Ex-change, particularly with respect to the Morrow situation. (Jameson Decl., [Doc. 228, ¶ 8, Ex. 5]; Fried Depo., [Doc. 288, pp. 86–87, Ex. 5] ). Chouhdry complained to Jameson that (1) the Plaintiff's poor performance with respect to the Elgin Ex-change was "getting out of control"; (2) he had made a "mistake" in not allowing Fried to send a letter to Morrow; (3) he had contacted Morrow by telephone con-trary to Chouhdry's specific request to have a written letter sent to Morrow; and (4) he was frustrating the process by pre-venting Fried from managing a situation she had more knowledge about. (*Id.*) Chouhdry also stated, "My suggestion is to take [the Plaintiff] off this case and let [Fried] work with compliance and legal if necessary. [Fried] has been to the Ex-change several times and understands the situation much better than any other HR person." (*Id.*)[62]

87. On Thursday, March 13, 2003, Jameson, George and Chouhdry had an early-morning conference call with Chris Perkins, the CFO of Per–Se Technologies, Inc. (Jameson Depo., [Doc. 217, p. 80] ). During this conference, Perkins gave final approval of the budget for the Elgin pro-ject. (*Id.*)

88. Having received final budget ap-proval, eHealth would be under significant pressure to implement plans for, *inter alia,* a major RIF at the Elgin facility. (*Id.* at pp. 82–83). Jameson understood that this action would require substantial

**61.** The Plaintiff admits that the e-mail was sent, but improperly attempts to dispute the allegations contained therein. However, while the Plaintiff cites to his own deposition testimony, the evidence ostensibly supporting his dispute, the cited evidence does not, in fact, dispute the defendants' contentions. Thus, this Statement of Fact is deemed admit-ted.

**62.** *See* FN 61.

HR support over the coming months. (*Id.*)[63]

89. Following the conference with Perkins, George and Chouhdry immediately approached Jameson and asked for his commitment to assign Fried to provide direct HR support for the Elgin project. (*Id.* at pp. 83–84). George and Chouhdry demanded that Fried be assigned directly to them and that she not be required to report to or through the Plaintiff. (*Id.*)[64]

90. Faced with these demands by two of eHealth's senior managers, and considering the importance, expense, and extraordinary urgency of the Elgin project, Jameson determined that Fried needed to be fully committed to assisting George and Chouhdry for the duration of the Elgin project. (*Id.* at pp. 84, 87–88).[65]

91. Jameson therefore made the decision that Fried would be assigned to provide direct HR support to Elgin for the duration of the Elgin project and that she

would report directly to Jameson in lieu of the Plaintiff. (*Id.* at p. 84).[66]

92. Jameson made the decision to revise Fried's reporting arrangement on his own, without consulting eHealth President, Dagher. (*Id.* at pp. 84, 94, 97, 169–70).[67]

93. Immediately following his telephone conference with Perkins and his subsequent meeting with George and Chouhdry, Jameson met with Fried and asked if she believed she could handle HR support for the Elgin project on her own. (*Id.* at p. 88). Fried assured Jameson that she was capable of doing so. (*Id.*)

94. Immediately following his meeting with Fried, Jameson met with the Plaintiff in a conference room. (*Id.*; Pl. Depo., [Doc. 293, p. 579]).

95. The Plaintiff admits that he was not sure whether this temporary reporting arrangement was going to be "a long-term thing or if that was a temporary thing." (Pl.Depo., [Doc. 293, p. 458]).

---

**63.** Plaintiff improperly disputes this Statement of Fact. Furthermore, while the Plaintiff cites to Fried's deposition testimony, the evidence ostensibly supporting his dispute, the cited evidence does not, in fact, dispute the defendants' contentions. Thus, it is deemed admitted.

**64.** *See* FN 63. Furthermore, the Plaintiff has provided absolutely no evidence to support his contentions, except his own self-serving, conclusory suspicions. The Eleventh Circuit has consistently held that a party's conclusory allegations, without more, are insufficient to enable the non-moving party to withstand summary judgment. *See Holifield*, 115 F.3d at 1555.

**65.** *Ibid.*

**66.** Although the defendants contend that this reassignment was temporary, they failed to cite to evidence in support of this contention.

**67.** *See* FN 66. In addition, although the Plaintiff attempts to dispute this Statement of

Fact by stating that Jameson advised him that Dagher knew about the change, the remark is inadmissible hearsay. The general rule is that inadmissible hearsay "cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir.1999) (internal quotation and citation omitted). Indeed, Fed.R.Civ.P. 56(e) requires that "affidavits" that support or oppose summary judgment motions "shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence." This rule applies with equal force to deposition testimony. *Macuba*, 193 F.3d at 1323. Furthermore, the cited evidence does not, in fact, dispute the defendants' contention. Indeed, even considering the Plaintiff's response, the mere fact that Dagher knew of Fried's reassignment does not create a disputed issue of fact as to whether Jameson alone made the decision to reassign her. Thus, this Statement of Fact is deemed admitted.

96. The arrangement regarding Fried had no impact on the Plaintiff's job title or his compensation and benefits. (Pl.Depo., [Doc. 228, pp. 446–47] ).[68]

97. The Plaintiff's job title never changed between the date of his promotion to HR Director in March 2002 and his resignation in July 2003. (*Id.* at p. 446; Dagher Depo., [Doc. 216, pp. 67, 75] ).[69]

98. The Plaintiff's rate of pay was never diminished at Per–Se between the date of his initial promotion to HR Director in March 2002 until his resignation in July 2003. (*Id.* at p. 447).[70]

99. On March 14, 2003, the Plaintiff met with eHealth President Dagher. (Pl. Depo., [Doc. 292, p. 60; Doc. 293, pp. 553–55] ). The Plaintiff complained about Jameson's decision to have Fried report directly to Jameson for the duration of the Elgin project. (*Id.* at pp. 553–55).[71]

100. The Plaintiff left the workplace after his meeting with Dagher and never returned to work another day at Per–Se. (*Id.* at [Doc. 292, pp. 60–61, 175; Doc. 293, p. 374] ).[72]

101. As of Sunday, March 16, 2003, the Plaintiff "thought that [he] was going to be out for a little while." (*Id.* at [Doc. 292, p. 173] ).

102. At the time, the Plaintiff felt that he would "be away for a while but not for an extended period." (*Id.* at pp. 176–77).

103. Later that night on March 16, 2003, the Plaintiff returned to his office at Per–Se in order to collect "some things [he] would need while [he] was out" including some things "[he] was working on." (*Id.* at p. 173).

104. When the Plaintiff returned to his office that Sunday night, his intent was to retrieve "whatever I was working on and my ... personal stuff, [such as] my checkbook and ... a couple of things I was working on [such as] some recruiting stuff and ... some of that kind of stuff that I thought I might need while I was out." (*Id.* at pp. 175–76).

105. After his meeting with Dagher on March 14, 2003, and his brief return on Sunday night, March 16, 2003, to retrieve some personal items and materials for current work projects, the Plaintiff never returned to the workplace at Per–Se. (*Id.* at p. 374).[73]

106. The Plaintiff did not, however, intend to resign from Per–Se as of his last

---

68. *See* FN 66.

69. *See* FN 14. Furthermore, the Plaintiff improperly attempts to dispute this Statement of Fact by relying on statements that are stated as an issue and legal conclusion.

70. *Ibid.* Furthermore, although the Plaintiff cites to his own deposition testimony, the evidence ostensibly supporting his dispute, the cited evidence does not, in fact, dispute the defendants' contentions. Thus, it is deemed admitted.

71. Although the Plaintiff cites to his own deposition testimony, the evidence ostensibly supporting his dispute, the cited evidence

does not, in fact, dispute the defendants' contentions, but merely adds to them. Thus, it is deemed admitted.

72. While the Plaintiff admits that he never returned to work at Per–Se, he contends that he continued to work from his home while on approved medical leave. (Pl.Depo., [Doc. 292, p. 60] ).

73. As the Plaintiff points out, he did return to Per–Se for a meeting on June 27, 2003 regarding his plan to return to work, but he did not actually return to work. (Pl.Depo., [Doc. 293, p. 640] ).

day at work on March 14, 2003 as he stated, "March 14th had no significance to me other than I was out on I was out on a medical leave. I mean, so I was still employed there." (*Id.* at p. 60).

107. The Plaintiff was out sick during the period of March 17 to March 26, 2003. (Swaine Decl., [Doc. 228, ¶ 11] ).

108. On March 26, 2003, the Plaintiff requested permission to take leave under the Family Medical Leave Act (hereafter "FMLA"). (Swaine Decl., [Doc. 228, ¶ 12, Ex. 3] ). The Plaintiff said he understood that in order to qualify for FMLA leave, he would be "required to complete a Certification of Health Care Provider form and submit it to the HR department." (*Id.*)

109. After completing the required paperwork, the Plaintiff was approved for FMLA leave effective March 26, 2003 with an expected date of return on April 29, 2003. (*Id.*)

110. On April 14, 2003, Swaine sent a letter to the Plaintiff noting that (1) his request for FMLA leave was approved beginning on March 26, 2003 with an expected return date of April 29, 2003; (2) pursuant to Per–Se's company policy, the Plaintiff was required to use all vacation and sick benefits concurrently with his FMLA leave, and after such benefits were exhausted, any remaining leave would be unpaid; and (3) pursuant to Per–Se's company policy, the Plaintiff was also required to present a fitness-for-duty certificate prior to his return to work. (*Id.*)[74]

111. On April 24, 2003, after the Plaintiff had been on FMLA leave for more than five weeks, Swaine sent him a letter stating, "We look forward to your return next week on Tuesday [April 29, 2003]." (Swaine Depo., [Doc. 219, p. 137, Ex. 6] ). Swaine also noted, "We will need to discuss several matters as you resume your work," and suggested a one to two hour meeting with Jameson and Dagher in order to "plan your priorities and bring you up to speed on relevant matters." (*Id.*)

112. On April 28, 2003, the Plaintiff sent a letter to Swaine stating, "I was pleased to receive your letter of April 24, 2003 indicating that you, [Jameson], and [Dagher] are planning for my return. Regrettably, my physician has indicated that I should not return to work until May 4." (*Id.* at pp. 137–38, Ex. 6).

113. On May 5, 2003, the Plaintiff sent another letter to Swaine stating that his health had not improved, and that his physician had suggested that he continue on his leave of absence. (*Id.*)

114. On May 8, 2003, the Plaintiff sent a letter to Swaine stating that despite his doctor's suggestion, "I look forward to returning to work as soon as possible." (*Id.*) He also asked Swaine to "provide [him] with an assurance in writing that [he] will fulfill [his] legal obligation to provide both a safe place and a safe system of work."[75]

115. On May 14, 2003, Swaine responded to the Plaintiff's May 8 letter. (*Id.*) In

---

**74.** While the Plaintiff denies receiving this letter, his citation in support of his denial does not, in fact, support his contention that he did not receive this letter. Thus, it is deemed admitted.

**75.** A review of the actual letter sent to Swaine reveals that, as the Plaintiff contends, the defendants have mischaracterized the contents of the letter. Indeed, the letter indicates

that the Plaintiff's physician advised him that he should not return to work until his health improves. It further states as follows:

Ongoing unacceptable harassment, aggressive and dysfunctional behavior by Per–Se and its senior members of management caused the injury to health, which has caused me to take a leave of absence.

this letter, Swaine acknowledged that the Plaintiff could not return to work at the time, and assured him that the company would "uphold all its legal obligations with respect to [the Plaintiff's] leave and return to work." (*Id.*) Finally, Swaine asked the Plaintiff to contact him as soon as his "condition improve[d], so that [Per–Se could] plan [his] return." (*Id.*) [76]

116. The Plaintiff continued to work on current Per–Se job responsibilities while he was on FMLA leave. (Pl.Depo., [Doc. 292, p. 61]).

117. After March 14, 2003, and while he was out on FMLA leave through early July 2003, the Plaintiff continually "intend[ed] to come back to the company." (*Id.*)

118. Until his resignation in July, the Plaintiff still "wanted to go back" to Per–Se ("I really did"), and he "still had plans to return." (*Id.* at p. 62, [Doc. 293, p. 636]; Swaine Depo., [Doc. 219, p. 102]).

119. On June 18, 2003, the Plaintiff exhausted his twelve-week FMLA leave. (Swaine Decl., [Doc. 228, ¶ 13]). At that

time, Swaine had not heard from the Plaintiff in several weeks. (*Id.*) [77]

120. On June 20, 2003, Swaine sent a letter to the Plaintiff stating that he had exhausted his FMLA leave as of June 18, 2003, and that he needed to contact Swaine to coordinate his return to work. (*Id.* at ¶ 13, Ex. 4). Swaine also noted that the Plaintiff was eligible, under company policy, to apply for an additional period of "Personal Leave of Absence" for a maximum of thirty (30) days. (*Id.*)

121. On June 24 or 25, 2003, the Plaintiff telephonically contacted Swaine and advised him that he would not need to apply for additional personal leave, and that he planned to return to work on June 27, 2003. (*Id.* at ¶ 14).

122. During this telephone conversation, Swaine assured the Plaintiff that he would be welcomed back to Per–Se. (*Id.*) Swaine further explained that appropriate arrangements would need to be made for his return, and that he would need to meet with Swaine and Jameson in order to coordinate his return. (*Id.*) [78]

123. In addition, during this conversation, Swaine and the Plaintiff agreed that

---

I look forward to returning to work as soon as possible and to that end I ask you to provide me with an assurance in writing that you will fulfill your legal obligation to provide [sic] both a safe place and a safe system of work.

*See* (Swaine Depo., [Doc. 219, pp. 137–38, Ex. 6 (Doc. # PS–001137)]).

**76.** As the Plaintiff points out, the letter also advised that Per–Se "doesn't agree with [the Plaintiff's] contentions." (Swaine Depo., [Doc. 219, pp. 137–38, Ex. 6 (Doc. # PS–001139)]).

**77.** Plaintiff improperly disputes this Statement of Fact. Furthermore, while the Plaintiff cites to Swaine's deposition exhibit, the evidence ostensibly supporting his dispute, the cited evidence does not, in fact, dispute the defendants' contentions. Thus, it is deemed admitted.

**78.** Plaintiff improperly attempts to dispute this Statement of Fact by relying on mere speculation and conjecture. Furthermore, as the Plaintiff did not have access to Per–Se's thought processes, his conclusion about why old e-mails were gathered and forwarded to Swaine constitutes speculation. Moreover, the Plaintiff has provided absolutely no evidence to support his contentions in this regard, except his own self-serving, conclusory suspicions. As previously noted, the Eleventh Circuit has consistently held that a party's conclusory allegations, without more, are insufficient to enable the non-moving party to withstand summary judgment. *Holifield,* 115 F.3d at 1555. Thus, this Statement of Fact is deemed admitted.

he would report on Friday, June 27, 2003, for a meeting to plan his return to work at Per–Se. (*Id.*) [79]

124. Furthermore, Swaine and the Plaintiff agreed that the Plaintiff would resume his full-time duties as eHealth's HR Director during the following week. (*Id.*) [80]

125. Swaine also reminded the Plaintiff that he would need to bring a medical release from his physician and a request for personal leave to cover his absence between June 18 (i.e., the end of his FMLA leave) and his return. (*Id.*)

126. Prior to the Plaintiff's return to work on June 27, 2003, Moore had been reassigned to a different Senior VP position with new job duties in product management. (*Id.* at ¶ 18). As a result of this reassignment, Moore would no longer be the GM of the Cleveland, Ohio office. (*Id.*; Swaine Depo., [Doc. 219, p. 175] ).[81]

127. In March 2003, Medaxxis, a business unit in the eHealth Division, was transferred from eHealth to Physicians Services, a different Per–Se division. (Bender Depo., [Doc. 228, pp. 117–20, Ex. 13] ).[82]

128. The Medaxxis transfer was based on the fact that the business model of

Medaxxis (i.e., sale of software packages to small physician practices) was "better aligned" with the business model of the Physician Services Division. (*Id.* at p. 120).[83]

129. As a result of this transfer, Medaxxis management would then be supported by the Physician Services Division's HR Department. (*Id.* at p. 120, Ex. 13).[84]

130. On March 19, 2003, the Senior VP of Medaxxis sent an e-mail to the unit's senior managers in which he thanked the Plaintiff for his support and welcomed the Physician Services HR staff (i.e., Rhian and Jennifer) to the Medaxxis team. (*Id.*)

131. On June 30, 2003, the President and CEO of Per–Se, Philip Pead, announced that effective that day, Per–Se HR Directors would report directly to Division Presidents. (*Id.* at p. 39, Ex. 2). Accordingly, as of June 30, 2003, the Plaintiff would report directly to eHealth President Dagher. (*Id.*; Rowe Depo., [Doc. 214, pp. 165–66, Ex. 20]; Swaine Depo., [Doc. 219, p. 159] ).

132. On June 27, 2003, the Plaintiff was scheduled for a meeting with Swaine, Dagher, and Jameson in order to plan for the Plaintiff's transition back into the

---

**79.** The Plaintiff attempts to deny this Statement of Fact by relying on Attachment 60 to his affidavit (which is almost wholly illegible) [Doc. 220]. However, this Court has no idea what Attachment 60 is or where it came from as it has not been authenticated pursuant to Fed.R.Civ.P. 56(e), requiring that such document be attached to an affidavit of a person through whom the exhibit could be admitted into evidence. As the Plaintiff has failed to testify as to what this document is and where it came from, this Court cannot decipher whether it, in fact, supports his contention. Therefore, this Statement of Fact is deemed admitted.

**80.** Plaintiff improperly disputes this Statement of Fact by failing to state his dispute or

cite to any evidence in support of his dispute in violation of LR 56.1(B)(2)(a)(2)(i), N.D.Ga. This Court is not required to scrutinize the Plaintiff's evidence to determine whether it actually disputes the defendants' facts. Consequently, this fact is deemed true.

**81.** *See* FN 18.

**82.** *Ibid.*

**83.** *Ibid.*

**84.** *Ibid.*

workplace after his three-month leave of absence. (Swaine Depo., [Doc. 219, p. 142]; Swaine Decl., [Doc. 228, ¶¶ 14–15]; Pl. Depo., [Doc. 293, pp. 637–39] ).[85]

133. Upon his arrival at Per–Se on June 27, 2003, the Plaintiff was not asked to proceed directly to work at his desk as he might have done before his three-month absence. (Swaine Depo., [Doc. 219, p. 142] ). Instead, the Plaintiff waited in the lobby for a few minutes until Swaine came to walk him to a conference room for the scheduled meeting. (Id.; Pl. Depo., [Doc. 293, pp. 641, 646] ). Dagher and Jameson joined the meeting soon thereafter. (Pl. Depo., [Doc. 293, p. 649] ).

134. Swaine's intent for this meeting was to focus primarily on two topics, to wit: (1) the reassignment of duties and responsibilities to the Plaintiff that had been handled by other HR personnel during his three-month absence; and (2) the steps Per–Se would take to guard against any potential retaliation upon the Plaintiff's return to work. (Swaine Decl., [Doc. 228, ¶ 16]; Pl. Depo., [Doc. 293, p. 655] ).[86]

135. During this meeting, the Plaintiff expressed that he was ready to work and "wanted to return" to work the following business day. (Pl.Depo., [Doc, 292, p. 68] ).[87]

136. Swaine also asked the Plaintiff to prepare a list of communications he had received during his leave of absence. (Swaine Depo., [Doc. 219, p. 144] ).

137. Swaine further asked the Plaintiff to prepare and furnish a list of all projects

he had been working on prior to his extended leave of absence. (Swaine Decl., [Doc. 228, ¶ 16]; Pl. Depo., [Doc. 293, p. 652] ).

138. Swaine further advised the Plaintiff about some procedural and personnel changes that had occurred during his absence that would potentially have an impact on his duties upon his return to work. (Id. at ¶¶ 17–18; Id. at p. 658).

139. Swaine further informed him that Moore had recently been reassigned to a different Senior VP position with new job duties in product management, and that he would no longer be the GM of the Cleveland, Ohio office. (Id. at ¶ 18).

140. During this meeting, Dagher advised the Plaintiff that certain performance deficiencies observed before his leave of absence would also need to be addressed upon his return to work. (Pl. Depo., [Doc. 293, pp. 654–55]; Dagher Depo., [Doc. 216, pp. 106–07, 122] ). In response, the Plaintiff denied that any performance issues had ever been brought to his attention. (Id. at p. 654; Id. at pp. 107, 122; Swaine Depo., [Doc. 219, p. 145] ).

141. Swaine also explained that in order to have time to communicate the Plaintiff's return to Per–Se's employees and to plan for his transition back into the HR Director position after his three-month absence, he would need one more business day before the Plaintiff could begin working full-time again. (Swaine Depo., [Doc. 219, p. 147]; Swaine Decl., [Doc. 228,

---

85. *See* FN 79.

86. Plaintiff improperly disputes this Statement of Fact. Furthermore, while the Plaintiff cites to his own deposition and affidavit testimony, the evidence ostensibly supporting his

dispute, the cited evidence does not, in fact, dispute the defendants' contentions. Thus, it is deemed admitted.

87. *Ibid.*

¶¶ 19–21]; Pl. Depo., [Doc. 293, pp. 650–51] ).[88]

142. Accordingly, the group agreed that the Plaintiff's official return-to-work date would be Tuesday, July 1, 2003. (Swaine Decl., [Doc. 228, ¶ 21]; Pl. Depo., [Doc. 228, p. 68] ).

143. Swaine informed the Plaintiff that if, upon his return, he had any concerns about the way he was being treated, he should not hesitate to contact Swaine or, if appropriate, another HR Director. (*Id.;* Pl. Depo., [Doc. 293, p. 653] ).[89]

144. At the end of this meeting, Swaine again asked the Plaintiff to obtain and furnish the required medical release permitting him to return to work. (Swaine Depo., [Doc. 219, p. 143]; Pl. Depo., [Doc. 293, pp. 656, 658] ).

145. Pursuant to Per–Se's company policy, an employee must present a medical release prior to returning to work following an extended leave of absence pursuant to FMLA leave. (*Id.* at p. 143; Rowe Depo., [Doc. 214, p. 63] ).

146. The Plaintiff promised to provide Swaine a medical release by facsimile later that day. (Swaine Decl., [Doc. 228, ¶ 22]; Pl. Depo., [Doc. 293, pp. 658–59] ).

147. The June 27, 2003 meeting lasted approximately thirty minutes. (*Id.* at ¶ 23).

148. On June 30, 2003, Swaine sent an e-mail to the Per–Se employees with whom the Plaintiff routinely worked with regarding his return to work on Tuesday, July 1, 2003. (Swaine Depo., [Doc. 219, p. 99, Ex. 5] ). The message stated in pertinent part:

> You may be aware that Terry Bozeman has been away from the company on leave and that Terry has complained about certain employment and other practices at the company. Terry is scheduled to return to the company tomorrow, and the company will be welcoming him back. We will be working to address the concerns raised by Terry.
>
> In the meantime, we know that you appreciate the sensitive nature of this and other personnel issues, and that you will act professionally and not discussing or "gossiping about" Terry's situation. In addition, and very importantly, please understand that Terry is not to be treated any differently whatsoever based upon the fact of his leave or the fact that he has raised concerns as described above.[90]

149. Swaine also personally met with the HR Department employees and informed them that the Plaintiff was returning from his leave of absence, and that there was to be no retaliation against him. (Swaine Decl., [Doc. 228, ¶ 24]; Bender Depo., [Doc. 228, p. 128] ).[91]

150. After the June 27, 2003 meeting, the Plaintiff "hoped to" and "wanted to go back" to work at Per–Se. (Pl.Depo., [Doc. 292, pp. 62, 68] ).

---

**88.** *See* FN 86.

**89.** While the Plaintiff attempts to dispute this Statement of Fact, his contention does not, in fact, dispute this Statement. Thus, it is deemed admitted.

**90.** While the Plaintiff's objection is well-taken that the redacted e-mail does not reflect who, if anyone, this e-mail was sent to, this Court, on February 21, 2006, reviewed the unredacted versions of the e-mail, which does reflect that this e-mail was sent to Per–Se employees as stated in this Statement of Fact. Thus, it is deemed admitted.

**91.** *See* FN 18.

151. When the meeting ended, the Plaintiff was "ready to come back to work provided [he] could get comfortable with the situation." (*Id.* at p. 65).[92]

152. Over the next several days, the Plaintiff "still had plans to return . . . right down to the [day I was to return]." (*Id.* at p. 62).

153. On Monday afternoon, June 30, 2003, the Plaintiff sent an e-mail to Swaine regarding some administrative matters relating to his return to work scheduled for the following day. (Swaine Decl., [Doc. 228, ¶ 25, Ex. 6] ). At the end of the e-mail, the Plaintiff emphasized, "I look forward to seeing you upon my return tomorrow." (*Id.*)[93]

154. Despite his e-mail to Swaine, the next morning on Tuesday, July 1, 2003, while the Plaintiff was driving to work, he changed his mind, and decided he would not return to work on that day. (Pl. Depo., [Doc. 292, p. 69; Doc. 293, p. 426] ).[94]

155. However, even on the afternoon of July 1, 2003, the Plaintiff was still debating whether he should return to work. The Plaintiff telephoned Swaine to say he was "not sure" if he would return to work, and that he would contact Swaine later that

day or the next day. (Swaine Decl., [Doc. 228, ¶ 26] ).[95]

156. The Plaintiff did not contact Swaine again on either July 1 or July 2, 2003. (*Id.* at ¶ 27).[96]

157. On July 3, 2003, Swaine telephoned the Plaintiff at his home and left a voicemail message in which he (1) stated that he hoped the Plaintiff was feeling better; (2) reminded him that his FMLA leave had expired; (3) reminded him that he had not yet received medical information regarding his ability to return to work; and (4) asked him to contact him as soon as possible. (*Id.* at ¶ 28).[97]

158. At about 5:00 p.m. on July 3, 2003, the Plaintiff telephoned Swaine and advised him that he would not be returning to work at Per–Se. (*Id.*)[98]

159. Based on his representations, Per–Se considered the Plaintiff to have voluntarily terminated his employment on July 3, 2003. (*Id.* at ¶ 29).[99]

160. On July 7, 2003, Swaine sent the Plaintiff a letter confirming the terms of their discussion regarding his voluntary resignation from Per–Se. (*Id.* at ¶ 30, Ex. 7). The letter also detailed the series of events that had occurred over the previous three months. (*Id.*) The Plaintiff did not respond to this letter, and has never con-

92. The Plaintiff admits that this was his testimony, but adds that he also testified that he, in subsequent telephonic conversations with Swaine, did not feel that the assurances he needed were in place such that he was comfortable returning to work at Per–Se. (Pl. Depo., [Doc. 292, p. 65] ).

93. A review of the actual e-mail reveals that although the Plaintiff did say that "I look forward to seeing you upon my return tomorrow," he did not emphasize that statement in the e-mail. Furthermore, while the Plaintiff attempts to dispute this Statement of Fact, his contentions do not, in fact, dispute it.

94. *See* FN 89.

95. *See* FN 89.

96. *Ibid.*

97. *Ibid.*

98. *Ibid.*

99. *See* FN 89.

tested the contents of that letter. (*Id.*)[100]

161. The Plaintiff was due for an annual performance review in March 2003 for the applicable review period of March 27, 2002 to March 26, 2003. (*Id.* at ¶ 32).

162. Prior to the end of his review period, the Plaintiff went on sick leave and then approved FMLA leave. (*Id.;* Swaine Decl., [Doc. 228, ¶ 32]).[101]

163. Pursuant to Per–Se's company practice, when an employee is on an extended leave of absence (such as FMLA leave), the employee's annual review is delayed until the employee returns to work. (Swaine Decl., [Doc. 228, ¶ 32]).[102]

164. Each year, in conjunction with the annual performance review process, a supervisor has some discretion to award "merit" pay increases to his or her subordinate employees. (*Id.*)

165. If an employee is on an extended leave of absence during the period when an annual review would have been conducted, subsequently returns to work, is given a performance review, and is recommended for a merit pay increase, Per–Se's regular practice is to retroactively apply such merit pay increase. (*Id.;* Rowe Depo., [Doc. 214, pp. 178–80]).[103]

166. The Plaintiff never returned to work after March 14, 2003, and thus never received an annual performance review for the applicable review period (i.e., March 27, 2002 to March 26, 2003). (*Id.;* Jameson Depo., [Doc. 217, p. 48]).[104]

167. The Plaintiff also states that prior to his resignation, he would normally only attend management meetings that would "require HR's presence" or any meeting "that they needed someone to be able to consult HR about various things." (*Id.* at 467–68).[105]

168. Prior to March 2003, the eHealth Division management team had discussed the fact that "management meetings were quite large … we were trying to skinny down the meeting. Currently [in 2005] the meeting is now down to four. At the time, it was probably 12." (Jameson Depo., [Doc. 217, p. 98]).[106]

169. The "form and substance of the management meeting was changing so we didn't need updates or marketing … human resources, and … certain sales aspects. [Thus, these functional areas] were removed from the meeting." (Dagher Depo., [Doc. 216, p. 56]).[107]

170. As a result of these considerations, Dagher determined that certain functional area representatives needed to be removed from eHealth management meetings because the focus of the meetings had, over time, shifted to simply a

**100.** Although the Plaintiff admits that the letter was sent, he attempts to dispute this Statement of Fact. However, his contentions do not, in fact, dispute the defendants' Statement of Fact. Thus, it is deemed admitted.

**101.** While the Plaintiff admits that he went on sick leave and FMLA leave, he disputes the remainder of this Statement of Fact. However, his cited evidence does not, in fact, dispute the defendants' contentions. Thus, this Statement of Fact is deemed admitted.

**102.** *See* FN 89.

**103.** *Ibid.*

**104.** *Ibid.*

**105.** *Ibid.*

**106.** *See* FN 89.

**107.** *Ibid.*

"focus on updating numbers and executing on those numbers to the company [CEO] and [CFO]." (*Id.*) [108]

171. "To have someone in there from HR did not make sense in that arena." (Jameson Depo., [Doc. 217, p. 98] ). [109]

172. In or about March 2003, Dagher made the decision to stop inviting an HR representative to division meetings. (Pl. Depo., [Doc. 228, pp. 468–69] ). [110]

173. On March 13, 2003, Dagher sent an e-mail to his administrative assistant directing her to remove the Plaintiff, Moore, and Judy Gallagher, an employee in the Accounting Department, from the list of attendees at the company's monthly management meetings. (Dagher Depo., [Doc. 216, pp. 54–56, Ex. 10] ).

174. The Plaintiff is not aware "whether HR was represented at all at future meetings" after he resigned from the company. (Pl.Depo., [Doc. 293, p. 470] ). [111]

175. According to Per–Se's company policy, while the Plaintiff was on approved FMLA leave, he was required to use accrued vacation and sick leave. (Swaine Decl., [Doc. 228, ¶ 33] ). [112]

176. On May 23, 2003, the Plaintiff sent a letter to Swaine requesting a copy of all of Per–Se's records regarding his paid vacation and sick days since his hire date. (*Id.*)

177. In response, Swaine accumulated all relevant data in Per–Se's possession and created a detailed analysis of the Plaintiff's balances since his hire date. (*Id.* at ¶ 33, Ex. 8).

178. Swaine provided a copy of his analysis to the Plaintiff. (*Id.*)

179. The Plaintiff did not respond to Swaine's letter, and never contacted Swaine to contest the analysis he had prepared and furnished to the Plaintiff. (*Id.*) [113]

180. The Plaintiff cannot identify another employee who "left the company on or after July 2003[who] got vacation pay for an extent that [the Plaintiff] did not." (Pl.Depo., [Doc. 293, p. 343] ).

## II. *The Plaintiff's Statement of Material Facts* [114]

1. In February 2002, the Plaintiff was one of a handful of company employees to be directly recognized for his superlative contributions to Per–Se's success through

108. *Ibid.*

109. *Ibid.*

110. *See* FN 89.

111. *Ibid.*

112. *Ibid.*

113. The Plaintiff attempts to dispute this Statement of Fact, albeit improperly by citing to a pleading rather than to evidence in support of his dispute. Thus, it is deemed admitted.

114. As previously mentioned, to the extent that they are not duplicative or disputed by the defendants, this Court sets out the Plaintiff's Facts as Drawn from his Statement of Material Facts as to Which There Exists No Genuine Issue to be Tried [Doc. 210] and his Statement of Material Facts in Support of the Denial of the Defendants' Motions for Summary Judgment [Doc. 256]. However some of the Plaintiff's "facts" are actually set out as legal conclusions. Pursuant to LR 56.1(B)(1)(c), N.D.Ga., this Court has omitted these "facts." In addition, many of the Plaintiff's "facts" contain inadmissible hearsay; and, therefore, have been disregarded. *See Macuba,* 193 F.3d at 1322 (The general rule is that inadmissible hearsay "cannot be considered on a motion for summary judgment.") (internal quotation and citation omitted).

an "Employee Gifts" award made by the President and CEO of Per–Se, Phil Pead. [Doc. 256, Ex. 2].[115]

2. The Plaintiff's performance as of March 22, 2002, was rated by Per–Se as superior. The "Management Performance Appraisal" form that accompanied the Plaintiff's review indicates that he received a rating of either "Exceptional" or "Exceeds Expectations" in eleven out of the twelve evaluated categories. [Id. at Ex. 3].

3. With respect to the Plaintiff's technical and professional knowledge, his appraisal indicates "[he] clearly understands the technical issues of HR and works to address any outstanding issues in the division." The appraisal also indicates that he "maintains solid integrity" and "focuses on the details and likes to be as accurate as possible." [Id.]

4. Corporate HR VP Swaine testified that he had no issues with the Plaintiff's integrity, honesty, or work ethic. (Swaine Depo., [Doc. 219, p. 105]).[116]

5. The Plaintiff testified that "Swaine told him that he needed to be careful- and just kind of let things go because the company was not going to correct these things and [the Plaintiff] was only going to be hurting himself and his career by trying to get the company to change when they had been doing this for-as long as they have and they were not going to change." (Swaine Depo., [Doc. 219, p. 6]; Pl. Depo.,

---

This Court also notes that the Plaintiff's counsel has failed to comply with the provisions of LR 56.1(B)(1), NDGa by failing to support each material fact with a citation to evidence proving such fact. Indeed, most of the Plaintiff's Statement of Facts contained in his Statement of Material Facts as to Which There Exists No Genuine Issue to be Tried [Doc. 210] are supported only by a citation to a pleading rather than to evidence, if it is supported at all. In fact, the only properly cited Statements of Fact in Doc. 210 for this Court to consider, although they may be disregarded for other reasons or properly disputed by the defendants, are Statements of Fact Nos. 21, 29, 31–32, 38–42, 47, 49, 51–58. Thus, this Court will disregard those Statements of Fact that are not properly supported as provided by LR 56.1(B)(1). Furthermore, in most of the Plaintiff's Statements of Fact, he relies on the Stipulation [Doc. 123] entered into by the parties on March 29, 2005 as supportive of his facts. However, the Stipulation does not support any of the Plaintiff's factual assertions, but only binds the defendants from contesting the "good faith" and "objectively reasonable belief" elements in relation to any of the Plaintiff's statutorily protected activities. In addition, the defendants specifically denied that they "discriminated or retaliated against company employees, or that they engaged in unlawful employment or ac-

counting practices." See [Doc. 123, p. 2]. Thus, this Court finds that the Stipulation does not support the specific facts establishing the alleged protected activity, or any other facts in this case.

**115.** A review of the actual e-mail reveals that, as the defendants contend, the Plaintiff has mischaracterized the e-mail's contents. Indeed, the e-mail indicates that Per–Se achieved a "net earnings of 3 cents per share," which represented a profitability turnaround. As a result, Per–Se's CEO provided gifts as a "token of appreciation" to thirty employees in the eHealth Division of Per–Se. [Doc. 256, Ex. 2]. Furthermore, the defendants note that this gift was provided in February 2002, one year and five months prior to the Plaintiff's resignation in July 2003.

**116.** A review of Swaine's deposition reveals, as the defendants contend, that he, in fact, testified that he was personally not aware of any issues with the Plaintiff's integrity or honesty while the Plaintiff was employed with Per–Se. (Swaine Depo., [Doc. 219, p. 105]). He further testified that he currently had an issue with the Plaintiff's recollection of events that are the subject of this lawsuit. (Id. at pp. 105–06).

[Doc. 292, p. 220] ).[117]

6. The Plaintiff understood that his colleagues' refusal to communicate with him was "because [he] had raised concerns." (Pl.Depo., [Doc. 292, p. 197] ).

7. The Plaintiff testified that "none of these problems occurred right off." He "was not treated that way until [he] started voicing concerns ..." "[A]s I started asking questions ... that's when ... all that started." (*Id.* at p. 234).

8. On March 3, 2003, an employee of Moore's, Jackie Jackson, served Per–Se with a discrimination lawsuit. (Pl.Aff., [Doc. 220, Att.33] ).[118]

9. Swaine recalled telling the Plaintiff that he needed to pick the issues that he felt were important and prioritize them. According to Swaine, the Plaintiff would not be able to fix everything. (Swaine Depo., [Doc. 219, p. 64] ).[119]

10. The Plaintiff testified that Moore telephoned him from Ohio and stated, "I told you about continuing to run your mouth ... You're not up here [in Ohio]." (Pl.Depo., [Doc.292, p. 254] ).[120]

11. Tracy Fried, a former HR employee and direct report of the Plaintiff, discussed with Maria Dress, the Plaintiff's other subordinate, the fact that Moore wanted the Plaintiff terminated. (Fried Depo., [Doc. 288, p. 225] ).[121]

12. Because of all of the events occurring at work, the Plaintiff grew increasingly stressed and became physically sick at work and threw up. (Pl.Depo., [Doc.292, p. 272] ).

13. Swaine recommended and referred the Plaintiff to a psychiatrist with whom Swaine was familiar. (Swaine Depo., [Doc. 219, pp. 91–92] ).

14. The Plaintiff's Board Certified internist, Dr. Patrick Coleman ("Dr.Coleman"), with the Piedmont Physicians Group, diagnosed the Plaintiff with "depression" on March 27, 2003. (Coleman Depo., [Doc. 286, pp. 101–02, 104] ). He further treated the Plaintiff for this condition on several subsequent occasions from March 2003 through January 2005. (*Id.* at p. 107).

15. Dr. Coleman's "To Whom It May Concern" letter dated October 22, 2003, described the relationship between the Plaintiff's workplace stress and his clinical diagnosis of anxiety and depression as follows:

117. Most of this Statement of Fact contained legal conclusions and was not supported by the cited evidence. Thus, this Court disregarded those portions.

118. The remainder of this Statement of Fact contained a statement not supported by the cited evidence. Thus, this Court disregarded it.

119. The defendants admit that Swaine testified that he told the Plaintiff that he "needed to pick the issues that he felt were important and he needed to prioritize them and couldn't fix everything"; however, the defendants also point out that Swaine could not recall anything about the "context of the discussion" or "how it came about." (Swaine Depo., [Doc. 219, p. 64] ).

120. The Plaintiff's actual Statement of Fact mischaracterized Moore's testimony, Thus, this Court has admitted Moore's actual testimony in this regard.

121. Assuming *arguendo* this statement by Fried may be inadmissible hearsay, nevertheless, the Plaintiff could testify as to what Dress told him. In any event, otherwise admissible evidence may be introduced, albeit in inadmissible form, at the summary judgment stage, if the statements could be reduced to admissible evidence at trial. *Macuba,* 193 F.3d at 1323; *McMillian v. Johnson,* 88 F.3d 1573, 1584 (11th Cir.1996).

Terry Bozeman is a 31 year old white male who I have known as a patient since December 1999. He presented to my office on March 18, 2003 with complaints of severe migraine-type headaches and accelerated hypertension. His blood pressure was reading 140/114. It was felt that his hypertension could be contributing to his headaches and his medicines were changed. He was also exhibiting signs of anxiety as well. I suggested 2 weeks time off of work in order to get his blood pressure under control.

He followed up with me two weeks later on March 27, 2003 with worsening symptoms including migraine-type headaches, dizziness, fatigue and increased anxiety. Mr. Bozeman related work as being a severe stressor in his life. He was evaluated and again his medicines were changed. An antidepressant/anti anxiety drug was added. Unable to work, I advised him to take another 2 weeks off.

On April 6, 2003 he was evaluated at Wellstar Kennestone Hospital for hypertension and bright red blood per rectum, which was related to his hypertension. He returned to my office as scheduled on April 10, 2003 at which time his blood pressure was under control but his headaches continued and his anxiety had not improved. He was advised to see me again on April 24, 2003. At that time his blood pressure was again elevated and his anxiety level was worse. He related to me that his work environment was a tense situation in which he felt threatened. I adjusted his medications including adding additional medications for his anxiety and debilitating depression. I recommended he take time off due to his short-term disability and requested that he follow up with me in approximately six weeks.

He returned to see me on July 2, 2003, at which time his complaints persisted and his blood pressure was uncontrolled at 158/98. Due to his physical problems and anxiety and stress he was completely debilitated and unable to work. I again adjusted his medications and advised him not to return to work.

I saw him again on July 29, 2003 and most recently on October 6, 2003. His condition has not improved although he has been compliant on medications and has followed my medical advice. The anxiety and stress level at work has not decreased. He reported threats he had received at work to me. He was unable to perform normal activities and his duties at work which translated into physical disability of hypertension, headaches, nausea, dizziness, panic attacks, and decreased concentration.

In summary, he was diagnosed with accelerated hypertension, migraine-type headaches, anxiety, depression, panic attacks, dizziness, nausea, constipation, rectal bleeding, and abdominal pain. An explanation of this disease process was listed above. I feel he could not perform his work due to the increased stress level at his workplace where he felt threatened. This in turn has caused his blood pressure to raise causing headaches and associated symptoms making it impossible for him to perform normal daily activities.

I feel that his prognosis is good if he can get the situation at work under control. Prior to this incident his only health problem was controlled hypertension. He had no history of anxiety, panic attacks, or depression. Please feel free to contact me if should need further information. A copy of my office notes is enclosed.

(*Id.* at pp. 108–111).[122]

16. Because of his stress, the Plaintiff was also treated by G. Patrick Stogner, a licensed therapist employed by Magellan Behavioral Health, with whom Per–Se had contracted to provide counseling services to Per–Se's employees. (Stogner Depo., [Doc. 285, pp. 75, 78]).

17. Stogner treated the Plaintiff on five occasions between May 1, 2003 and July 2, 2003. (*Id.* at p. 79). Stogner diagnosed the Plaintiff with "Adjustment Disorder with Anxiety and Depression." (*Id.* at pp. 82–83).

18. Dr. Coleman referred the Plaintiff to Dr. Linda Thomas ("Dr. Thomas"), a Board Certified psychiatrist. (Thomas Depo., [Doc. 287, pp. 93, 96]).

19. Dr. Thomas, whose practice is associated with Wellstar Behavioral Health System, treated and provided counseling to the Plaintiff on March 22, 2004, April 6, 2004, and May 4, 2004. (*Id.* at p. 97). Dr. Thomas' principal diagnosis on March 22, 2004 was "Major Depression with Anxiety." (*Id.*)

20. According to Dr. Thomas, the major contributing or causative factor relative to this diagnosis was the Plaintiff's work-related stress. (*Id.* at pp. 98–99).[123]

21. Dr. Thomas believed the Plaintiff was a good candidate for a partial hospital-

ization program involving intensive group therapy for five days a week and five hours a day. (*Id.* at pp. 78, 101).[124]

22. On March 17, 2003, Dagher sent an e-mail to Jameson telling Jameson to "make sure" that the Plaintiff (as well as two other employees) were "terminated in association with a riff [Jameson] may know of . . ." [Doc. 256, Ex. 6].

23. On March 24, 2003, the Plaintiff sent a letter to Yolanda Ross of the Securities and Exchange Commission ("SEC") advising that he was aware during his employment at Per–Se that the finance and accounting department, acting on instruction from Dagher, failed to accrue for certain debts and instead misclassified them as revenue, "artificially inflated" its operating results, improperly shifted revenue from one division of Per–Se to another, did not account for vacation balance accrual owing to employees (thereby understating liabilities on balance sheets), changed "cost centers" for employees "in order to make it appear that certain operating units and departments were profitable," and recognized revenue before "sales were complete." (Pl.Aff., [Doc. 220, Att.42]).

24. After having advised the SEC of his concerns regarding financial irregularities, in March 2003, the Plaintiff made Per–Se aware that he had, in fact, com-

---

**122.** While the defendants admit that Dr. Coleman wrote this letter, they deny that the letter supports any "relationship between Plaintiff's workplace stress and the clinical diagnosis of anxiety and depression," but rather contend that it is merely a description of what the Plaintiff described he was experiencing.

**123.** While the defendants admit that Dr. Thomas testified that in her opinion, the major causative factor to her diagnosis was the Plaintiff's work-related stress, they contend that the testimony merely contains her opin-

ion based on what the Plaintiff told her he was experiencing. (Thomas Depo., [Doc. 287, p. 23]).

**124.** While the defendants admit that Dr. Thomas testified that she considered having the Plaintiff enter a partial hospitalization program, they note that Dr. Thomas formed this consideration in May of 2004, about eleven months after the Plaintiff had resigned from Per–Se.

plained to the SEC. (Pl.Aff., [Doc. 220, p. 12, Ex. 44] ).

### III. *The Disputed Facts*

1. The defendants contend that in March 2002 (about one year after the Plaintiff was hired at Per–Se), in order to keep the Plaintiff's job title consistent with similarly-situated managers in other Per–Se divisions, the Plaintiff's job title was upgraded to HR Director. (Swaine Decl., [Doc. 228, ¶ 8] ). The Plaintiff's job responsibilities, however, remained essentially the same. (*Id.*)

> The Plaintiff contends that the decision to promote the Plaintiff was based on his exceptional performance ratings. (Baker Depo., [Doc. 215, Ex. 1] ). In addition, Baker testified that during the first year of his employment with Per–Se, the Plaintiff was handling a lot of complex issues and handling them well. (*Id.* at p. 39). She further testified that she decided to promote the Plaintiff after she consulted Jennifer Bender, an HR Director for another division, and Bender had "very positive things to say" about him. (*Id.* at pp. 52–53). Nevertheless, the Plaintiff admits that his job responsibilities remained the same with regard to this promotion.

2. The defendants contend that in January 2002, the Plaintiff hired Maria Dress to work under his supervision as an HR Manager. (Dress Decl., [Doc. 228, ¶ 3] ). Dress worked in the Cleveland, Ohio office and had primary responsibility to provide local HR support for four offices, to wit: Cleveland, Columbus, and Cincinnati, Ohio; and Indianapolis, Indiana. (*Id.*)

> The Plaintiff contends that Dress was hired to work under his supervision as HR manager for the Cleveland opera-

tions only. He further contends that it was when she was taken away as one of his direct reports, that she was given complete HR responsibility for the Cleveland operation, as well as Cincinnati, Columbus, and Indianapolis. (Pl. Depo., [Doc. 293, pp. 458–59] ).

3. The defendants contend that by the Spring of 2002, senior management in eHealth began to observe serious deficiencies in the Plaintiff's abilities and overall job performance. (Baker Depo., [Doc. 215, pp. 36–38] ).

> The Plaintiff contends that the defendants have misquoted Baker's testimony: She actually testified that she thought the Plaintiff handled the job well, and that it was only towards the end of the time that she supervised the Plaintiff (i.e., October 2002), he seemed more stressed out and could not handle all of the job responsibilities. The only examples that she provided were that he was nervous in his verbal communications with managers in a group setting, and that he expressed himself better in writing. (*Id.*) In addition, Baker further testified that during the first year of his employment with Per–Se, the Plaintiff was handling a lot of complex issues and handling them well. (*Id.* at p. 39). She stated that the Plaintiff's verbal communication was just his "personal style" and not a handicap to being able to do his job. (*Id.* at p. 40). She further stated that she decided to promote him despite his communication style. (*Id.* at p. 52). She also stated that she consulted Bender before promoting him and that she had "very positive things to say" about him. (*Id.* at p. 53). In her performance evaluation of the Plaintiff in Spring 2002, Baker gave the Plaintiff exceptional performance ratings, and in

particular, "exceeding expectations" in communication. (*Id.* at pp. 54–58, 69, Ex. 1).

4. The defendants contend that during the following six months (between the Spring and Fall of 2002), Baker perceived that the Plaintiff's job performance had not improved. (Baker Depo., [Doc. 215, p. 36]).

The Plaintiff contends that in the Spring of 2002, Baker gave the Plaintiff exceptional performance ratings, and in particular, "exceeding expectations" in communication. (*Id.* at pp. 54–58, 69, Ex.1). She testified that towards the end of the time that she supervised the Plaintiff (i.e., October 2002), he seemed more stressed out and could not handle all of the job responsibilities. However, the only examples that she gave were his problems with verbal communication, which she attributed to his "personal style" and not a handicap to being able to do his job. (*Id.* at pp. 36, 40).

5. The defendants contend that in August 2002, in an effort to address continued complaints he had received from senior managers regarding the Plaintiff's work performance, eHealth President Dagher counseled the Plaintiff during a lunch meeting. (Dagher Depo., [Doc. 216, pp. 108, 111]). Dagher advised the Plaintiff that he needed to, *inter alia*, (1) improve his responsiveness to company management by getting back to them more promptly; (2) articulate his thoughts more clearly; and (3) be a better business advocate by better advocating to business managers how HR policy should be applied in the business environment. (*Id.* at p. 108–09).

The Plaintiff contends that no one, including Dagher, had addressed any performance issues with him, other than his last performance review in March 2002, until the June 27, 2003 meeting where he attempted to return to work after being on approved medical leave. (Pl. Depo., [Doc. 293, p. 654]).

6. The defendants contend that in December 2002, in response to management concerns, Dagher called a counseling meeting in his office to address the Plaintiff's work performance, particularly his lack of responsiveness in providing HR support to management (i.e., failing to respond to voicemails and e-mails). (Dagher Depo., [Doc. 216, p. 49]; Moore Depo., [Doc. 214, pp. 54, 64]; Jameson Depo., [Doc. 217, pp. 65–67]).

The Plaintiff contends that no one, including Dagher, addressed any performance issues with him other than at his last performance review in March 2002 until the June 27, 2003 meeting where he attempted to return to work after being on approved medical leave. (Pl. Depo., [Doc. 293, p. 654]).[125] The Plaintiff, however, does admit that Moore called and the meeting took place.

7. The defendants contend that during a meeting with the Plaintiff in a conference room, Jameson explained to the Plaintiff that as a result of the urgency of the Elgin project, Fried would be assigned to provide direct HR support to Elgin, and to facilitate this change, she would report directly to Jameson for the duration of the project. (Jameson Depo., [Doc. 217, pp. 88–89]).

The Plaintiff contends that Jameson never provided him with a reason for the

---

**125.** This Court has disregarded that portion of the Plaintiff's dispute which is only supported by a citation to a pleading (i.e., his complaint) rather than to evidence as provided by LR 56.1 B(1)(b).

change, but rather told him he would not give him a reason at that time. He further contends that he asked Jameson if the reassignment had anything to do with his accounting concerns, and Jameson would not confirm or deny that was the reason, but merely walked away. (Pl.Depo., [Doc. 293, p. 581] ).

8. The defendants contend that the Plaintiff abruptly left the meeting with Jameson and went home for the day. (Jameson Depo., [Doc. 217, p. 89] ).

The Plaintiff contends that he did not abruptly leave the meeting, but rather Jameson walked away when he pressed him for a reason for Fried's reassignment. (Pl.Depo., [Doc. 293, p. 581] ). He then discussed with Swaine and Rowe what had transpired with Jameson in the meeting. (*Id.* at p. 583).

9. The defendants contend that Jameson had no intention of eliminating the Plaintiff's job, and he did not change any of his other normal job responsibilities. Jameson's intent was only to address an urgent, but temporary need in Elgin. (Jameson Depo., [Doc. 217, pp. 83–86, 88, 90]; Dress Decl., [Doc. 228, ¶¶ 8–9] ).

The Plaintiff contends that Jameson's intent was to eventually strip the Plaintiff of all of his job responsibilities, and that he had asked Fried to prepare a memo of how HR could be reorganized without the Plaintiff. (Fried Depo., [Doc. 288, pp. 102, 211–12, Ex. 10] ). He further contends that all of his responsibilities were, in fact, reassigned to his two assistants, Fried and Dress. (Pl. Depo., [Doc. 293, pp. 448–86] ). In addition, he contends that during this time period, Dagher, Jameson and Moore were all engaged in discussions about terminating the Plaintiff. (Dagher Depo., [Doc. 216, p. 57] ).

10. The defendants contend that the new arrangement was not permanent, but rather Jameson intended to maintain this reporting arrangement only for the duration of the Elgin project. (Jameson Depo., [Doc. 217, pp. 84, 88, 90] ).

The Plaintiff contends that Fried's reassignment was not temporary, and that Jameson's intent was to eventually strip the Plaintiff of all of his job responsibilities, and had asked Fried to prepare a memo of how HR could be reorganized without the Plaintiff. (Fried Depo., [Doc. 288, pp. 102, 211–12, Ex. 10] ). He further contends that all of his responsibilities were, in fact, reassigned to his two assistants, Fried and Dress. (Pl. Depo., [Doc. 293, pp. 448–86] ). In addition, he contends that during this time period, Dagher, Jameson and Moore were all engaged in discussions about terminating the Plaintiff. (Dagher Depo., [Doc. 216, p. 57] ).

11. The defendants contend that outside of the Elgin project, which required special attention from Fried, Jameson made no other changes to the Plaintiff's duties. (Jameson Depo., [Doc. 217, pp. 102–03]; Dress Decl., [Doc. 228, ¶¶ 8–9] ).

The Plaintiff contends that the defendants began to dismantle the Plaintiff's job by pulling away responsibilities. (Pl. Depo., [Doc. 293, p. 443] ). He further contends that Jameson's intent was to eventually strip the Plaintiff of all of his job responsibilities, and had asked Fried to prepare a memo of how HR could be reorganized without the Plaintiff. (Fried Depo., [Doc. 288, pp. 102, 211–12, Ex. 10] ). The Plaintiff asserts that along with the reassignment of Fried, he no longer would be attending management meetings, reviewing and responding to EEOC charges, handling compli-

ance calls, assisting in the collection of information relative to bids for government contracts, reviewing vacation accruals or any other accounting information such as pay increases, assisting managers with employee relations or providing guidance with respect to company policies, reviewing any EEO-1 data, assisting with affirmative action, and would not be supervising any employees. (*Id.* at pp. 448-86).

12. The defendants contend that Jameson believed that this temporary arrangement would result in no significant change to the Plaintiff's day-to-day job responsibilities since Fried was already handling the vast majority of HR support for Elgin and the Plaintiff "wasn't involved there anyways." (Jameson Depo., [Doc. 217, pp. 88-89, 162]; Fried Depo., [Doc. 288, p. 108]).

> The Plaintiff contends that Fried's reassignment was not temporary. He further contends that Jameson's intent was to eventually strip the Plaintiff of all of his job responsibilities, and had asked Fried to prepare a memo of how HR could be reorganized without the Plaintiff. (Fried Depo., [Doc. 288, pp. 102, 211-12, Ex. 10]). He further contends that all of his responsibilities were, in fact, reassigned to his two assistants, Fried and Dress. (Pl.Depo., [Doc. 293, pp. 448-86]). In addition, he contends that during this time period, Dagher, Jameson and Moore were all engaged in discussions about terminating the Plaintiff. (Dagher Depo., [Doc. 216, p. 57]).

13. The defendants contend that the Plaintiff's other direct report, Dress (generally responsible for performing HR functions under the Plaintiff's supervision in Cleveland, Cincinnati, Columbus, and Indianapolis), continued to report directly to the Plaintiff. (Dress Decl., [Doc. 228, ¶ 9]; Jameson Depo., [Doc. 217, pp. 157-58]; Fried Depo., [Doc. 288, pp. 110-11, 180-81]; Swaine Depo., [Doc. 219, pp. 191, 198]). They further contend that Dress assumed no new duties as a result of the temporary arrangement relating to Fried. (Dress Decl., [Doc. 228, ¶ 9]).

> The Plaintiff contends that prior to the reassignment of Fried from him, Dress provided HR functions under the Plaintiff's supervision for the Cleveland operations only. He further contends that when Dress was taken away as his direct report, she was then given complete HR responsibility for the Cleveland operation, as well as Cincinnati, Columbus, and Indianapolis. (Pl.Depo., [Doc. 293, pp. 458-59]).

14. The defendants contend that Dress continued to report directly to the Plaintiff until the Plaintiff's resignation on July 3, 2003. (Dress Decl., [Doc. 228, ¶ 9]).

> The Plaintiff contends that Dress was taken away as one of the Plaintiff's direct reports at the same time as Fried. (Pl.Depo., [Doc. 293, p. 460]).

15. The defendants contend that in the Plaintiff's absence, other HR employees were required to fill in to perform his HR Director duties. Liesl Rowe, the HR Director for the Applications Software Division, was assigned to fill in for the Plaintiff's director-level responsibilities. (Fried Depo., [Doc. 288, p. 127]). The Plaintiff's subordinate, Fried, assumed "additional work responsibilities when [the Plaintiff] went out on extended absence," which "substantially increased [her] workload." (*Id.* at pp. 119, 127).

> The Plaintiff contends that most of his job responsibilities had already been reassigned to Fried, Dress, and Bender.

(*Id.* at pp. 102, 185, 211–12, Ex. 10; Pl. Depo., [Doc. 293, pp. 448–86]).

16. The defendants contend that during the planning meeting on June 27, 2003, Swaine assured the Plaintiff that Per–Se would take appropriate measures in order to ensure that he would suffer no retaliation, including, *inter alia,* advising appropriate groups within the company of his return. (Swaine Decl., [Doc. 228, ¶ 20]).

The Plaintiff contends that he encountered hostility by Dagher and was not assured at all that the harassment and retaliation would stop. (Pl.Depo., [Doc. 293, pp. 653–57]).

17. The defendants contend that under normal circumstances, the Plaintiff's supervisor, Jameson, would have completed the Plaintiff's 2002–2003 annual performance review in April 2003. (Jameson Depo., [Doc. 217, p. 45]).[126]

The Plaintiff contends that his annual review for March 26, 2001 through March 26, 2002 was performed by Baker on March 22, 2002, prior to his anniversary date. (Baker Depo., [Doc. 215, Ex. 1]). An employee does his own self-evaluation and then gives it to his supervisor, who in turn does an evaluation of the employee. (Jameson Depo., [Doc. 217, p. 32]). Jameson testified that a formal review is not a requirement, and that he has given some of his direct reports a raise without conducting a formal review with the employee. (*Id.* at pp. 36–37). The Plaintiff further contends that he was also included in the Management Incentive Compensation Program for the Director level and above. Each person compiles his or her goals for the upcoming year between January and March, and then it is approved in April by the Board of Directors. (*Id.* at pp. 38–39). Bonuses are awarded based upon the number of goals that are met. (*Id.* at p. 43). He further contends that he submitted his career goals following his evaluation in 2002, and they were approved by Jameson. (*Id.* at p. 44). He also submitted his career goals for the upcoming year to Jameson in January 2003. (*Id.* at Ex. 1). He had a meeting with Baker and Jameson in January or February 2003 where the incentive compensation bonus was discussed and he was told by both of them that he was doing a great job. (Pl.Depo., [Doc. 293, p. 372]). He contends that he never received the bonus, and never heard back from Baker or Jameson regarding a bonus. (*Id.* at pp. 373–74). Jameson further testified that he had no idea whether the Plaintiff was given a bonus in 2003 for the prior year's incentive. (Jameson Depo., [Doc. 217, p. 47]). The Plaintiff further contends that about 90 percent of Per–Se employees received raises. (Rowe Depo., [Doc. 214, pp. 86, 179]).

18. The defendants contend that prior to his resignation from Per–Se, the Plaintiff was never informed "one way or another whether [he would] be getting a raise for 2003." (Pl.Depo., [Doc. 293, pp. 374–76]).

The Plaintiff contends that in early 2003, he received a voice mail message from Dagher indicating that he was up for an increase soon. (Pl.Depo., [Doc. 293, p. 371]).

19. The defendants contend that during the Plaintiff's approved FMLA leave

126. The defendants' citation does not, in fact, support their contention. However, a review of Jameson's deposition revealed that page 44 of his deposition does, in fact, support their contention.

period, he exhausted his paid sick leave and vacation leave balances, and therefore, for part of this period, he was on unpaid leave. (Swaine Decl., [Doc. 228, ¶ 33]).

The Plaintiff contends that in 2002, Per–Se took away hours that he had already earned. (Pl.Depo., [Doc. 293, pp. 339, 347]). He further contends that he was not paid all of his accrued vacation as other employees had received upon their termination. (*Id.* at pp. 342–43).

20. The defendants contend that based on the detailed analysis prepared by Swaine in response to the Plaintiff's request, Swaine confirmed that the Plaintiff had, as of that date, exhausted all of his accrued paid time off. (Swaine Decl., [Doc. 228, ¶ 33]).

The Plaintiff contends that in 2002, Per–Se took away hours that he had already earned. (Pl.Depo., [Doc. 293, pp. 339, 347]). He further contends that he was not paid all of his accrued vacation leave as other employees had upon their termination. (*Id.* at pp. 342–43).

21. The Plaintiff contends that based on his performance as of March 2002, he was given a 15 percent raise in salary effective March 26, 2002. [Doc. 256, Ex. 3].

The defendants object to this Statement because it relies on a hearsay document that is not authenticated by a witness competent to do so. The defendants further object as the Plaintiff's Statement mischaracterizes the referenced document. The defendants contend that the document shows that the Plaintiff received a "pay raise" solely in relation

to his promotion to "Human Resources Director" in March 2002. The defendants further contend that this promotion was in order to keep the Plaintiff's job title consistent with similarly-situated managers in other Per–Se divisions. (Swaine Decl., [Doc. 228, ¶ 8]). The defendants further contend that the document does not state or in anyway indicate that this pay raise was based simply on the Plaintiff's "performance" *vis a vis* his promotion. [Doc. 256, Ex. 3].

22. The Plaintiff contends that on November 1, 2002, the Plaintiff submitted an "Employee Complaint" form [Doc. 256, Ex. 4] to Division President Dagher in which he indicated that Moore had threatened him and subjected him to retaliation and a hostile work environment since he had complained to members of management regarding discriminatory practices within the company. (Stipulation, [Doc. 123]; S.A. Compl., [Doc. 43, ¶ 61]).[127]

The defendants object to this Statement because it cites to a pleading in violation of LR 56.1(B)(1)(b). They further object because it does not contain a proper citation to evidence in violation of LR 56.1(B)(1)(a). To the extent he attempts to rely on the "Stipulation" as evidence of his factual assertions, the defendants contend that the Plaintiff mischaracterized the terms of the Stipulation.

In addition, to the extent this Statement describes "underlying events" related to the Plaintiff's alleged protected activity, the defendants contend that such facts are not material for purposes of the parties' summary judgment motions.

[127]. It should be noted that the Plaintiff again failed to comply with LR 56.1(B)(1) by citing to a pleading rather than to evidence. However, since the Plaintiff did cite to Exhibit 4 attached to his Statement of Material Facts [Doc. 256], this Court will consider this Statement of Fact.

Moreover, the defendants further contend that the Plaintiff's assertions regarding protected activity are not outcome determinative with respect to their Motions for Summary Judgment. Furthermore, the defendants point out that the Plaintiff offered no evidence in support of his Statement that he had "submitted an 'Employee Complaint' form to ... Dagher." In fact, Dagher has denied that he ever received any such complaint form from the Plaintiff. (Dagher Depo., [Doc. 216, pp. 125–27] ). Indeed, Per–Se, as the defendants contend, has no record of any such form being submitted by the Plaintiff; and Dagher testified that the Plaintiff never complained to him about Moore engaging in unprofessional or intimidating conduct against him. (*Id.* at p. 33). Dagher further testified that no such complaints were ever brought to his attention by anyone else; and he was never made aware of any threats allegedly made by Moore against the Plaintiff. (*Id.* at pp. 35–36, 127–28).

23. The Plaintiff contends that individuals with whom he necessarily had to communicate regarding workplace issues and other aspects of his job (such as Jameson, Swaine, Dagher, and Baker) avoided him and "stopped communicating" with him. (Pl.Depo., [Doc.292, pp. 187–88] ).

The defendants object to this Statement because the cited deposition testimony does not support the Plaintiff's assertion that he "necessarily has to communicate regarding workplace issues and other aspects of [his] job" with any particular persons. (*Id.*) In addition, the defendants contend that the cited testimony does not support the Plaintiff's assertion that Swaine "stopped communicating" with him. (*Id.*)

24. The Plaintiff contends that he learned that co-employees and work colleagues were instructed not to speak to him. (*Id.* at pp. 190–96).[128]

The defendants object to this Statement because it is not supported by a citation to admissible evidence, but rather relies solely on inadmissible hearsay. (*Id.* at pp. 190–96). The defendants further contend that the Plaintiff has not sought to obtain testimony from any witness that he or she was actually "instructed [by management] not to speak to [the] Plaintiff." Therefore, the defendants deny this allegation. Furthermore, the defendants contend that the Plaintiff cannot show that such alleged instruction was linked to any form of protected activity in which he participated. (*Id.* at pp. 214–16, 219–20, 234). Thus, the defendants contend that this Statement is not material and should not be considered by this Court.

25. The Plaintiff contends that Bob Wood, a manager in Per–Se's Cleveland,

---

**128.** The Plaintiff relies extensively upon hearsay evidence in this Statement of Material Fact. Specifically, the Plaintiff relies upon statements allegedly made to him by fellow employees, without identifying any such employees. Suffice it to say that he failed to depose any of his former co-workers; nor did he obtain their affidavits to support this factual assertion. As previously noted, the general rule is that inadmissible hearsay "cannot be considered on a motion for summary judgment." *Macuba*, 193 F.3d at 1322. However, this Court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be "reduced to admissible evidence at trial" or "reduced to admissible form." *Wright v. Southland Corp.*, 187 F.3d 1287 (11th Cir.1999). Because the Plaintiff may be able to obtain affidavits from his former co-workers, thereby rendering the evidence admissible, this Court will consider their alleged statements in considering the parties' Motions for Summary Judgment.

Ohio office, told the Plaintiff that he was told not to call the Plaintiff or discuss HR issues with him. (*Id.* at p. 196).[129]

> The defendants object to this Statement because it is not supported by a citation to admissible evidence, but rather relies solely on inadmissible hearsay. (*Id.* at p. 196). The defendants further contend that the Plaintiff has not sought to obtain the testimony of Wood that he was actually instructed to not contact the Plaintiff. Therefore, the defendants deny this allegation. Furthermore, the defendants contend that the Plaintiff cannot show that such alleged instruction was linked to any form of protected activity in which he engaged. (*Id.* at pp. 214–16, 219–20, 234). Thus, the defendants contend that this Statement is not material and should not be considered by this Court.

26. The Plaintiff contends that a couple of Per–Se employees in the Cleveland office with HR issues (who ultimately called the Plaintiff on his personal phone) told him that they were told not to call him to discuss workplace issues. (*Id.* at pp. 199–200).[130]

> The defendants object to this Statement because it is not supported by a citation to admissible evidence, but rather relies

solely on inadmissible hearsay. (*Id.* at p. 196). The defendants further contend that he has not sought (or has not located) a witness to testify that he or she was actually "told not to call [the] Plaintiff." Therefore, the defendants deny this allegation. Furthermore, the defendants contend that the Plaintiff cannot show that such alleged instruction was linked to any form of protected activity in which the Plaintiff participated. (*Id.* at pp. 214–16, 219–20, 234). Thus, the defendants contend that this Statement is not material and should not be considered by this Court.

27. The Plaintiff contends that Karen Scott, a female employee in Per–Se's Detroit, Michigan office, complained to the Plaintiff about the lawfulness of her termination; and, during the course of that conversation, informed the Plaintiff that she had been told not to speak to him about her concerns regarding shredding accounting documents. (*Id.* at p. 201).[131]

> The defendants object to this Statement because it is not supported by a citation to admissible evidence, but rather relies solely on inadmissible hearsay. (*Id.* at p. 196). The defendants further contend that he has not sought to obtain the testimony of Scott that she was instructed "not to speak to [the] Plaintiff."

---

129. Assuming *arguendo* this statement by Wood may be inadmissible hearsay, nevertheless, the Plaintiff could testify as to what he told him. In any event, as previously noted, otherwise admissible evidence may be introduced, albeit in inadmissible form, at the summary judgment stage, if the statements could be reduced to admissible evidence at trial. *Macuba,* 193 F.3d at 1323; *McMillian,* 88 F.3d at 1584. Furthermore, the Plaintiff may not offer the statement to prove the truth of the matter asserted, but rather to demonstrate the alleged systematic discrimination and general hostility fostered by the defendants against him.

130. *See* FN 128.

131. Assuming *arguendo* this statement by Scott may be inadmissible hearsay, nevertheless, the Plaintiff could testify as to what Scott told him. In any event, otherwise admissible evidence may be introduced, albeit in inadmissible form, at the summary judgment stage, if the statements could be reduced to admissible evidence at trial. *Macuba,* 193 F.3d at 1323; *McMillian,* 88 F.3d at 1584.

**1328**

Therefore, the defendants deny this allegation. Furthermore, the defendants contend that the Plaintiff cannot show that such alleged instruction was linked to any form of protected activity in which he engaged. (*Id.* at pp. 214–16, 219–20, 234). In fact, the defendants contend that the Plaintiff has not even offered evidence as to the identity of the person who allegedly gave the instruction to Scott. (*Id.*) Thus, the defendants contend that this Statement is not material and should not be considered by this Court.

28. The Plaintiff further contends that he understood through Judy Gallagher and Kevin O'Keefe, employees in the accounting department, that Karen Baker, their supervisor, instructed employees in that department not to discuss issues with the Plaintiff relating to vacation balances and sales commissions. (*Id.* at p. 202).[132]

The defendants object to this Statement because it is not supported by a citation to admissible evidence, but rather relies solely on inadmissible hearsay. (*Id.* at p. 196). The defendants further contend that he has not sought to obtain the testimony of Gallagher or O'Keefe that he or she was instructed "not to discuss issues with [the] Plaintiff." Therefore, the defendants deny this allegation. Furthermore, the defendants contend that the Plaintiff cannot show that such alleged instruction was linked to any

form of protected activity in which he engaged. (*Id.* at pp. 214–16, 219–20, 234). In fact, the defendants contend that the Plaintiff admits he is not sure whether Gallagher had only been instructed not to speak to the Plaintiff, or whether she had been instructed not to speak to anyone about the subject. (*Id.*) Thus, the defendants contend that this Statement is not material and should not be considered by this Court.

29. The Plaintiff contends that a female employee, "Kim," a project manager, called him after a co-employee lodged a complaint against her. During this call, Kim informed him that she was "going to get in trouble" for talking to him. (*Id.* at pp. 211–12).[133]

The defendants object to this Statement because it is not supported by a citation to admissible evidence, but rather relies solely on inadmissible hearsay. (*Id.* at p. 196). The defendants further contend that the Plaintiff has not sought to obtain the testimony of "Kim" about her alleged concern that she would "get in trouble" for speaking to the Plaintiff. Therefore, the defendants deny this allegation. Furthermore, the defendants contend that the Plaintiff cannot show that any concern of "Kim" was linked to any form of protected activity in which he engaged. (*Id.* at pp. 214–16, 219–20, 234). Thus, the defendants contend that this Statement is not material and should not be considered by this Court.

**132.** Assuming *arguendo* the statements by Gallagher and O'Keefe may be inadmissible hearsay, nevertheless, the Plaintiff could testify as to what they told him. In any event, as previously noted, otherwise admissible evidence may be introduced, albeit in inadmissible form, at the summary judgment stage, if the statements could be reduced to admissible evidence at trial. *Macuba,* 193 F.3d at 1323; *McMillian,* 88 F.3d at 1584.

**133.** Assuming *arguendo* this statement by "Kim" may be inadmissible hearsay, nevertheless, the Plaintiff could testify as to what "Kim" told him. In any event, otherwise admissible evidence may be introduced, albeit in inadmissible form, at the summary judgment stage, if the statements could be reduced to admissible evidence at trial. *Macuba,* 193 F.3d at 1323; *McMillian,* 88 F.3d at 1584.

30. The Plaintiff contends that one of his direct reports, Dress, told him that she was told not to discuss a sexual harassment issue with him that she would ordinarily discuss with him. (*Id.* at p. 212).[134]

The defendants object to this Statement because it is not supported by a citation to admissible evidence, but rather relies solely on inadmissible hearsay. (*Id.* at p. 196). The defendants further contend that the Plaintiff has not sought to obtain the testimony of Dress regarding any alleged instructions about her communications with the Plaintiff (even though the defendants offered to make Dress available for deposition). Therefore, the defendants deny this allegation. Furthermore, the defendants contend that the Plaintiff cannot show that any alleged instruction was linked to any form of protected activity in which he engaged. (*Id.* at pp. 214–16, 219–20, 234). Thus, the defendants contend that this Statement is not material and should not be considered by this Court.

31. The Plaintiff contends that when he learned of the issue and asked Dress why she had not discussed it with him, she indicated that she had been instructed not to share or discuss the matter with him. (*Id.* at p. 224).[135]

The defendants object to this Statement because it is not supported by a citation to admissible evidence, but rather relies solely on inadmissible hearsay. (*Id.* at p. 196). The defendants further contend that the Plaintiff has not sought to ob-

tain the testimony of Dress regarding any alleged instructions about her communicating with the Plaintiff (even though the defendants offered to make Dress available for deposition). Therefore, the defendants deny this allegation. Furthermore, the defendants contend that the Plaintiff cannot show that any alleged instruction was linked to any form of protected activity in which he engaged. (*Id.* at pp. 214–16, 219–20, 234). Thus, the defendants contend that this Statement is not material and should not be considered by this Court.

32. The Plaintiff contends that on various occasions, he also learned from other employees that inaccurate information about him was being discussed with those employees. (Pl.Depo., [Doc. 293, p. 420]).[136]

The defendants object to this Statement because it is not supported by a citation to admissible evidence, but rather relies solely on inadmissible hearsay. (Pl. Depo., [Doc.292, p. 196]). The defendants further contend that the Plaintiff has not sought to obtain the testimony of any witness who would testify that "inaccurate information about him was being discussed." Furthermore, the defendants contend that the Plaintiff cannot show that any alleged conduct was linked to any form of protected activity in which he engaged. (*Id.* at pp. 214–16, 219–20, 234). Thus, the defendants contend that this Statement is not material and should not be considered by this Court.

---

134. Assuming *arguendo* that this statement may be inadmissible hearsay, nevertheless, the Plaintiff could testify as to what Dress told him. As previously noted, otherwise admissible evidence may be introduced, albeit in inadmissible form, at the summary judgment stage, if the statements could be reduced to admissible evidence at trial. *Macuba*, 193 F.3d at 1323; *McMillian*, 88 F.3d at 1584.

135. *See* FN 134.

136. *See* FN 128.

33. The Plaintiff contends that there were times, for example, when he had to prepare certain reports such as EEO-1 reports, which required him to obtain correct data regarding, *inter alia,* the job titles, race, and age of Per–Se's employees. To assemble the necessary information, he required the cooperation of other management employees. As a result of his colleagues being prohibited from communicating with him, he contends, he was unable to complete his work. (*Id.* at p. 209).

The defendants object to this Statement because it assumes that the Plaintiff's co-workers were instructed not to "communicate with him," and such assertions are not supported by a citation to admissible evidence in violation of LR 56.1(B)(1)(a), but rather rely solely on inadmissible hearsay. (*Id.* at p. 196). The defendants further contend that the Plaintiff has not sought to obtain the testimony of any witness regarding any such alleged instructions prohibiting communications with the Plaintiff. Therefore, the defendants deny the Plaintiff's allegations. Furthermore, the defendants admit that the Plaintiff was "unable to do his job," but deny that his inability to do his job was because he "could not obtain the correct data [for the EEO–1 Report]." Moreover, the defendants contend that the allegation is not material since the Plaintiff has failed to show that his inability to obtain data for EEO–1 reports resulted in any change in the terms and conditions of his employment, or that it was linked in any way to alleged protected activity by him.

34. The Plaintiff contends that his supervisor, Jameson, refused to communicate with him or discuss personal issues he was having with co-employees. This refusal further caused the Plaintiff to be unable to "perform many functions of my job." (*Id.* at p. 210).

The defendants contend that the cited testimony does not support the Plaintiff's assertion that Jameson "refused to communicate" with him. (*Id.*) In addition, the defendants deny his assertions that Jameson "fail[ed] to respond" to him and "ignored [his] phone calls." (*Id.*) Furthermore, this allegation is not material since the Plaintiff has failed to show that Jameson's lack of communication resulted in any change in the terms and conditions in his employment.

35. The Plaintiff contends that he was physically threatened by Moore on two occasions. (*Id.* at p. 235).

The defendants dispute that the Plaintiff ever raised concerns to his superiors about any alleged mistreatment by Moore. In fact, the defendants contend that the evidentiary record establishes that the Plaintiff did not complain to his superiors that he had been harassed or intimidated by Moore. (Dagher Depo., [Doc. 216, pp. 33, 35–36, 127–28]; Jameson Depo., [Doc. 217, pp. 64–65]; Pead Depo., [Doc. 245, p. 90]; Baker Depo., [Doc. 215, pp. 144–45] ). In addition, the defendants object to the Plaintiff's characterization regarding "physical threats by Moore." They deny that Moore ever "physically threatened" the Plaintiff and set forth the following as supported by the evidentiary record:

- The Plaintiff claims to recall two instances when he was "physically threatened by Moore." (Pl.Depo., [Doc.292, p. 235] ).

- The Plaintiff claims that Moore was the "only person who physically

threatened [him] at Per–Se, . . . and it happened on two occasions." (*Id.* at pp. 235, 244).

- The first "threat" allegedly occurred in early 2002 (i.e., over a year prior to the Plaintiff's eventual resignation in 2003) after the Plaintiff made a presentation to a group of senior Per–Se managers regarding various employment statistics and personnel-related matters. (*Id.* at pp. 257, 262).

- Moore believed the presentation was replete with inaccurate data, and, as the meeting ended, approached the Plaintiff to address his concerns. (*Id.* at p. 258; Moore Depo., [Doc. 214, pp. 66, 77] ).

- The Plaintiff claims Moore was "very irate" and "screaming." (*Id.*)

- Although he cannot recall Moore's exact words, the Plaintiff thinks Moore said "something about shutting my GD mouth"; about "minding my own business"; about "letting [Moore] run his business or operations the way he runned [sic] it"; and "that I needed to be careful and watch what I did [and] I wasn't helping myself." (*Id.* at pp. 259–60).

- The Plaintiff claims that, in response, he stood up to Moore and asked, "Why are you so upset about this? . . . I'm just doing my job." (*Id.* at 261).

- The second "threat" allegedly occurred "close to Fall" 2002 (i.e., about nine months prior to his resignation) after a dinner that most of eHealth management attended at a Mexican restaurant during a management conference. (*Id.* at pp. 235–37, 244, 262).

- The Plaintiff claims that, after dinner, Moore approached him in the vicinity of other managers about some work he was doing for Moore's office. (*Id.* at pp. 236, 249).

- Again, the Plaintiff does not recall "any of the exact words Moore used" (*Id.* at p. 247), but he does recall: "He just told me that I needed to be careful and I need to keep my mouth shut"; "I could ruin my career or he could ruin my career"; "I needed to be quiet and mind my own business . . . or I would regret [it]"; "something about whipping your ass or something like that"; and "there's something about [my] career." (*Id.* at pp. 236, 245–46).

- Nothing further was said because Moore immediately walked away from the Plaintiff. (*Id.* at p. 246).

36. The Plaintiff contends that the day after the first "threat," he complained to Dagher about the incident. Dagher responded "that's just Chip [Moore] . . . just stay away." (*Id.* at p. 254).

The defendants contend that the Plaintiff has mischaracterized the record and deny that Moore ever "threatened" the Plaintiff. In addition, the defendants contend that the cited testimony does not support the Plaintiff's contention that he "complained" to Dagher or that Dagher was responding to a complaint. (*Id.* stating ("I discussed it with him.")). Moreover, the defendants further contend that the evidentiary record establishes that the Plaintiff did not complain to Dagher that he had been harassed or intimidated by Moore. (Dagher Depo., [Doc. 216, pp. 33, 35–36, 127–28] ).

37. The Plaintiff contends that the first incident occurred as he was gathering his belongings and was the last one left in the conference room. He contends that Moore

approached him and complained about the information that he had presented during the meeting. Moore stated to the Plaintiff that he should "shut his god damn mouth." (*Id.* at pp. 259–60). Moore further warned him that he wasn't helping himself and should "watch what [he] did." (*Id.* at p. 260).[137]

> The defendants contend that this Statement mischaracterizes the evidentiary record. Considering the facts in the light most favorable to the Plaintiff, and relying on the Plaintiff's own deposition testimony, the defendants established the following evidentiary record:
>
> ● The alleged incident allegedly occurred in early 2002 (i.e., over a year prior to the Plaintiff's resignation in 2003) after the Plaintiff made a presentation to a group of senior Per–Se managers regarding various employment statistics and personnel-related matters. (*Id.* at pp. 257, 262).
>
> ● Moore believed the presentation was replete with inaccurate data, and, as the meeting ended, approached the Plaintiff to address his concerns. (*Id.* at pp. 258–59; Moore Depo., [Doc. 214, pp. 66, 77]).
>
> ● The Plaintiff claims Moore was "very irate" and "screaming." (*Id.* at p. 258).
>
> ● Although he cannot recall Moore's exact words, the Plaintiff thinks Moore said "something about shutting my GD mouth"; about "minding my own business"; about "letting [Moore] run his business or operations the way he runned [sic] it"; and "that I needed to be careful and watch what I did [and] I wasn't helping myself." (*Id.* at pp. 259–60).
>
> ● The Plaintiff claims that, in response, he stood up to Moore and asked, "Why are you so upset about this? ... I'm just doing my job." (*Id.* at p. 261).

38. The Plaintiff contends that Moore testified that the Plaintiff's complaints about Katherine Matos–Williams' termination "was the straw that broke the camel's back." (Moore Depo., [Doc. 214, pp. 94–103, 108–16]; Pl. Aff., [Doc. 220, Att. 29]).[138]

> The defendants contend that the Plaintiff has mischaracterized the testimony of Moore. Indeed, Moore testified that despite the fact that Matos–Williams had engaged in misconduct that clearly warranted immediate termination, the Plaintiff refused to permit the termination because she was Hispanic, and thus in a protected minority class. (Moore Depo., [Doc. 214, pp. 112–14]). In addition, the defendants contend that Moore's dissatisfaction with the Plaintiff's work performance had built to a crescendo over the course of two years. During this period, Moore perceived that the Plaintiff was generally unresponsive to management, had a tendency to "start and stop tasks," often failed to

**137.** The Plaintiff actually characterizes this as the second "threat"; however, the undisputed evidence is that the first "threat" allegedly occurred in early 2002 after a presentation made to Per–Se managers (Pl.Depo., [Doc. 292, p. 262]), and the second "threat" allegedly occurred in the Fall of 2002 outside of a Mexican restaurant (*Id.* at pp. 235–37, 244, 262).

**138.** The Plaintiff attempted to include factual assertions solely based on speculation and conjecture, and not supported by any evidence in the record. Accordingly, this Court has disregarded those unproven alleged factual assertions.

complete tasks, was inconsistent in his approach to resolving tasks, was inaccurate in his work, consistently failed to give adequate HR support to the Cleveland operation, and frequently made poor decisions regarding personnel-related matters. (*Id.* at pp. 54, 56, 68, 150). Thus, Moore perceived the Plaintiff as being unreasonable in his refusal to agree to the termination of an employee who had engaged in egregious misconduct based solely on his concern that she might "sue" the company claiming discrimination on the basis of her protected class. (*Id.* at p. 116).

Nothing in this testimony indicates that Moore wanted to discourage the discussion of an employee's protected class-indeed, he encouraged such discussion and believed it was the Plaintiff's responsibility to raise such concerns. (*Id.* at pp. 112–13). Furthermore, the defendants contend that Moore's intent was not material as he had no authority to act upon any alleged desire to have the Plaintiff terminated. (*Id.* at pp. 52, 65, 79–80, 121). They further contend that Jameson would not have considered Moore's opinion, and in any event, this is irrelevant as the Plaintiff was never terminated. (Jameson Depo., [Doc. 217, pp. 90–91]; Pl. Depo., [Doc. 293, p. 446]).

39. The Plaintiff contends that following his opposition to employment practices, he was denied the authorization and privilege of attending senior management meetings which he previously attended. (Pl.Depo., [Doc.292, p. 183]).

The defendants contend that Plaintiff's factual assertion is not supported by the cited evidence in violation of LR 56.1(B)(1)(a). The cited testimony does not support his assertion that he "op-

pos[ed] employment practices." (*Id.*) In addition, the defendants contend that his assertion of his being denied attendance at senior management meetings is conclusory and not supported by the evidence. Indeed, the defendants contend that the facts based on the evidentiary record are as follows:

● The Plaintiff testified that prior to his resignation, he would normally only attend management meetings that would "require HR's presence" or any meeting "that they needed someone to be able to consult HR about various things." (Pl.Depo., [Doc. 293, pp. 467–68]).

● During or prior to March 2003, eHealth Division management had discussed the fact that "management meetings were quite large . . . we were trying to skinny down the meeting. Currently, [i.e., in 2005], the meeting is now down to four. At the time, it was probably 12." (Jameson Depo., [Doc. 217, p. 98]).

● The "form and substance of the management meeting was changing so we didn't need updates on marketing . . . human resources, and . . . certain sales aspects. [Thus, these functional areas] were removed from the meeting." (Dagher Depo., [Doc. 216, p. 56]).

● As a result of these considerations, Dagher determined that certain functional area representatives needed to be removed from eHealth management meetings because the focus of the meetings had, over time, shifted to simply a "focus on updating numbers and executing on those numbers to the company [CEO] and [CFO]." (*Id.*)

● "To have someone in there from HR did not make sense in that arena." (Jameson Depo., [Doc. 217, p. 98]).

• In or about March 2003, Dagher made the decision to stop inviting an HR representative to division meetings. (Dagher Depo., [Doc. 216, pp. 55–56]).

• On March 13, 2003, Dagher sent an e-mail to his administrative assistant directing her to remove the Plaintiff, Moore, and Judy Gallagher (an employee in the Accounting Department) from the list of attendees at the company's monthly management meetings. (*Id.* at pp. 54–56, Ex. 10).

• The Plaintiff is not aware "whether HR was represented at all at future meetings" after he resigned from the company. (Pl.Depo., [Doc. 293, p. 470]).

40. The Plaintiff contends that according to two of his former HR colleagues, management's removal of Fried from his supervision represented a significant change in the Plaintiff's job responsibilities, status and authority. (Fried Depo., [Doc. 288, p. 181]; Rowe Depo., [Doc. 214, p. 174]).

The defendants object to this Statement because it mischaracterizes the testimony of Fried and Rowe. Indeed, Fried testified that she believed the temporary change to the reporting structure (i.e., having Fried report to Jameson while she supported the Elgin project) was a significant change to the Plaintiff's "job responsibilities" only. (*Id.*)

Rowe testified that the "removal of subordinates from [a person's supervision]" could be perceived as a "demotion of sorts," but noted that the Plaintiff's title did not change and she did not recall the

Plaintiff being demoted. (Rowe Depo., [Doc. 214, p. 174]).

The defendants further contend that neither Fried nor Rowe testified regarding the Plaintiff's "status" or "authority." Moreover, Fried specifically denied that the Plaintiff had been "demoted." (Fried Depo., [Doc. 288, p. 225]). The defendants further contend that Rowe and Fried's personal opinions and perceptions are not material. They contend that the material issue is whether the arrangement caused a permanent and material change in the terms and conditions of the Plaintiff's job, when the facts show that it did not.

41. The Plaintiff contends that he understood that Jameson and Dagher would have been responsible for the decision not to give him a raise. (Pl.Depo., [Doc. 228, pp. 368–76]).[139]

The defendants contend that the Plaintiff mischaracterized Dagher's role in approving any merit increase for which the Plaintiff may have been qualified. Indeed, the Plaintiff testified that Dagher would have had to approve the merit increase only if the increase was more than 5 percent. (Pl.Depo., [Doc. 293, p. 368]). The typical merit increase was about 3 percent. (Rowe Depo., [Doc. 214, pp. 86–87]). The defendants dispute the Plaintiff's contention that he was entitled to a "15%–18%" annual merit increase as such an increase would only occur in conjunction with a promotion. (*Id.* at p. 87; Pl. Depo., [Doc. 293, pp. 367–68]). Indeed, the Plaintiff does not contend that he was to be promoted in 2003. The defendants fur-

---

139. This Statement of Fact contained statements not supported by the cited evidence. Thus, this Court disregarded those statements. Furthermore, this Statement of Fact

relies on speculation and conjecture, and is not supported by the evidence, as shown by the defendants' objection.

ther contend that the Plaintiff has offered no evidence, other than his speculation, based on no personal knowledge, that Dagher was otherwise involved in the decision to approve a merit increase for him. (Pl.Depo., [Doc.292, pp. 268–75] ).

42. The Plaintiff contends that on March 12, 2003, he participated in a series of e-mails with Director Joe Pittiglio and VP Jeff Cronon from the Southfield, Michigan office regarding their desire to terminate an employee because he was suspected of having AIDS, citing concerns of having to share, *inter alia*, work surfaces, phones, and keyboards with this employee. The Plaintiff objected to terminating the employee for the reasons cited, and advised that if the company did so, it would be in violation of the Americans with Disabilities Act. (Pl.Aff., [Doc. 220, p. 11, Att.37] ).

The defendants contend that the Plaintiff mischaracterized the content of the e-mails. In fact, nowhere in the e-mails does Pittiglio make any mention of possible "termination" of the employee, nor that the employee is suspected of having AIDS. Furthermore, the defendants dispute the Plaintiff's allegation that he objected to an alleged effort to terminate the employee because he was suspected of having AIDS. (Jameson Depo., [Doc. 217, p. 161]; Dagher Depo., [Doc. 216, p. 102] ).

43. The Plaintiff contends that he stated to Dagher that it was not advisable to label the termination of Johnny Morris (hereafter "Morris") as a "reduction in force," when this individual was going to be replaced by a Caucasian employee who would be more highly compensated. (Stipulation, [Doc. 123]; Complaint, [Doc. 1, ¶ 51]; Pl. Aff., [Doc. 220, Ex. 18] ).

The defendants contend that Dagher testified that he had no knowledge about this employee. (Dagher Depo., [Doc. 216, p. 35] ).

### Conclusions of Law

*Part Four*

### I. *The Standard for Review*

Pursuant to Fed.R.Civ.P. 56(c), this Court must grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue as to any material fact.[140] This Court must view any materials submitted in favor of the motion in the light most favorable to the non-moving party in deciding motions for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Knight v. Baptist Hospital of Miami, Inc.*, 330 F.3d 1313 (11th Cir.2003); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir.1991).

Once the moving party has made this showing, the burden of going forward shifts to the non-moving party to show the presence of a disputed material fact. The non-moving party cannot create a disputed issue of fact by his pleadings, but rather must file a response which includes, or at

---

140. The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

least refers to, affidavits, declarations, depositions, or similar credible evidence showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir.1997); *Worsham v. Provident Companies, Inc.*, 249 F.Supp.2d 1325, 1330 (N.D.Ga.2002).

In making its determination as to whether there exists a genuine issue of material fact, this Court is not authorized to weigh the relevant evidence and make credibility determinations. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 850 (11th Cir.2000); *McKenzie v. Davenport–Harris Funeral Home*, 834 F.2d 930, 934 (11th Cir.1987). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir.1995) (citing *Anderson*, 477 U.S. at 247–49, 106 S.Ct. 2505). Instead, a genuine issue of material fact only exists if there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict in its favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000); *Thornton v. E.I. Du Pont De Nemours and Co.*, 22 F.3d 284, 288 (11th Cir. 1994). Where the legal issue is one on which the *movant* would bear the ultimate burden of proof at trial, the movant must show

> *affirmatively* the absence of a genuine issue of material fact: it must support

its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir.1991)). Mere conclusory allegations and assertions are insufficient to create a disputed issue of material fact. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990); *Weed Wizard Acquisition Corp. v. A.A.B.B., Inc.*, 201 F.Supp.2d 1252, 1256 (N.D.Ga.2002); *Mack v. W.R. Grace Co.*, 578 F.Supp. 626, 630 (N.D.Ga.1983).

This Court will use these gauges to measure whether either party is entitled to summary judgment as a matter of law.[141]

## II. PER–SE IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S TITLE VII RETALIATION CLAIM.

Title VII's anti-retaliation provision forbids an employer from "discriminat[ing]

141. As a general matter, this Court observes that in the Plaintiff's Motion for Partial Summary Judgment and his opposition brief to the defendants' Motions for Summary Judgment, he makes numerous factual assertions that are either not supported by any citation to the evidence; or, is often the case that when the Plaintiff has cited to evidence, the evidence cited fails to support the Plaintiff's allegation. As previously noted, it is not this Court's task to cull through the materials submitted by the Plaintiff searching for evidence which creates a disputed issue of fact, *Adkinson*, 135 F.3d at 1378–80, and "it need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could be conveniently found." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir.2001).

against" an employee or job applicant because the individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in a Title VII proceeding or investigation." *See* 42 U.S.C. § 2000e–3(a). The Plaintiff contends that Per–Se retaliated against him for engaging in protected activity (i.e., opposing unlawful employment practices and filing an EEOC complaint) in violation of Title VII by, *inter alia*, demoting him in his supervisory responsibilities and job duties, excluding him from senior management meetings, denying him a salary increase, and depriving him of earned vacation days. In addition, the Plaintiff contends that he suffered an adverse job action when the defendants subjected him to retaliatory harassment, to wit: his co-workers and supervisors ostracized him and Moore threatened him on two occasions and subjected him to verbal abuse. Finally, the Plaintiff contends that he suffered an adverse employment action when he was ultimately constructively discharged by Per–Se.[142]

The ultimate question in the Plaintiff's retaliation claims is whether Per–Se retaliated against the Plaintiff by taking the foregoing actions because he engaged in protected activity. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407, 418 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The Plaintiff bears the initial burden of establishing a *prima facie* case of retaliation. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *Pace v. Southern Ry. Sys.*, 701 F.2d 1383 (11th Cir. 1983), *cert. denied*, 464 U.S. 1018, 104 S.Ct.

549, 78 L.Ed.2d 724 (1983), 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983). A plaintiff may make out a *prima facie* case of retaliation in several different ways, depending on the facts of the specific case. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, n. 13, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir.1989). As the Plaintiff has presented no direct evidence of an unlawful motive for Per–Se's actions, he must make out a *prima facie* case using circumstantial evidence. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

Once the Plaintiff makes the necessary *prima facie* showing, the burden of going forward shifts to Per–Se to present evidence that it took its actions for a legitimate non-discriminatory reason ("LNDR"). *Young v. General Foods Corp.*, 840 F.2d 825 (11th Cir.1988), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). The fact that a plaintiff makes out a *prima facie* case of retaliation does not preclude a grant of summary judgment for an employer. *Wall v. Trust Co.*, 946 F.2d 805 (11th Cir.1991); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 950 (11th Cir.1991). Despite the presumption against using summary judgment to resolve the "elusive factual question" of discriminatory intent, *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 921 (11th Cir.1993), a defendant may present such strong evidence of a non-discriminatory rationale that summary judgment is warranted. *Brown*, 939 F.2d at 946; *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir.1987).

If Per–Se proffers credible, non-discriminatory reasons for its actions that are

---

**142.** While the Plaintiff asserts his constructive discharge claim based on his resignation from employment on July 3, 2003, as an adverse action in support of his retaliation claim, this Court will address the constructive discharge claim in a separate section with its own facts and legal analysis.

sufficiently probative, then the Plaintiff must come forward with specific evidence demonstrating that the reasons given by Per–Se are mere pretexts for retaliation. *Brown*, 939 F.2d at 946. Although the Eleventh Circuit has recently held that the evidence used by a Title VII plaintiff to establish the *prima facie* case may, standing alone, suffice to create a disputed issue of fact as to pretext, *Hairston*, 9 F.3d at 921, the Plaintiff still bears the burden of establishing pretext by presenting some probative evidence thereof to avoid summary judgment. *Young*, 840 F.2d at 828–831. Furthermore, throughout the proceedings, the burden of persuasion always remains with the Plaintiff, who has the obligation of showing that he was a victim of retaliation. *St. Mary's*, 113 S.Ct. 2742, 125 L.Ed.2d at 416, 419.

### A. The Plaintiff has failed to make out a prima facie case of retaliation.

█ Generally, when relying on circumstantial evidence, a plaintiff establishes a *prima facie* case of retaliation under Title VII by showing that (1) he engaged in protected activity; (2) simultaneously therewith or subsequent thereto, he suffered an adverse employment action; and (3) some causal connection exists between the protected activity and the adverse employment action. *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir.2000); *Morgan v. Jasper*, 959 F.2d 1542, 1547 (11th Cir.1992).[143]

Here, Per–Se concedes that the Plaintiff engaged in covered protected activities when he filed an EEO complaint and opposed certain unlawful employment practices. Consequently, the Court infers that the Plaintiff has met this element. Rather, Per–Se contends that the Plaintiff cannot show that he suffered any adverse employment actions or any causal connection between his protected activities and the adverse employment actions that he alleges.

### 1. The Plaintiff did not suffer an adverse employment action.

█ Per–Se contends that the Plaintiff has failed to show that the events supporting his claims rose to the level of an adverse employment action. The U.S. Supreme Court recently clarified that the Plaintiff "must show that a reasonable employee would have found the challenged action materially adverse," which means "it well might have 'dissuaded a reasonable

**143.** This Court acknowledges that the Plaintiff contends he is entitled to partial summary judgment on his Title VII retaliation claim based on a mixed-motive theory under *Desert Palace, Inc. v. Costa, supra* [Doc. 210, p. 30]. This Court disagrees. While some courts have held that the holding in *Desert Palace* altered the employment discrimination analysis established by the Civil Rights Act of 1991, the Eleventh Circuit has not. *Cooper v. Southern Co.*, 390 F.3d 695, 724–25 (11th Cir.2004); *Sanders v. Montgomery*, 319 F.Supp.2d 1296, 1313–14 (M.D.Ala.2004); *Herawi v. Ala. Dept. of Forensic Sciences*, 311 F.Supp.2d 1335, 1344–46 (M.D.Ala.2004) (There is nothing in *Desert Palace* that undermines the continued usefulness of *McDonnell Douglas* in either single or mixed-motive cases based on circumstantial evidence for assessing Title VII liability). More importantly, however, the mixed-motive provisions of the 1991 Act do not apply to retaliation claims. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir.2001) (holding that the mixed-motive defense is still available in retaliation cases and a defendant may, therefore, avoid liability if it can prove that it would have made the same disputed employment decision in the absence of the alleged bias); *Porter v. Natsios*, 414 F.3d 13, 19 (D.C.Cir.2005) (noting that almost every circuit, including this Circuit, has held that the mixed motive provisions of the 1991 Act do not apply to retaliation claims).

worker from making or supporting a charge of discrimination.'" (i.e., an objective standard) *Burlington Northern & Santa Fe Railway Co. v. White*, ——, U.S. ——, —— ——, 126 S.Ct. 2405, 2414–15, 165 L.Ed.2d 345 (2006) (No. 05–259) (citations omitted).[144] The Supreme Court further stated that it "phrase[d] the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 2416–16. Specifically, the Supreme Court stated:

> A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children ... A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others ...
>
> [T]his standard does *not* require a reviewing court or jury to consider the nature of the discrimination that led to the filing of the charge. Rath-

er, the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint. By focusing on the materiality of the challenged actions and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination.

*Id.* (citations omitted) (internal quotation marks omitted).

The Eleventh Circuit has also held that a mere *de minimis* inconvenience, when viewed objectively, is not actionable. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir.2001) (collecting cases) (quoting 42 U.S.C. § 2000e–2(a)); *see Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1453 (11th Cir.1998); *see also Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir.2000); *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996) (noting that not everything that makes an employee unhappy is an actionable adverse action, otherwise, "every trivial personnel decision that an irritable ... employee did not like would form the basis of a discrimination suit"). As this Circuit has repeatedly noted, "Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace."

---

**144.** Prior to this recent U.S. Supreme Court decision, the Eleventh Circuit, as noted in Justice Alito's concurring opinion, required a materially adverse employment action, which it interpreted as "an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" *Gupta*, 212 F.3d at 587 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3rd Cir. 1997)). Actions that failed to rise to the level of ultimate employment decisions may still have been actionable, but they must have met "some threshold level of substantiality" to have been cognizable. *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998).

*Davis*, 245 F.3d at 1239 (citations and quotations omitted).

Although Title VII does not require proof of direct economic consequences, for purposes of showing an adverse employment action, the alleged impact on an employee must be more than speculative. *Id.; Doe*, 145 F.3d at 1449. "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Burlington Northern, supra; Davis*, 245 F.3d at 1239; *see also Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233–34 (11th Cir.2006).

Here, the Plaintiff contends that Per–Se's conduct, especially when considered in the aggregate, amounts to an adverse employment action against him as a result of his opposition to the defendants' unlawful employment practices, to wit: (a)the defendants reassigned one of his direct subordinates, Tracy Fried, from his supervisory authority; (b) he did not receive a salary increase which he was due in March 2003; (c) the defendants excluded him from senior management meetings and did not include him in the HR organizational chart; (d) the defendants took any accrued vacation hours; (e) the defendants harassed him; and (f) the defendants constructively discharged him.[145] *See* [Doc.

255, pp. 14–19]. The Plaintiff contends that when viewed collectively, these acts are sufficient to show that he suffered an adverse employment action. As discussed hereinbelow, this Court is compelled to disagree. These actions, whether viewed individually or collectively, simply do not constitute material adverse employment actions such that a reasonable person in the Plaintiff's position would have felt dissuaded from complaining or assisting in complaints about discrimination.

a. *The defendants' reassignment of Tracy Fried, denial of a merit salary increase, exclusion of the Plaintiff from senior management meetings and in the February 2003 HR organizational chart, removal of the Plaintiff's accrued vacation hours, and their retaliatory harassment do not constitute adverse employment actions under Title VII.*

1. *Reassignment of Tracy Fried* [146]

◼ The undisputed evidence shows that in March 2003, based on the needs of the facility in Elgin, Illinois that was approved by management to be closed and moved to Lawrenceville, Georgia, Jameson determined that Tracy Fried needed to be specifically assigned to provide direct HR support to senior management for the "Elgin Exchange" project, and he also determined that she should report directly to

---

**145.** As previously noted, while the Plaintiff asserts his constructive discharge claim as an adverse action in support of his retaliation claim, this Court will address the constructive discharge claim in a separate section with its own facts and legal analysis.

**146.** Although the Plaintiff also contends that Maria Dress was also reassigned from his supervisory authority, the Plaintiff has failed to present any credible evidence in support of this contention. Indeed, the evidence shows

that Dress testified that her responsibilities remained constant from the time she was hired through the duration of the Plaintiff's employment, and that she always reported to him until he left Per–Se. (DX–12, ¶¶ 8–9). Furthermore, even if Dress was reassigned from the Plaintiff's supervisory authority, the undisputed evidence is that he never suffered a decrease in compensation, loss of benefits, or change in job responsibilities. [Undisputed Facts 96, 97, 98].

him in lieu of the Plaintiff for the duration of the project. [Undisputed Facts 55, 60, 87, 88, 89, 90, 91, 92]. The Plaintiff contends, however, that this reassignment caused him to suffer an adverse employment action.

The undisputed evidence shows that the Plaintiff's salary, benefits, and job responsibilities remained the same after this reassignment. [Undisputed Facts 96, 97, 98]. The Plaintiff has failed to present any evidence that the defendants' reassignment of Fried resulted in decreased responsibilities, a demotion to the Plaintiff, diminished the prestige of his position, or in any way impeded his "professional growth or advancement." *Doe,* 145 F.3d at 1452.[147] Neither did he suffer a loss of pay or benefits. *See Davis,* 245 F.3d at 1239, 1244 (cautioning that a court should not act as a "super-personnel department" by questioning an employer's business judgment). Indeed, reassignment of job duties is not automatically actionable. *See Burlington Northern,* —— U.S. ——, —————, 126 S.Ct. 2405, 2416–17, 165 L.Ed.2d 345 (finding reassignment of job duties actionable only because considerable evidence showed that new job responsibilities were more arduous and dirtier whereas old job responsibilities required more qualifications and therefore more prestigious, and was objectively considered a better job for which the plaintiff was resented for by other employees for occupying). But here, the Plaintiff has failed to produce any evidence that the reassignment of Fried from the Plaintiff's supervisory authority affected his status as an employee in any way such that it would deter employees from complaining or opposing unlawful employment practices. Although the Plaintiff may have been subjectively unhappy with his change in responsibilities, he has failed to demonstrate that this change was objectively "adverse." *See Collier v. The Clayton County Comm. Service Bd.,* 236 F.Supp.2d 1345, 1378–79 (N.D.Ga.2002), aff'd, 82 Fed.Appx. 222 (11th Cir. Sept.4, 2003) (Table); *see also Greene v. Loewenstein, Inc.,* 99 F.Supp.2d 1373, 1383 (S.D.Fla.2000) (a transfer to a new position from plant manager to special manager was not an adverse job action, even though the plaintiff no longer supervised others, lost his private office, and was excluded from meetings). As a result, this Court is compelled to conclude that the Plaintiff has failed to present any evidence that he suffered an adverse employment action that a reasonable person would find materially adverse within the meaning of Title VII.[148]

### 2. *Denied Merit Salary Increase*

■ The Plaintiff contends that he did not receive a salary increase to which he was due in March of 2003. [Doc. 255, p. 14]. He further contends that Per–Se's failure to review him in March 2003 deprived him of a tangible economic benefit (i.e., a merit increase). [Doc. 255, p. 15]. The undisputed evidence shows that the

---

**147.** Viewing the reassignment of Fried as a demotion, as the Plaintiff urges this Court to do, is uncompelling. Indeed, the evidence shows that the Plaintiff was not, in fact, demoted as a result of this reassignment.

**148.** Per–Se also argues that Fried's reassignment to the Elgin project was temporary. While a temporary assignment to another position is generally not a materially adverse employment action especially where the Plaintiff did not suffer a reduction in pay or a loss of benefits, *Hudson v. Southern Ductile Corp.,* 849 F.2d 1372, 1375 (11th Cir.1988), reh'g denied, 859 F.2d 928, Per–Se failed to cite to sufficient evidence in support of its contention.

Plaintiff was due for an annual performance review in March 2003 for the applicable review period of March 27, 2002 to March 26, 2003. [Undisputed Fact 161]. However, prior to the end of his review period, the Plaintiff went on sick leave and then approved FMLA leave. [Undisputed Fact 162]. He was on sick leave from March 17 to March 26, 2003. [Undisputed Fact 107]. On March 26, 2003, the Plaintiff requested and received leave under the Family Medical Leave Act ("FMLA") from March 26, 2003 with an expected return date of April 29, 2003. [Undisputed Facts 108, 109]. However, the Plaintiff was unable to return on April 29, 2003, and therefore, continued on approved leave until he exhausted his twelve-week FMLA leave on June 18, 2003 [Undisputed Fact 119].

It is also undisputed that each year, in conjunction with the annual performance review process, a supervisor has some discretion to award "merit" pay increases to his or her employees. [Undisputed Fact 164]. The Plaintiff never returned to work after March 14, 2003; and, therefore, never received an annual performance review for the applicable period: March 27, 2002 to March 26, 2003. [Undisputed Fact 166]. Thus, the defendants contend that no determination was ever made as to whether the Plaintiff would receive a merit increase because, pursuant to company policy delaying a performance review for an employee on extended leave until the employee returns to work, the Plaintiff never returned to work. [Undisputed Facts, 163, 165]; (DX–11, ¶ 32).

In addition, the undisputed facts show that the Plaintiff had no entitlement to any merit increase. [Undisputed Fact 164]. "[L]oss of a bonus is not an adverse employment action in a case where the employee is not automatically entitled to the bonus." *See Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir.1996). This Court is compelled to conclude that a reasonable employee would not be dissuaded from making or supporting a charge of discrimination based on this alleged retaliatory act, whether viewed individually or collectively, as the merit increases in this case was, by its very nature, discretionary with the employer, and a reasonable employee may expect that there will always be some employees who will not receive merit increases, whether based on low performance evaluations or for any other reason.

3. *Exclusion from senior management meetings and non-inclusion in the HR organizational chart*

■ The Plaintiff contends that his status and privileges were reduced, and he, therefore, suffered adverse employment actions when the defendants excluded him from management meetings and did not include him in a February 2003 HR organizational chart. Specifically, the Plaintiff contends that he was excluded from senior management meetings in retaliation for his expressed opposition to the defendants' unlawful employment actions. (Pl.Depo., [Doc. 292, p. 183] ). In this regard, the undisputed evidence shows that in March 2003, in an effort to limit those present at the meetings to only those individuals necessary to effectuate the purpose of the meeting, Dagher made the decision to stop automatically inviting an HR representative and other managers to all division meetings. (Dagher Depo., [Doc. 216, pp. 55–56] ). As a consequence, on March 13, 2003, Dagher sent his assistant an e-mail directing her to remove the Plaintiff, Moore, and Judy Gallagher from the list of attendees at Per–Se's regular monthly management meetings. (*Id.* at pp. 54–56, Ex. 10).

Here, the Plaintiff has overstated his case by claiming that he was kept out of management meetings. Indeed, since the Plaintiff went on approved sick leave beginning on March 14, 2003, and thereafter, never returned to work at Per–Se's offices, it is unclear as to whether he was actually excluded from any meetings. Furthermore, he has provided no information regarding what was discussed at those meetings or why his attendance was required. In addition, and most notably, the very person the Plaintiff contends harassed him and engaged in unlawful employment practices (i.e., Moore) was also removed from attending the management meetings. [Undisputed Fact 173]. Moreover, the Plaintiff has failed to produce any evidence that his absence from these meetings impacted his ability to do his job. The lack of any such evidence is fatal to his assertion that his exclusion from these meetings was a material adverse employment action. *See Parkins v. Civil Constructors of Illinois,* 163 F.3d 1027 (7th Cir.1998).

As previously stated, "Not everything that makes an employee unhappy is actionable adverse action under Title VII." *Doe,* 145 F.3d at 1449 (quoting *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir. 1996)). Likewise, "[a]n employment action . . . is not adverse merely because the employee dislikes it or disagrees with it." *Collier,* 236 F.Supp.2d at 1378 (citation omitted); *see also Duffy v. Paper Magic Group, Inc.,* 265 F.3d 163, 167–68 (3rd Cir.2001) (holding that numerous actions by employer, including exclusion of plaintiff from regularly conducted seminars and committee meetings, may have caused "stress and discomfort on the job" but did not constitute adverse employment action in age discrimination suit); *Rogers–Libert v. Miami–Dade County,* 184 F.Supp.2d 1273, 1285–86 (S.D.Fla.2001) (granting

summary judgment in employer's favor; excluding plaintiff from necessary meetings, even when combined with other negative actions, was not adverse or retaliatory; citing *Dekalb County School Dist.,* 145 F.3d at 1449); *Greene,* 99 F.Supp.2d at 1382–83, n. 17 (granting summary judgment for employer where plaintiff alleged transfer was an adverse action based on proof that he had been forced to share his office and had been excluded from regularly scheduled meetings).

In the present case, Dagher made a determination to stop inviting the Plaintiff, as well as two other employees, to the management meetings. Moore, one of the employees Dagher decided to stop inviting, is the very employee the Plaintiff alleges harassed and retaliated against him for opposing unlawful employment practices. As a consequence, this Court is compelled to conclude that a reasonable employee would also not be dissuaded from making or supporting a charge of discrimination based on this alleged retaliatory act, whether viewed collectively or individually.

The Plaintiff further contends that his removal from a February 2003 HR organizational chart by Tracy Fried, considered in the aggregate, establishes an adverse action. However, the Plaintiff has failed to produce any evidence that this chart was ever implemented, that anyone other than Fried and Jameson saw it, that it caused him to suffer a loss of pay or benefits, or that it caused him to suffer a change in status. Furthermore, although these indignities may have humiliated the Plaintiff, they did not amount, either individually or collectively, to adverse employment actions. *See Ware v. Billington,* 344 F.Supp.2d 63, 72–73 (D.D.C.2004). Put simply, "a 'bruised ego' is not enough." *Burlington Indus. Inc. v. Ellerth,* 524 U.S.

742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

### 4. *Removal of his accrued vacation hours*

■ The Plaintiff also contends that his accrued vacation hours were taken away after he opposed unlawful employment practices. He also states that other Per-Se employees who did not oppose discriminatory practices did not suffer the same loss of accrued vacation benefits. However, the Plaintiff has failed to produce any evidence in support of this allegation; and, in fact, there is no evidence in the record that he was treated any differently than any other Per–Se employee. *See* [Undisputed Fact 180]. Rather, the evidence shows that the Plaintiff exhausted his paid sick leave and vacation leave while he was on sick leave and FMLA leave from March 17 to June 18, 20003 pursuant to company policy. [Undisputed Facts 107, 108, 109, 110, 113, 117, 175, 176, 177, 178, 179, 180]. Furthermore, the fact that the Plaintiff disagreed with or disliked company policy is insufficient to constitute an adverse action. *See Malladi v. Brown,* 987 F.Supp. 893, 915 (M.D.Ala.1997).

### 5. *Retaliatory harassment.*[149]

With regard to the Plaintiff's retaliatory harassment claim, he alleges the following: (1) he was ostracized by his co-workers and supervisors, (2) he was threatened by Moore on two occasions, and (3) Moore subjected him to verbal abuse. Specifically, the Plaintiff contends that he was ostracized by his co-workers, including, *inter alia,* Swaine, Jameson, Dagher, and Baker. (Pl.Depo., [Doc. 292, pp. 186–88] ). In support of this contention, the Plaintiff relies on various [identified and unidentified] employees' alleged statements to him [on unspecified dates] that they were instructed [by identified and unidentified employees] not to speak to him, and that inaccurate information about him was being discussed with these [unidentified] employees. *See* [Disputed Facts 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34].

In addition, the Plaintiff contends that Moore physically and verbally threatened him. More particularly, as previously noted, the first threat allegedly occurred in early 2002 after the Plaintiff made a presentation to a group of senior managers regarding compensation, employment statistics, and various personnel-related matters. (Pl.Depo., [Doc. 292, pp. 257, 262] ). The Plaintiff claims that after this meeting, Moore was "very irate" and "screaming." (*Id.* at p. 258). The Plaintiff further contends that Moore said words to the effect of "shut your GD mouth" and "mind your own business." (*Id.* at pp. 259–60).

The second threat allegedly occurred in the Fall of 2002 after a management con-

---

**149.** It us unclear as to whether the Plaintiff actually asserts a retaliatory hostile work environment claim or a traditional retaliation claim. This Court does not read the Plaintiff's Second Amended Complaint to allege both a traditional retaliation claim and a hostile work environment claim. [Doc. 43]. A hostile work environment claim is a separate and distinct cause of action under Title VII, and requires a different analytical approach than a traditional retaliation claim. *Rojas v.* *Florida,* 285 F.3d 1339, 1344 (11th Cir.2002). Furthermore, in the Plaintiff's Response to the defendants' Motion for Summary Judgment [Doc. 255], he appears to focus almost entirely upon the *McDonnell Douglas* burden-shifting framework for analyzing a traditional retaliation claim. Because the Plaintiff failed to present concrete arguments and evidence to support a hostile work environment claim, this Court will not discuss a retaliatory hostile work environment claim.

ference dinner at a Mexican restaurant.[150] (*Id.* at pp. 235–37, 244, 262). The Plaintiff claims that after this dinner, Moore approached him about some work he was doing in Moore's office and said words to the effect of "that he needed to be careful and keep his mouth shut," "the plaintiff could ruin his career or that [Moore] could ruin the plaintiff's career, that he needed to be quiet or he would regret it," and something about "whipping his ass." (*Id.* at pp. 236, 245–47, 249).

■ What courts have recognized is that conduct which does not involve job actions such as firing or demotion may nonetheless constitute actionable retaliation "provided [it is] severe enough to amount to adverse employment action, the classic example being constructive discharge ... or severe harassment itself." *Heuer v. Weil–McLain,* 203 F.3d 1021, 1023 (7th Cir.2000). "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern,* —— U.S. ——, —— – ——, 126 S.Ct. 2405, 2414–15, 165 L.Ed.2d 345 (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed.1996)) (stating "courts have held that personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers" are not actionable under § 704(a)). A claim for retaliatory harassment, like other types of harassment, still requires proof of harassing acts so severe or pervasive that they altered the terms and conditions of the Plaintiff's employment. *Id.; see gen-*

*erally Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations and quotation marks omitted); *Gupta, supra.* Requiring a plaintiff to prove that the harassment was severe and pervasive ensures that Title VII does not become a "general civility code." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

■ Generally, the courts have held that shunning or ostracism by co-workers and supervisors is insufficient to sustain a retaliation claim. *See Wu v. Thomas,* 996 F.2d 271, 273 n. 3 (11th Cir.1993), *cert. denied,* 511 U.S. 1033, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994) ("we cannot find any case that clearly established that retaliatory harassment, as opposed to sexual or racial harassment, could violate Title VII where the employer caused the employee no tangible harm, such as loss of salary, benefits or position") *Williams v. City of Kansas City,* 223 F.3d 749, 754 (8th Cir. 2000) (supervisor's "silent treatment is at most ostracism, which does not rise to the level of an actionable adverse employment action"); *Munday v. Waste Management of North America, Inc.,* 126 F.3d 239, 243 (4th Cir.1997), *cert. denied,* 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998) (yelling at the employee and telling others to ignore and spy on her does not constitute an adverse employment action); *Metcalf v. Metropolitan Life, Inc.,* 961 F.Supp. 1536, 1544 (D.Utah 1997) ( [b]eing treated "almost contemptuously" by fellow employees, the "isolation treatment," and publicly criticizing an employee's work performance without just cause does not constitute

---

**150.** The Plaintiff's testimony is actually unclear as to which incident took place first. In his deposition, he refers to the Mexican restaurant incident has having occurred first and the conference room incident as second (Pl.

Depo., [Doc. 292, pp. 235–36, 257] ), but he later testified that he believes the conference room incident occurred first in early 2002 and the Mexican restaurant incident in the Fall of 2002. (*Id.* at pp. 261–62).

adverse employment action by an employer); *Scusa v. Nestle USA Co., Inc.*, 181 F.3d 958, 969–70 (8th Cir.1999) ("general allegations of co-worker ostracism" are not actionable); *Reynolds v. Golden Corral Corp.*, 106 F.Supp.2d 1243, 1255 (M.D.Ala. 1999) (shunning and not speaking to the plaintiff did not support harassment claim); *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1112 (9th Cir.2000) (finding that a supervisor who reacted to plaintiff's complaint about him by being less civil, staring at her in a hostile fashion, and being more critical of her performance did not constitute an adverse employment action within the meaning of Title VII); *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir.2000) ("[M]ere ostracism by co-workers does not constitute an adverse employment action") (citation omitted); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir.1998) (terms and conditions of plaintiff's employment were not affected by co-workers' shunning).

Furthermore, even if shunning was actionable under the Eleventh Circuit standards, the Plaintiff has failed to establish that he was shunned or ostracized because of his protected activity, as opposed to some lawful factor, such as his co-workers simple dislike for him. Moreover, the Plaintiff's allegations of threats by Moore are, likewise, devoid of any evidence that the Plaintiff's protected activity was the motivating factor behind Moore's alleged actions. In addition, there is no evidence that Moore possessed the authority or apparent authority during the period in which these events transpired to affect the terms of the Plaintiff's employment. *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1553 (11th Cir.1997).

Indeed, the Plaintiff has failed to cite to any legal authority in which a court found "severe or pervasive" retaliatory harassment based on events similar to those alleged here. A thorough review of the case law has revealed that courts have refused to find actionable retaliation based upon a "totality of the circumstances" far greater than that at issue here. *See Silk v. City of Chicago*, 194 F.3d 788 (7th Cir. 1999) (in evaluating a retaliation claim brought under the ADA, the court found that verbal harassment regarding a plaintiff's medical condition, ridicule from fellow co-workers, threats of physical violence, lowered performance evaluations, loss or modification of earned days of leave, and the denial of supervisory authority did not rise to the level of a materially adverse employment action). As a result, Plaintiff's retaliatory claim based on harassment, whether viewed individually or collectively, is insufficient to support an adverse employment action as the Plaintiff has failed to show that the alleged actions were severe or pervasive enough to constitute actionable harassment under Title VII or to dissuade employees from opposing unlawful employment practices.[151]

**B.** *Per-se Has Produced Evidence of Legitimate Nondiscriminatory Reasons (LNDR) for its Employment Actions.*

■ Assuming *arguendo* that the Plaintiff had made out a *prima facie* case of

---

**151.** "Although a plaintiff's burden in proving a prima facie case is light, summary judgment against the plaintiff is appropriate if he fails to satisfy any one of the elements of a prima facie case." *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432–33 (11th Cir.1998) (citation omitted). As this Court has concluded that the Plaintiff has failed to set forth an adverse employment action, he has failed to make out a *prima facie* case of retaliation under Title VII, and there is no need to address the causation element of a retaliation claim.

retaliation in violation of Title VII, the burden of going forward would shift to Per–Se to produce evidence of a legitimate, nondiscriminatory reason ("LNDR") for its actions. *Young*, 840 F.2d at 825. Here, Per–Se has articulated legitimate, nondiscriminatory reasons for its actions.

First, with regard to the reassignment of Tracy Fried, the undisputed evidence shows that at the time of the Plaintiff's employment with Per–Se, the eHealth Division operated a facility in Elgin, Illinois. [Undisputed Fact 55]. As the HR Director for eHealth, the Plaintiff was responsible for providing HR support to the Elgin Exchange. [Undisputed Fact 56]. The Elgin Exchange was responsible for processing all company claims transactions, and was therefore, a "critical piece" in Per–Se's business operations. [Undisputed Fact 57]. The senior manager with overall responsibility for the Elgin Exchange was Senior VP John George and the second manager in charge was VP Mubarak Chouhdry. [Undisputed Fact 59]. In late 2002 and early 2003, the eHealth Division was contemplating shutting down the Elgin Exchange and moving its operations to its Lawrenceville, Georgia location. [Undisputed Fact 60]. If the Elgin Exchange was closed, it would result in a substantial reduction in force at the Elgin Exchange. [Undisputed Fact 63]. As a result, in early 2003, the Elgin facility was experiencing "a lot of turmoil" with its employees and several HR-related issues needed to be addressed. [Undisputed Fact 64].

In late 2002 and early 2003, Tracy Fried, an HR assistant who reported to the Plaintiff, started providing regular HR support to Elgin managers as they dealt with the HR issues associated with the possibility of closing the facility and in the Plaintiff's absence from the facility. [Undisputed Fact 65]. By early 2003, senior managers in charge of the Elgin Exchange (i.e., George and Chouhdry) started to rely primarily on Fried for HR support to Elgin because their concerns were not being addressed by the Plaintiff. [Undisputed Fact 66]. In addition, by early 2003, Fried was traveling to Elgin to provide HR support at least twice a month. [Undisputed Fact 67]. Although Fried became the exclusive provider of HR support for the Elgin Exchange, she was still being supervised by the Plaintiff. [Undisputed Fact 68]. Senior managers in charge of the Elgin Exchange (i.e., George and Chouhdry) were dissatisfied with the lack of HR support they received from the Plaintiff, and they believed that he was an obstacle to the excellent support they were receiving from Fried. [Undisputed Fact 69]. By early 2003, George and Chouhdry were "bombarding" Jameson about a "crisis" at the Elgin Exchange because of "all kinds of personal issues." [Undisputed Fact 70]. George and Chouhdry informed Jameson that when Fried spent some time in Elgin, "the temperature of the office just cooled down instantaneously." [Undisputed Fact 72]. However, George and Chouhdry further informed Jameson that the Plaintiff continued to be an obstacle to Fried, precluding her from providing the support they needed. (*Id.*)

On January 27, 2003, George sent an e-mail to Jameson in which he (1) expressed his dissatisfaction with the Plaintiff's support of the Elgin Exchange; and (2) requested that Jameson allow Fried to provide support to Elgin. [Undisputed Fact 73]. On January 29, 2003, Chouhdry sent an e-mail to Jameson noting that "HR issues [would] continue to be a challenge" as the Elgin project moved forward, and requested that Fried be permitted to pro-

vide HR support for the Elgin Exchange. [Undisputed Fact 74]. By March 2003, based on complaints he was receiving from the senior managers at Elgin and other managers, Jameson concluded that the Plaintiff's responsiveness to senior management was seriously deficient. [Undisputed Fact 75]. Jameson determined that the Plaintiff was increasingly non-responsive to management, was difficult to find, was often missing from the workplace, and was becoming an obstacle to HR support to Elgin. (*Id.*) Meanwhile, Jameson also concluded that Fried was doing a "wonderful job" of "diffusing a time bomb" situation in Elgin. (*Id.*)

On March 4, 2003, George sent another e-mail to Jameson complaining about the Plaintiff's lack of responsiveness with regard to a situation taking place with an employee who had been terminated (i.e., Corine Morrow). [Undisputed Fact 82]. Subsequently, on the next day, Chouhdry sent an e-mail to the Plaintiff describing his dissatisfaction with his support to the Elgin Exchange. [Undisputed Fact 83]. On March 10, 2003, Chouhdry sent another e-mail to Jameson regarding his dissatisfaction with the Plaintiff's support to the Elgin Exchange. [Undisputed Fact 86]. Based on these complaints and the fact that the Elgin project was granted final approval, Jameson determined that Fried needed to be fully committed to assisting George and Chouhdry for the duration of the Elgin project, and that she would report directly to him in lieu of the Plaintiff. [Undisputed Facts 87, 88, 89, 90, 91, 92].

Second, with regard to the alleged denial of a merit increase in March 2003, the undisputed facts show that pursuant to Per–Se's standard company practice, when an employee is on an extended leave of absence, the employee's annual review is delayed until the employee returns to work. [Undisputed Fact 163]. Upon the employee's return to work, the employee is given a performance review, and if the employee is recommended for a merit pay increase, Per–Se's regular practice is to retroactively grant such a merit pay increase. [Undisputed Fact 165]. The Plaintiff was on approved sick and FMLA leave from March 17 to June 18, 2003. [Undisputed Facts 107, 108, 109, 119]. The Plaintiff was scheduled to return to work from his approved leave of absence on July 1, 2003. [Undisputed Fact 142]. However, the Plaintiff failed to report; and, on July 3, 2003, the Plaintiff telephoned Swaine and advised him that he would not be returning to work at Per–Se. [Undisputed Fact 158]. The Plaintiff never returned to work after March 14, 2003; and, therefore, in accordance with Per–Se's policy, he never received an annual performance review for the applicable period of March 27, 2002 to March 26, 2003. [Undisputed Fact 166]. Therefore, Per–Se contends that it was never required to make a determination as to whether the Plaintiff would receive a merit increase. (DX–11, ¶ 32). In short, as he never returned to work, Per–Se never had the opportunity to either grant or deny the Plaintiff an annual increase.

■ The Plaintiff contends that pursuant to Per–Se policy, supervisor's review their subordinates one year from the date of the employee's last review; and therefore, the Plaintiff should have been reviewed by Per–Se in March of 2003. He further contends that Per–Se's failure to review him in March 2003 deprived him of a tangible economic benefit. [Doc. 255, p. 15]. Although the Plaintiff failed to present any credible evidence that reviews always take place exactly one year from the

date of the last review, even if this Court accepts Plaintiff's allegation as true, Per–Se would not have been ordinarily required to review the Plaintiff until March 22, 2003 (i.e., one year from his last review of March 22, 2002). However, at that time, he was already on approved sick leave. *See* [Doc. 214, Ex. 3]; [Undisputed Fact 107]. Therefore, the Plaintiff has failed to present any evidence disputing the foregoing company policy and disproving that when an employee is on an extended leave of absence, his annual review is delayed until he returns to work.[152] [Undisputed Fact 163]. Since the Plaintiff never returned to work after March 14, 2003, he was never entitled to have his review, and Per–Se, therefore, never had the occasion to make a determination as to whether he would receive a merit increase for the applicable year.

Moreover, the Plaintiff has failed to identify any similarly situated employees who did not oppose unlawful employment practices at Per–Se that were given merit increases while they were on extended leaves of absence. Thus, he has failed to present any evidence that Per–Se enforced its policies exclusively against him in retaliation for his complaints. "When an employer applies its standard policies in a nondiscriminatory manner, its action is not objectively adverse." *Cotton,* 434 F.3d at 1234 (citation omitted); *see also Sowell v.*

---

**152.** The Plaintiff contends that Per–Se's policy of not reviewing employees on leave violates the FMLA, which states that the taking of leave "shall not result in the loss of employment benefits accrued prior to the date on which the leave commenced." *See* 29 U.S.C. § 2614. However, this Court finds the Plaintiff's argument uncompelling. A central point of the FMLA is that employees on leave are not entitled to special privileges. 29 U.S.C. § 2614(a)(3)(B) provides in pertinent part:

Nothing in this section shall be construed to entitle any restore employee to ... any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.

An employee on FMLA leave has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. *See* 29 C.F.R. § 825.216(a). For example,

an employer may fire an employee for misconduct while on leave, as long as "the employer's policies are nondiscriminatory, are applied uniformly to similarly-situated employees, and violate no other laws, regulations, or collective bargaining agreements where applicable." Comments to 29 C.F.R. § 825.216. This same logic applies to pay increases given to employees after a certain period of service. Department of Labor regulations allow employers to delay the pay increase by the amount of time the employee has spent on FMLA leave:

Because restored employees are not entitled to accrue seniority during a period of FMLA leave, pay increases based on performance reviews conducted after 12 months of completed service with the employer may be delayed by the amount of unpaid FMLA leave an employee takes during the 12–month period (in the absence of policies that treat other forms of unpaid leave differently).

*See* Department of Labor Summary of Major Comments, 60 Fed.Reg. 2180, 2215 (1995). Per–Se's policy provides that an employee on an extended leave of absence during his or her applicable review period will be reviewed upon his or her return to work from leave of absence. Any merit increase that the employee may be awarded would be applied retroactively. As merit increases are discretionary to start with, the Plaintiff was never entitled to a merit increase prior to his taking leave. Furthermore, the Department of Labor, as noted above, provides if the employer determines that its employee is entitled to a pay increase, the employer may delay the payment thereof by the amount of unpaid FMLA leave an employee takes during the year. Therefore, Per–Se is not using the Plaintiff's taking of FMLA leave as a negative factor or to deny the Plaintiff employment benefits accrued prior to his taking leave.

*Alumina Ceramics, Inc.,* 251 F.3d 678, 684 (8th Cir.2001) (no adverse employment action where policy applied to all employees). Furthermore, when he was due for a review, the Plaintiff neither complained to his supervisor that he had not yet received his review, nor reported this issue to Per–Se management. Indeed, he offered no evidence that he subjectively viewed Per–Se's failure to conduct his review as an adverse action. *Id.* Therefore, this Court is compelled to conclude that the Plaintiff has failed to demonstrate a genuine issue as to whether he suffered an adverse employment action based on Per–Se's denial of a merit increase to which he may have been entitled.

Likewise, with regard to the Plaintiff's claim that he was denied accrued vacation time, the undisputed evidence shows that the Plaintiff was out of work because of a sickness from March 17 to March 26, 2003. [Undisputed Fact 107]. On March 26, 2003, the Plaintiff asked Per–Se for permission to take FMLA leave, which Per–Se approved, effective March 26, 2003. [Undisputed Facts 108, 109]. On April 14, 2003, Swaine sent the Plaintiff a letter noting that his request for FMLA leave had been approved beginning on March 26, 2003 with an expected return date of April 29, 2003; and that, pursuant to company policy, he would be required to use all vacation and sick benefits concurrently with his FMLA leave, and after such benefits were exhausted, any remaining leave would be unpaid. [Undisputed Fact 110].

It is undisputed that while the Plaintiff was on approved FMLA leave, he was, pursuant to company policy, required to use accrued vacation and sick leave. [Undisputed Fact 175]. On June 18, 2003, the Plaintiff exhausted his twelve-week FMLA leave. [Undisputed Fact 119]. On May 23, 2003, the Plaintiff sent a letter to Swaine requesting a copy of all of Per–Se's records regarding his paid vacation and sick days since his hire date. [Undisputed Fact 176]. In response, Swaine accumulated all relevant data in Per–Se's possession and created a detailed analysis of the Plaintiff's earned vacation and sick leave since his hire date, which he provided to the Plaintiff. [Undisputed Facts 177, 178]. The Plaintiff did not respond to Swaine's letter, and never contacted Swaine to contest Swaine's analysis. [Undisputed Fact 179]. Moreover, it is undisputed that the Plaintiff cannot identify any other employee (i.e., a comparator) who "left the company on or after July 2003[who] got vacation pay for an extent that [the Plaintiff] did not." [Undisputed Fact 180]. As previously stated, "[w]hen an employer applies its standard policies in a nondiscriminatory manner, its action is not objectively adverse." *Cotton,* 434 F.3d at 1234 (citation omitted); *see also Sowell,* 251 F.3d at 684 (no adverse employment action where policy applied to all employees). Thus, the Plaintiff has failed to present any credible evidence that Per–Se enforced its policies against him in retaliation for his complaints.

Finally, with regard to Dagher's decision to no longer automatically include the Plaintiff in senior management meetings, the undisputed evidence shows that prior to his resignation, the Plaintiff would normally only attend management meetings that would "require HR's presence" or any meeting "that they needed someone to be able to consult HR about various things." [Undisputed Fact 167]. Prior to March 2003, the eHealth Division management team had discussed the fact that its management meetings had become unduly large, cumbersome, and needed to be downsized for efficiency. [Undisputed

Fact 168]. The form and substance of the management meetings was changing and updates, marketing, human resources, and certain sales aspects were no longer routinely needed thereat since the focus of the meetings had shifted to a "focus on updating numbers and executing on those numbers to the company [CEO] and [CFO]." [Undisputed Facts 169, 170]. Thus, Dagher made the decision to remove these areas from the meeting in or about March 2003. [Undisputed Facts 169, 170, 172]. Indeed, in 2005, the meetings were down to four participants, as opposed to twelve (as in the past). [Undisputed Fact 168].

It is further undisputed that on March 13, 2003, Dagher sent an e-mail to his administrative assistant directing her to remove the Plaintiff, Moore, and Judy Gallagher, an employee in the Accounting Department, from the list of attendees at the company's monthly management meetings. [Undisputed Fact 173]. Moreover, the Plaintiff testified that he is not aware "whether HR was represented at all at future meetings" after he resigned from the company. [Undisputed Fact 174].

Thus, Per–Se has shown that it took the foregoing employment actions against the Plaintiff for legitimate nondiscriminatory reasons (LNDR). This Court finds that Per–Se's evidence is sufficient to meet its relatively light burden of production. In short, Per–Se has articulated legally sufficient legitimate non-discriminatory reasons for its employment actions. Thus, the burden of going forward returned to the Plaintiff to produce evidence of pretext.

C. *The Plaintiff has Failed to Create a Disputed Issue of Fact that Per–Se's Legitimate, Nondiscriminatory Reasons (LNDR) were Pretexts for Retaliation.*

Once Per–Se has articulated legitimate non-discriminatory reasons for its employment actions, the Plaintiff must demonstrate, or at least create a disputed fact, that the reason proffered by the employer was not the true reason for the employment decision and that Per–Se's true reason was unlawful retaliation. *St. Mary's,* 509 U.S. at 502, 113 S.Ct. 2742, (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089). The burden of proving that the employer's unlawful reason, in fact, was the true reason for the Plaintiff's adverse employment action, devolves upon the Plaintiff at trial. *Id.* Therefore, to withstand summary judgment, a plaintiff need only present evidence that the defendant's articulated reason is not credible, as a "rejection of the defendant's proffered reason will permit the trier of fact to infer the ultimate fact of intentional discrimination." *St. Mary's,* 509 U.S. at 502, 113 S.Ct. 2742 (emphasis provided); *Combs,* 106 F.3d at 1519; *Richardson v. Leeds Police Dep't,* 71 F.3d 801 (11th Cir.1995); *Cooper–Houston v. Southern Ry. Co.,* 37 F.3d 603 (11th Cir.1994); *Howard v. BP Oil Co., Inc.,* 32 F.3d 520, 525 (11th Cir. 1994); *Batey v. Stone,* 24 F.3d 1330 (11th Cir.1994). The Plaintiff may meet his burden by (a) presenting evidence that Per–Se's proffered reason is not worthy of belief, from which a jury could infer that retaliation was the real reason, or (b) by presenting evidence that retaliation was, in fact, the real reason. *St. Mary's,* 509 U.S. at 502, 113 S.Ct. 2742, *Howard,* 32 F.3d at 520.

In attempting to show pretext, however, a plaintiff may not recast an employer's legitimate, non-discriminatory reason or substitute his business judgment for that of the employer, but instead must meet each reason head on and rebut it. *Chapman,* 229 F.3d at 1030. As previously noted in numerous decisions, the Court's role is not that of an employer's super-

personnel department. Consequently, "it is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not motivated [by race or some other impermissible factor]." *Id.,* (quoting *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1341 (11th Cir.2000)); *see Combs,* 106 F.3d at 1523.

Here, the Plaintiff has not squarely challenged the legitimacy of the LNDR offered by Per–Se. In fact, he has not offered any additional evidence to support his contentions other than his imagination and his interpretation of events from the *prima facie* case. This Court is, of course, obliged to view the Plaintiff's evidence in the light most favorable to him. Nevertheless, this Court concludes that the Plaintiff's evidence is insufficient to create a disputed issue of fact as to pretext. *See Chapman,* 229 F.3d at 1030. It must be emphasized that an employer has the right to make an employment decision for a multitude of reasons: It can be for the right reason, for the wrong reason, or for no reason. The employer is only prohibited from taking an adverse job action for an impermissible reason. Indeed, it may even make a mistake as to the basis of the reason. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984), *reh. den.,* 747 F.2d 710 (1984).

The Plaintiff contends that Per–Se's LNDR is pretextual because statements made by management-level employees demonstrate retaliatory animus; and, thus, create an issue of fact as to the pretextual nature of Per–Se's LNDR. Specifically, the Plaintiff relies on statements allegedly made by Swaine, Moore, Wood, and various (unidentified) employees, and an e-mail from Dagher [153], which he contends shows that Per–Se wanted him terminated from his employment with Per–Se. *See* [Doc. 255, pp. 32–34]. However, the Plaintiff has failed to show how any of these statements, as he asserts, suggests retaliatory animus by the alleged speaker. For example, the Plaintiff contends that, in response to his opposing unlawful employment practices, Swaine advised him to "let things go" and that he "would only be hurting himself and his career by openly opposing employment practices that might get the company in trouble." [*Id.* at p. 32; Plaintiff's Fact 5]. This Court fails to see how this alleged statement even remotely suggests retaliatory animus on the part of the defendants or in any way creates a disputed issue of fact as to the defendants' LNDR. Furthermore, this speculative statement amounts to nothing more than a stray remark under the facts of this case, and does not constitute evidence of retaliation. Indeed,

**153.** This Court has reviewed the e-mail from Dagher; and, while it discusses the termination of the Plaintiff in association with a RIF, the undisputed evidence shows that the Plaintiff was never, in fact, terminated by Per–Se. Furthermore, the Plaintiff mischaracterizes the content of the e-mail to Per–Se employees [Doc. 256, Ex. 7], and this Court declines to infer "that the company had no desire for [the Plaintiff] to remain employed" based thereon. The undisputed evidence shows that in March 2003, Medaxxis, a business unit in the eHealth Division, was transferred from eHealth to Physicians Services, a different Per–Se division. [Undisputed Fact 127]. The Medaxxis transfer was based on the fact that the business model of Medaxxis (i.e., sale of software packages to small physician practices) was "better aligned" with the business model of the Physician Services Division. [Undisputed Fact 128]. As a result of this transfer, Medaxxis management would then be supported by the Physician Services Division's HR Department. [Undisputed Fact 129]. Thus, on March 19, 2003, the Senior VP of Medaxxis sent an e-mail to the unit's senior managers in which he thanked the Plaintiff for his support and welcomed the Physician Services HR staff (i.e., Rhian and Jennifer) to the Medaxxis team. [Undisputed Fact 130].

there is no evidence in the record that Swaine, Moore or Wood were in any way related to or were decisionmakers with respect to the alleged retaliatory employment actions taken by Per–Se against the Plaintiff. In fact, with regard to the alleged threats by Moore [Doc. 255, p. 33], it is undisputed that the Plaintiff did not report directly to Moore, and that Moore had no authority to take personnel actions with respect to the Plaintiff. [Undisputed Fact 13]. Accordingly, statements by these non-decisionmakers unrelated to the decisional process at issue are not sufficient to satisfy the Plaintiff's burden of demonstrating that the defendants' proffered reasons were pretexts for retaliation. *See Steger v. General Electric Co.*, 318 F.3d 1066, 1079 (11th Cir.2003) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring)); *Rowell v. BellSouth Corp.,* 433 F.3d 794, 802 (11th Cir.2005); *Mitchell v. USBI Co.,* 186 F.3d 1352, 1355 (11th Cir.1999) (managers' statements did not constitute circumstantial evidence of discrimination where the managers were non-decisionmakers, especially where the comments were ambiguous) (citing *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1326 (1998) (statement by non-decisionmaker was not probative of discriminatory intent)).[154]

In short, this Court is compelled to conclude that the Plaintiff's evidence and his subjective interpretation of events could not convince a reasonable factfinder to reject Per–Se's reasons for its employment actions or conclude that retaliation was its real reason. Viewing all of the evidence in the light most favorable to him, the record

in the present case is bereft of evidence from which a rational factfinder could infer that Per–Se retaliated against the Plaintiff for opposing unlawful employment practices. Consequently, Per–Se is entitled to summary judgment on the Plaintiff's Title VII retaliation claim for the additional reason that the Plaintiff has failed to show or create a disputed material fact that Per–Se's LNDR is a pretext for retaliation.

### III. PER–SE IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S TITLE VII RETALIATORY CONSTRUCTIVE DISCHARGE CLAIM.

The Plaintiff contends that Per–Se retaliated against him for engaging in protected activity, which resulted in his constructive discharge. 42 U.S.C. § 2000e–3(a) prohibits retaliation by an employer against an employee who engages in protected activity. *See Durley v. APAC, Inc.,* 236 F.3d 651, 657 (11th Cir.2000). As such, the Plaintiff must first establish his *prima facie* case of retaliation. Here, it is undisputed that the Plaintiff engaged in protected activity, however, the Plaintiff contends that he suffered an adverse employment action when the defendants constructively discharged him. The "threshold for establishing constructive discharge ... is quite high," higher than that for proving a hostile work environment. *Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1231 (11th Cir.2001), *cert. denied,* 534 U.S. 1127, 122 S.Ct. 1064, 151 L.Ed.2d 968 (2002); *see also Beltrami v. Special Counsel, Inc.,* 2006 WL 279238, at *1 (11th Cir.2006) (No. 05–12164). Specifically, if

---

**154.** The Plaintiff also contends that the temporal proximity between his protected activities and alleged adverse treatment is sufficient to establish pretext. [Doc. 255, pp. 34–38].

However, the Plaintiff has failed to set forth any evidence linking particular protected activity to an alleged adverse employment action.

an employer deliberately makes an employee's working conditions so intolerable that no reasonable employee could be expected to endure it (compelling the employee to involuntarily resign), the employer is "as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee." *Doe,* 145 F.3d at 1450.

■ In order to establish a constructive discharge claim using circumstantial evidence, the Plaintiff must prove: (1) that his working conditions were so intolerable that no reasonable person could be expected to endure them; (2) that the intolerable working conditions were a product of conduct that violated Title VII; (3) that Per–Se was responsible for the intolerable working conditions; and (4) that his involuntary resignation resulted therefrom. *See Kilgore v. Thompson & Brock Mgmt.,* 93 F.3d 752, 754 (11th Cir.1996); *Morgan v. Ford,* 6 F.3d 750, 755 (11th Cir.1993), *cert. denied,* 512 U.S. 1221, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1317 (11th Cir.1989). In short, the Plaintiff must offer proof that the employer intentionally rendered his working conditions so difficult, unpleasant or intolerable that he was compelled to quit involuntarily because a reasonable person in his shoes would have felt compelled to resign. *See Poole v. Country Club, Inc.,* 129 F.3d 551, 553 (11th Cir.1997); *Buckley v. Hospital Corp. of America, Inc.,* 758 F.2d 1525, 1530 (11th Cir.1985). Nevertheless, the Plaintiff has an obligation not to assume the worst or to jump to conclusions too fast. *See Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir.1987). Therefore, courts generally require the aggrieved employee to give the employer sufficient time to remedy the allegedly intolerable situation before leaving his job. *See id.*

■ Here, the Plaintiff has presented the same alleged retaliatory actions as above in an effort to establish that his working conditions were intolerable. However, the only evidence of hostility that the Plaintiff presented that was directed at him are the two alleged incidents involving Moore's alleged isolated threats, which incidents occurred almost nine months to a year prior to his resignation. Furthermore, on June 27, 2003, the Plaintiff attended a meeting with Swaine, Jameson and Dagher regarding his return to work from his three-month approved leave of absence, and he advised him that he was ready to return to work and wanted to return to work the following business day. Swaine, however, replied that he needed more time to prepare Per–Se employees for the Plaintiff's return to work. Therefore, they decided that he would return to work on July 1, 2003. [Undisputed Facts 135, 141, 142]. Moreover, the undisputed evidence shows that the Plaintiff was advised at this meeting that Per–Se had reassigned Moore from his former position as GM of the Cleveland location to a position that would not require him to interact with the Plaintiff. [Undisputed Facts 126, 139]. More importantly, the Plaintiff continually advised them that he intended to return to his employment with Per–Se. [Undisputed Facts 117, 118, 121, 135, 150, 152, 153]. However, the Plaintiff testified that, after this meeting, he did not feel comfortable that the alleged harassment was going to stop despite assurances the defendants had given him that it would not take any retaliatory actions against him. (Pl. Depo., [Doc. 292, pp. 68–69]; Swaine Depo., [Doc. 219, pp. 99, 137–38, Exs. 5–6]; Swaine Decl., [Doc. 228, ¶¶ 20, 22] ); [Un-

disputed Facts 132, 134, 143, 148, 149]. As previously stated, the Plaintiff had an obligation not to assume the worst, and not to jump to conclusions too fast (i.e., that he would be subjected to harassment). *Garner, supra.* Courts do not consider the Plaintiff's subjective feelings, but rather, rely on a reasonable person's standard; and, because the employer eliminated virtually all of the conduct about which the Plaintiff complained, it was unreasonable for the Plaintiff to assume the worst (i.e., that he would again be subjected to harassment). *See McDaniel v. Merlin Corp.,* 2003 WL 21685622, at *1 (N.D.Ga. 2003) (No. 1:01CV2992JEC) (adopting J. Feldman's R & R); *Smith v. Akstein,* 408 F.Supp.2d 1309 (N.D.Ga.2005).

While the Plaintiff has presented evidence of alleged working conditions he considered unpleasant, he has failed to show that Per–Se subjected him to working conditions that were so hostile and pervasive that a reasonable person would have found them intolerable. *See Beltrami,* 2006 WL 279238, at *1 (where employee was given a list of allegedly extremely difficult work objectives to accomplish within 30 days, and employer's intent was to terminate him when he did not complete the objectives, working conditions were not so intolerable as to establish a retaliatory constructive discharge claim); *Fitz v. Pugmire Lincoln–Mercury, Inc.,* 348 F.3d 974, 977–78 (11th Cir.2003) (affirming the district court adopting J. Feldman's R & R) (being reprimanded and hearing from coworkers of management's intent to fire him were insufficient to show constructive discharge); *Wardwell v. School Bd. of Palm Beach County, FL,* 786 F.2d 1554, 1558 (11th Cir.1986) (holding that employer's failure to promote and added workload were insufficient to a constitute constructive discharge); *Boze v. Branstetter,* 912

F.2d 801, 804–06 (5th Cir.1990) (holding that unwarranted criticism, poor performance evaluation, probation and withdrawal of responsibilities did not constitute a constructive discharge as a matter of law). Neither has he shown that he suffered any adverse actions at the time that the alleged events were occurring. Furthermore, the Plaintiff's constructive discharge claim fails for the additional reason that he has failed to put forth any evidence that the defendants wanted him to quit. *See Cross v. Southwest Recreational Indus., Inc.,* 17 F.Supp.2d 1362, 1376 (N.D.Ga. 1998). Instead, the undisputed evidence shows that Per–Se continued to communicate with the Plaintiff while he was on approved leave, and coordinated and prepared for him to return to work. [Undisputed Facts 111, 112, 114, 115, 120, 121, 122, 125, 132, 134, 141, 142, 143, 148, 149, 157]. *See Smith,* 408 F.Supp.2d at 1332–33 (no constructive discharge where the plaintiff failed to present evidence that it was his employer's purpose for employee to resign).

Viewing the evidence in the light most favorable to the Plaintiff, this Court is compelled to conclude that the Plaintiff's evidence does not show that the alleged conduct was so severe or pervasive enough to support a finding of constructive discharge. Simply put, there are no allegations of harsh treatment; and, even if the Plaintiff could demonstrate he was subjected to harsh treatment, Title VII does not shield employees against harsh treatment in the workplace. *McCollum v. Bolger,* 794 F.2d 602, 610 (11th Cir.1986); *Hellums v. Webster Indus., Inc.,* 97 F.Supp.2d 1287, 1297 (M.D.Ala.2000) ("hurt feelings are insufficient as proof of constructive discharge"). Since the Plaintiff has failed to prove that his workplace was "permeated with discriminatory intimidation, ridi-

cule and insult," he is not entitled to Title VII relief. *Harris*, 510 U.S. at 21, 114 S.Ct. at 370.

Although alleged ostracism by employees and harassment by Moore may have subjectively upset the Plaintiff, he has not proven that their conduct crossed the line and allegedly forced him to resign, thus establishing a Title VII violation. *Hipp*, 252 F.3d at 1231; *Cross*, 17 F.Supp.2d at 1376. Rather, the evidence is clear that the Plaintiff remained employed by Per–Se while in a leave status for several months after he voiced complaints of retaliation and financial irregularities; and the defendants only considered him to have resigned his employment when it became clear that he did not intend to return to work at Per–Se. *Farley*, 115 F.3d 1548, 1555 (termination after months on leave when it became clear that plaintiff would neither return nor accept another position was not retaliatory or discriminatory in nature). Consequently, Per–Se is entitled to summary judgment on the Plaintiff's Title VII constructive discharge claim.

IV. *PER–SE, PEAD, AND DAGHER ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S SARBANES–OXLEY RETALIATION CLAIM.*

■ The Plaintiff attempts to state a cause of action against defendants Per–Se, Pead, and Dagher under the Sarbanes–Oxley Act of 2002 ("SOX") (18 U.S.C.

§ 1514A). Specifically, the Plaintiff contends that the defendants retaliated against him (and subsequently constructively discharged him) after he had advised the defendants that he had contacted the Securities and Exchange Commission ("SEC") in March 2003 with his concerns regarding the defendants' involvement in alleged financial irregularities at Per–Se. (S.A.Compl., [Doc. 43, ¶¶ 136, 138, 139, 141, 142] ).

SOX ("Section 806") provides "whistleblower" protection to employees of publicly traded companies.[155] Under this provision, a public company (or agent of a public company) may not discriminate against any employee who "provide[s] information, causes[s] information to be provided, or otherwise assist[s] in an investigation" concerning conduct that the employee "reasonably believes constitutes a violation of . . . any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders." *See* 18 U.S.C. § 1514A(a)(1).

"Before an employee can assert a cause of action in federal court under the Sarbanes–Oxley Act, the employee must file a complaint with [OSHA] and afford OSHA the opportunity to resolve the allegations administratively." *Willis v. Vie Financial Group, Inc.*, 2004 WL 1774575, at *6 (E.D.Pa. Aug. 6, 2004) (No. 04–435); *see also* 18 U.S.C. § 1514(b)(1)(A).[156] The administrative complaint must be filed

---

155. In the absence of case law interpreting 18 U.S.C. § 1514A, courts "look to case law applying provisions of other similar federal whistleblower statutes for guidance," in ascertaining Congress' intent; here, these include the Energy Reorganization Act of 1974, 42 U.S.C. § 5851 ("ERA"). *See Collins v. Beazer Homes USA, Inc.*, 334 F.Supp.2d 1365, 1374 (N.D.Ga.2004).

156. The statute provides for filing the administrative complaint with the Secretary of Labor. The Secretary has delegated that responsibility to OSHA. *See* 29 C.F.R. § 1980.103(e).

"[w]ithin 90 days after an alleged violation of the Act" and must include "a full statement of the acts and omissions, with pertinent dates, which are believed to constitute the violations." *Id.*, § 1514A(b)(2)(D); 29 C.F.R. § 1980.103(b, d). If the employee meets these requirements for a particular violation, and a final administrative decision has not issued within 180 days of the filing, the employee is authorized to proceed with an action in federal court based on that violation (i.e., no further exhaustion of administrative remedies is required). 18 U.S.C. § 1514A(b)(1)(B); *Willis*, 2004 WL 1774575, at *3; *Murray v. TXU Corp.*, 279 F.Supp.2d 799, 802 (N.D.Tex.2003).

### A. The Plaintiff has failed to show that he exhausted his administrative remedies with respect to his SOX claims asserted against Pead and Dagher.

A federal court "can only conduct a 'de novo review' of those [SOX whistleblower] claims that have been administratively exhausted." *Willis*, 2004 WL 1774575, at *6 (holding that plaintiff's failure to raise an administrative complaint with OSHA precluded raising that claim in district court); *see also McClendon v. Hewlett–Packard Co.*, 2005 WL 2847224, at * 2–4 (D.Idaho Oct. 27, 2005) (No. 05–087–S–BLW) (holding that a district court can only conduct a "de novo review" of those claims that have been administratively exhausted); *Hanna v. WCI Communities, Inc.*, 348 F.Supp.2d 1322, 1324, 1329 (S.D.Fla.2004) (under the "de novo review" provided by SOX, "district courts are able to consider the merits of a plaintiff's whistle-blower [administrative] complaint as if it had not

been decided previously") (internal quotation omitted); *Murray*, 279 F.Supp.2d at 802 (district court lacks subject matter jurisdiction over Section 806 claim if plaintiff has failed to comply with administrative procedures). The Plaintiff has failed to sufficiently allege (or persuasively argue) that he has satisfied Section 806's exhaustion requirement with respect to his claims against Pead and Dagher. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000) ("A plaintiff asserting subject matter jurisdiction had the burden of proving by a preponderance of the evidence that it exists.").

While the regulations implementing SOX may provide for individual liability,[157] that does not obviate the need for the Plaintiff to exhaust his administrative remedies for each claim he seeks to assert against each defendant. In the present case, the Plaintiff filed an administrative complaint with OSHA on August 4, 2003 naming only Per–Se Technologies, Inc. as the Respondent. [Doc. 256, Ex. 10]. As the Plaintiff did not specifically name Pead and Dagher in the OSHA proceedings, he, thus, failed to exhaust his administrative remedies with respect to them. *See Hanna v. WCI Communities, Inc.*, 2004 U.S. Dist. LEXIS 25652, at *7–9 (S.D.Fla. Nov. 15, 2004) (dismissing SOX claim against individual defendant not named as respondents in plaintiff's OSHA complaint). The Plaintiff contends that Dagher and Pead are covered by the administrative complaint he filed with OSHA because they are identified as actors in his complaint, and were, therefore, on notice as to the claims against them. This Court disagrees and finds the Plaintiff's arguments uncompelling.

---

157. *See* 29 C.F.R. § 1980.101 (2004) (definition of "company representative" includes

"any officer, employee, contractor, subcontractor, or agent of a company)."

In *Hanna*,[158] the district court specifically rejected the same arguments that the Plaintiff here attempts to persuade this Court to accept. Specifically, the district court in *Hanna* was faced with a Motion to Dismiss filed by an individual defendant arguing that the plaintiff's SOX claim asserted against him was barred for failure to file an administrative complaint specifically naming him as a party, even though he was identified in the administrative complaint as an actor involved in the plaintiff's termination. *Id.* at *7. The district court agreed that merely mentioning the individual defendant in the body of the administrative complaint as an actor, rather than naming him in the heading of the administrative complaint, is insufficient, and failed to afford OSHA the opportunity to resolve the plaintiff's allegations through the administrative process. *Id.* at *8. More important, the district court stated, "Even if the court assumed that [the individual defendant] was placed on notice that he had allegedly violated the law, that notice has no consequence as to whether OSHA was placed on notice that it was required to investigate [the individual defendant's] actions in this case." *Id.* Therefore, OSHA was never provided an opportunity to issue a final decision within 180 days of the plaintiff filing his administrative complaint. *Id.* at *9.

Likewise, in the present case, the Plaintiff never provided OSHA with an opportunity to issue a final decision within 180 days of his filing his administrative complaint as to the claims he raises against Pead and Dagher because he failed to specifically name them in the heading of his administrative complaint. In fact, the Plaintiff failed to even mention Pead in his OSHA complaint, and the mere fact that Dagher is mentioned in the body of the OSHA complaint is insufficient. *See* [Doc. 256, Ex. 10]; *Hanna, supra.* Thus, the Plaintiff has failed to exhaust his administrative remedies as to his SOX claims asserted against defendants Pead and Dagher. Accordingly, defendants Pead and Dagher are entitled to summary judgment as to the Plaintiff's SOX claims asserted against them.

B. *The Plaintiff has failed to make out a prima facie case of a violation of SOX against Per–Se.*

■ To assert a whistleblower claim under SOX, the Plaintiff "must show by a preponderance of the evidence that (1)[he] engaged in protected activity; (2) the employer knew of the protected activity; (3)[he] suffered an unfavorable personnel action; and (4) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action." *Collins v. Beazer Homes USA, Inc.*, 334 F.Supp.2d 1365, 1375 (N.D.Ga.2004) (citations omitted); *see also Fraser v. Fiduciary Trust Co. Int'l*, 417 F.Supp.2d 310, 322 (S.D.N.Y.2006) (quoting *Collins* for these four factors); *Bishop v. PCS Administration, Inc.*, 2006 WL 1460032, at *1 (N.D.Ill. May 23, 2006) (No. 05–C–5683) (citing *Collins* for these four factors); 18 U.S.C. § 1514(A)(b)(2)(C) (action brought under [SOX] "shall be governed by the legal burdens of proof set forth in section 42121(b) of title 49, [U.S.] Code."). The defendant may avoid liability if it can demonstrate by clear and convincing evidence that it "would have taken the same unfa-

---

**158.** *Hanna v. WCI Communities, Inc.*, 2004 U.S. Dist. LEXIS 25652 (S.D.Fla. Nov. 15, 2004).

vorable personnel action in the absence of [protected] behavior" (i.e., a legitimate nondiscriminatory reason [LNDR]). *Collins,* 334 F.Supp.2d at 1375–76 (quoting 49 U.S.C. § 42121(b)(2)(B)(iv)).

SOX protects employees who provide information, which the employee "reasonably believes constitutes a violation" of any SEC rule or regulation. 18 U.S.C. § 1514A(a)(1); *Collins,* 334 F.Supp.2d at 1376. While a plaintiff need not show an actual violation of law by his employer, or cite a code section he believes was violated, "general inquiries ... do not constitute protected activity." *Id.; Bechtel Constr. Co. v. Sec'y of Labor,* 50 F.3d 926, 931 (11th Cir.1995); *see also Lerbs v. Buca Di Beppo, Inc.,* 2004–SOX–8, 2004 DOLSOX LEXIS 65, at *33–34 (Dep't Labor June 15, 2004) ("[I]n order for the whistleblower to be protected by [SOX], the reported information must have a certain degree of specificity [and] must state particular concerns, which, at the very least, reasonably identify a respondent's conduct that the complainant believes to be illegal.") (citing *Bechtel,* 50 F.3d at 931); *Bishop,* 2006 WL 1460032, at *5 ("An employee can engage in § 1514A protected activity even if the reported conduct did not actually constitute a violation of one of the laws or regulations enumerated in § 1514A(a)(1)."). Protected activity must implicate the substantive law protected in Sarbanes–Oxley "definitively and specifically." *American Nuclear Res., Inc. v. United State Dep't of Labor,* 134 F.3d 1292, 1295–96 (6th Cir. 1998). It is sufficient that "the individuals to whom [the complaints] were addressed understood the serious nature of [the employee's] allegations." *Collins,* 334 F.Supp.2d at 1377–78.

Here, the parties do not dispute that the Plaintiff engaged in protected activity when he complained of financial irregularities to the SEC in March 2003, and that Per–Se was made aware of the Plaintiff's protected activity. [Plaintiff's Facts 23, 24]. Rather, Per–Se contends that the Plaintiff has failed to make out a *prima facie* case of retaliation under SOX for the same reason that his Title VII retaliation claim fails: he has failed to present any evidence to show that he suffered any adverse employment action. In addition, Per–Se contends that the Plaintiff's SOX retaliation claim fails because he cannot show that his protected activity contributed to the alleged adverse employment actions taken by Per–Se against him. Moreover, Per–Se contends that even if the Plaintiff could establish a *prima facie* case of retaliation in violation of SOX, it is still entitled to be granted summary judgment on this claim for the additional reason that it would have taken the same employment actions even in the absence of the Plaintiff's protected activity (i.e., a mixed motive case).

1. *The Plaintiff did not suffer an unfavorable personnel action.*

▆ The Plaintiff alleges he suffered an unfavorable personnel action after he complained about financial irregularities to the SEC in March 2003 when his working conditions were made so intolerable that he felt compelled to resign on July 3, 2003 (i.e., he was constructively discharged) [Doc. 43, ¶¶ 141, 142]. As previously mentioned, complaints alleging SOX whistleblower violations must be filed with OSHA within 90 days of an alleged violation of the statute. 18 U.S.C. § 1514A(b)(2)(D); *Murray,* 279 F.Supp.2d 799. Because the Plaintiff filed his OSHA complaint on August 4, 2003 [Doc. 256, Ex. 10], any event that occurred before May 6, 2003, happened outside of the 90–day statute of

limitations applicable to his SOX claims. Thus, the Plaintiff's attempt to rely on alleged adverse employment actions that occurred prior to May 6, 2003 has been disregarded by this Court as those allegations are time barred.

As previously discussed, the Plaintiff never returned to work at Per–Se's offices after March 14, 2003. [Undisputed Facts 99, 100]. He was on approved sick and FMLA leave from March 17 to June 18, 2003 [Undisputed Facts 107, 108, 109, 119]. As previously noted, on June 27, 2003, the Plaintiff met with Swaine, Dagher and Jameson regarding his return to work after his twelve-week leave of absence. [Undisputed Fact 132]. At that time, they all agreed that the Plaintiff would return to work on July 1, 2003, but, as he drove to work on that date, he changed his mind and never returned to work at Per–Se. [Undisputed Facts 142, 154, 158].

The undisputed evidence also shows that the Plaintiff has failed to establish that he suffered any adverse employment action while he was on approved leave from March 17 to June 18, 2003. Indeed, he was approved for and received his full entitlement of FMLA leave, and was allowed to return to his pre-leave position. [Undisputed Facts 109, 119]. Rather, the Plaintiff solely attempts to rely on a March 17, 2003 e-mail from Dagher to Moore and Jameson telling Jameson to "make sure" that the Plaintiff (as well as two other employees) were "terminated in association with a riff [Jameson] may know of ..." [Plaintiff's Fact 22]. He also argues that he was met with hostility at the June

27, 2003 meeting with Swaine, Dagher and Jameson. [Doc. 255, p. 43]. However, the mere threat of termination is not an adverse employment action. *Van Der Meulen v. Brinker Int'l,* 153 Fed.Appx. 649, 655 (11th Cir.2005) (threat did not in fact cause any objective change in the plaintiff's employment where plaintiff worked for three weeks after the threatening statement); *Pennington,* 261 F.3d at 1267 (no adverse employment action where the employment decision is rescinded before the employee suffers a tangible harm); *see also Israel v. Potter,* 2004 WL 574668, at *4 (N.D.Ill.2004) (No. 02–V–8006); *Hitt v. Connell,* 301 F.3d 240, 246 (5th Cir.2002) ("neither the perception of a threat to one's job, nor fear of being fired, nor even the proposed notice of firing constitutes an actionable injury"). Ultimately, the Plaintiff was not terminated. Likewise, the Plaintiff's subjective feelings of hostility by Swaine, Dagher and Jameson at the June 27, 2003 meeting is not an adverse employment action. *Van Der Meulen, supra* (employee's subjective feelings about employer's actions should not be considered). Thus, the Plaintiff's sole allegation of adverse employment action is based on his claim of constructive discharge. However, for the reasons stated *supra,* the Plaintiff's constructive discharge claim fails as a matter of law. Accordingly, Per–Se is entitled to summary judgment as to the Plaintiff's Sarbanes–Oxley claims.[159]

C. *Per–Se established that it would have taken the same employment actions even in the absence of the Plaintiff's protected activity.*

 Assuming *arguendo* that the Plaintiff had made out a *prima facie* case

---

**159.** If the Plaintiff had been able to establish an adverse employment action, he may have been able to show a disputed issue of fact as to whether his protected activity caused the adverse action thereby entitling him to a trial.

However, since the Plaintiff failed to allege an adverse employment action that Per–Se took against him, it is not necessary for this Court to address the causation element of a *prima facie* case of retaliation in violation of SOX.

of retaliation in violation of SOX, Per–Se would still be entitled to summary judgment as to this claim as it has established that it would have taken the same employment actions even in the absence of the Plaintiff's protected activity. *Collins*, 334 F.Supp.2d at 1376.

As previously stated, the Plaintiff left work on March 14, 2003 and was on an approved leave of absence from March 17, 2003 to June 18, 2003. [Undisputed Facts 107, 109, 119]. Subsequent to the exhaustion of his twelve-week FMLA leave, Per–Se contacted the Plaintiff and prepared for his return to work by scheduling a meeting for June 27, 2003. [Undisputed Facts 121, 122, 123, 124, 125, 132]. Per–Se even advised the Plaintiff that he was eligible to apply for additional personal leave for a maximum of thirty days if necessary. [Undisputed Fact 120]. The Plaintiff declined the offer stating that he planned to return to work. [Undisputed Fact 121].

At the June 27, 2003 meeting, the Plaintiff agreed to return to work beginning Tuesday, July 1, 2003. [Undisputed Fact 142]. However, on July 1, 2003, while driving to work for the first time since his leave of absence, the Plaintiff changed his mind and never returned to work at Per–Se. [Undisputed Fact 154]. Subsequently, on July 3, 2003, Swaine telephoned the Plaintiff at his residence and left a message stating that he hoped he felt better, and advising him that his FMLA leave had expired and asking him to contact him as soon as possible. [Undisputed Fact 157]. Later that evening, the Plaintiff telephoned Swaine and informed him that he would not be returning to his employment with Per–Se. [Undisputed Fact 158].

Based on this representation, Per–Se considered the Plaintiff to have voluntarily terminated his employment effective that day. [Undisputed Fact 159]. Indeed, Swaine sent the Plaintiff a letter confirming his voluntary resignation and outlining the series of events that had occurred leading up to his voluntary resignation, to which the Plaintiff never responded nor contested. [Undisputed Fact 160]. Thus, the evidence is undisputed that Per–Se, pursuant to company policy, offered the Plaintiff additional leave if necessary, and when the Plaintiff declined its offer, it prepared for his return to work. This is Per–Se's normal procedure even if the Plaintiff had not engaged in protected activity in March 2003. When the Plaintiff advised Per–Se that he would not be returning to work, Per–Se concluded that the Plaintiff had voluntarily resigned from his employment. Thus, Per–Se has shown that it would have taken the same employment actions regarding the Plaintiff in the absence of his protected activity (i.e., he had resigned from his job), and the Plaintiff has declined, failed to refute, or even address in his response. Accordingly, Per–Se is entitled to summary judgment as to the Plaintiff's SOX claims for the additional reason that it has established that it would have taken the same employment actions even in the absence of the Plaintiff's protected activity.

V. *THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S STATE LAW CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.*

█ The Plaintiff alleges that all of the defendants intentionally inflicted emotional distress ("IIED") upon him in violation of Georgia law. To state a *prima facie* claim of intentional infliction of emotional distress under Georgia law, the Plaintiff must prove four elements: (1) the conduct must

be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Northside Hosp. v. Ruotanen,* 246 Ga.App. 433, 435, 541 S.E.2d 66 (2000); *Bridges v. Winn–Dixie, Inc.,* 176 Ga.App. 227, 335 S.E.2d 445, 447 (Ga.Ct. App.1985). Georgia courts have granted summary judgments against plaintiffs who fail to present evidence which creates a disputed issue as to any of the four elements. *Gaston v. Southern Bell Tel. and Tel. Co.,* 674 F.Supp. 347, 352 (N.D.Ga. 1987) (citing *Bridges,* 335 S.E.2d at 445 and *Crowe v. J.C. Penney, Inc.,* 177 Ga. App. 586, 588, 340 S.E.2d 192 (Ga.Ct.App. 1986)).

■ Whether a claim rises to the requisite level of outrageousness and egregiousness is a question of law. The termination of the Plaintiff, standing alone, cannot suffice to state a claim of IIED under Georgia law. *ITT Rayonier, Inc. v. McLaney,* 204 Ga.App. 762, 420 S.E.2d 610, 612 (Ga.Ct.App.1992); *Borden v. Johnson,* 196 Ga.App. 288, 395 S.E.2d 628, 630 (Ga.Ct.App.1990); *see also Clark,* 990 F.2d at 1229. If the evidence shows that a reasonable person might find the presence of extreme and outrageous conduct resulting in extreme emotional distress, the question must be resolved by a jury. *Yarbray v. Southern Bell Tel. Co.,* 261 Ga. 703, 706(2), 409 S.E.2d 835 (Ga.1991).

A. *The Plaintiff is unable to show that defendant Moore engaged in extreme or outrageous conduct.*

To support a cause of action for IIED, the alleged conduct at issue "must have been so terrifying as naturally to humiliate, embarrass or frighten the plaintiff."

*See, e.g., Amstadter v. Liberty Healthcare Corp.,* 233 Ga.App. 240, 503 S.E.2d 877, 880 (1998). Liability is imposed "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Phinazee v. Interstate Nationalease, Inc.,* 237 Ga.App. 39, 514 S.E.2d 843, 845 (1999).

The Plaintiff claims that he was subjected to emotional distress when he was harassed by defendant Moore on several occasions, threatened by Moore on at least two occasions, and caused to suffer various adverse employment actions for opposing unlawful employment practices. (S.A.Compl., [Doc.43, ¶¶ 108–110, 116–117] ); [Doc. 255, p. 54]. Specifically, as previously discussed, the Plaintiff contends that he was subjected to (1) verbal abuse by Moore on numerous occasions, including, *inter alia,* threats to his job, and (2) at least two physical threats by Moore. [Doc. 255, pp. 52–54]. In addition, the Plaintiff contends that defendants Pead and Dagher ratified Moore's conduct by failing to intervene after the Plaintiff complained about Moore's alleged conduct and harassment. (S.A.Compl., [Doc.43, ¶¶ 111–115, 118, 121] ). This Court, however, is compelled to conclude that the Plaintiff's evidence falls short of creating a disputed issue of fact as to whether the defendants subjected him to conduct that exceeded "all possible bounds of decency."

While a reasonable jury could find that Moore's alleged conduct, if believed, was inappropriate, such conduct simply does not rise to the level of extreme and outrageous conduct. Georgia courts have found far greater mistreatment insufficient to base a claim of IIED thereon. *See Moses*

*v. Prudential Ins. Co. of America,* 187 Ga.App. 222, 369 S.E.2d 541 (Ga.App. 1988); *Durley,* 236 F.3d at 654; *Hendrix v. Phillips,* 207 Ga.App. 394, 394–95, 428 S.E.2d 91, 92–93 (Ga.App.1993); *Fox v. Ravinia Club, Inc.,* 202 Ga.App. 260, 414 S.E.2d 243 (Ga.App.1991). For example, in *Moses,* a former employer left a threatening message on a former employee's answering machine, stating that "you are going to find your butt in court or your neck broken somewhere." 187 Ga.App. at 225, 369 S.E.2d at 543–44. Nevertheless, the Court, considering the language used, the means by which the message was delivered, and the relationship of the parties, found such conduct insufficient to create a cause of action for intentional infliction of emotional distress under Georgia law. *Id.* The Court observed, "Liability clearly does not extend to mere insults indignities, threats, annoyances, petty oppressions, or other trivialities[;] plaintiffs must certainly be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Id.,* quoting the Restatement (Second) of Torts Ch. 2, Emotional Distress, § 46(1), comment (d); *see also Spence v. Panasonic Copier Co.,* 46 F.Supp.2d 1340, 1350–51 (N.D.Ga.1999). Simply put, the Plaintiff has failed to supply additional facts suggesting that the conduct to which he was allegedly subjected rose beyond the "insults, indignities, petty oppressions" and the like that fall decidedly below the Georgia standard for IIED.

In support of his contention, the Plaintiff cites *Yarbray, supra.* Yet this case, rather than bolster the Plaintiff's claim, illustrates that Moore's alleged treatment of the Plaintiff fell well below the standard for outrageous conduct set by Georgia law. In *Yarbray,* an employee was demoted (i.e., transferred to another position), abused, and physically threatened by her supervisor. *Id.* However, the transfer in *Yarbray* was considered outrageous only because it was part of a decision to "deliberately . . . retaliate against [the employee], and to punish her for ignoring its lawyer's admonitions and testifying against the employer, which retaliation included subjecting her to abuse by her supervisor and causing her severe emotional pain." *Id.* at 838. In addition, the Plaintiff's reliance on *Yarbray* is misplaced as the plaintiff in that case experienced abuse at the hands of her supervisor.

Here, it is undisputed that Moore was not the Plaintiff's supervisor. [Undisputed Fact 13]. As previously shown, Georgia law has ruled that far more egregious conduct than this falls short of the outrageousness necessary to constitute intentional infliction of emotional distress. *See Bowers v. Estep,* 204 Ga.App. 615, 618, 420 S.E.2d 336, 339 (Ga.App.1992) (plaintiff failed to state an IIED claim where he alleged he was intentionally harassed, threatened, humiliated, intimidated in the course of his supervisors' inquiries concerning his emotional condition, belittled, and maliciously transferred to another position causing him to take a leave of absence and be admitted to a psychiatric clinic); *Jarrard v. U.P.S., Inc.,* 242 Ga. App. 58, 529 S.E.2d 144 (Ga.App.2000) (supervisor giving plaintiff a harsh performance evaluation on his first day back from extended psychiatric care and continuing the interview despite plaintiff's tearful requests for a postponement causing him to suffer a complete mental breakdown did not rise to the level of outrageous required for an IIED claim).

Finally, this Court agrees with the Plaintiff that while inappropriate behavior

in an employment setting may "produce a character of outrageousness that otherwise might not exist," *Coleman v. Housing Auth. of Americus,* 191 Ga.App. 166, 381 S.E.2d 303, 306 (Ga.App.1989), the conduct about which the Plaintiff complains is not sufficiently severe to support a claim of intentional infliction of emotional distress even in an employment setting.

### B. *The Plaintiff cannot show Moore's conduct caused him severe emotional injury.*

 Courts have emphasized that the severity consideration requires a showing of distress "so severe that no reasonable man could be expected to endure it." *Witter v. Delta Airlines, Inc.,* 966 F.Supp. 1193, 1201 (N.D.Ga.1997); *see also Gaston,* 674 F.Supp. at 353. The defendants' behavior must be so extreme that "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim 'Outrageous!' " *Hardin v. City Wide Wrecker Serv. Inc.,* 232 Ga.App. 617, 502 S.E.2d 548, 550 (1998) (quoting *Williams v. Stepler,* 227 Ga.App. 591, 594, 490 S.E.2d 167, 170 (1997)).

The Plaintiff relies on his medical records to support his contention that he has suffered severe emotional distress. In this case, the medical records and undisputed evidence reflect that the Plaintiff suffered from depression, anxiety, migraines, hypertension, fatigue, dizziness, panic attacks, nausea, constipation, rectal bleeding and abdominal pain. [Plaintiff's Facts 14, 15, 17, 19]. Although the Plaintiff has presented some evidence that he has suffered emotional distress, the Plaintiff still has the burden of establishing that Moore's alleged behavior proximately caused his injuries. *See Phinazee,* 514

S.E.2d at 845. "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it ... the distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge ..." *Moses,* 369 S.E.2d at 544 (citation omitted).

As previously noted, the Plaintiff contends that his medical records support his claim that the defendants caused him to suffer extreme emotional distress due to Moore's extreme and outrageous conduct. However, the only evidence that the Plaintiff's alleged emotional distress was job related were his own self-serving statements to the medical providers when he was treated. More important, Moore's alleged conduct at issue occurred in early 2002 and in or about the Fall of 2002, almost nine months to a year prior to the Plaintiff's resignation in July 2003, and almost six months from the alleged second incident in Fall 2002 to his extended leave of absence in March 2003. (Pl.Depo., [Doc. 292, pp. 235–37, 244–49, 257–262] ). Indeed, the Plaintiff did not even seek treatment for his alleged mental injuries until March 2003. [Doc. 286, pp. 25–27, Ex. 1]. This temporal gap between the last alleged threat by Moore and his seeking medical treatment is sufficient to break a causal connection. *See Bridges,* 176 Ga. App. at 231, 335 S.E.2d at 448 (plaintiff failed to establish requisite causal connection where she acknowledged she did not consult her physician immediately after the incidents complained of). The Plaintiff has failed to present sufficient evidence to attribute any of his alleged emotional distress to Moore's conduct. Because the Plaintiff is unable to satisfy at least one element of a *prima facie* case, Moore is

entitled to summary judgment as to this claim.[160]

*Conclusion*

*Part Five*

In light of the foregoing,

**IT IS HEREBY RECOMMENDED** that the defendants' Motions for Summary Judgment [Docs. 223, 224, 225, 226] be **GRANTED** as to all claims asserted against them by the Plaintiff.

**IT IS FURTHER RECOMMENDED** that the Plaintiff's Motion for Partial Summary Judgment [Doc. 210] be **DENIED** as moot.

As this Court has found that the Plaintiff has failed to show a violation of federal law,

**IT IS HEREBY FURTHER RECOMMENDED** that the District Court decline to exercise its supplemental jurisdiction and conduct a trial on the defendants' state law counterclaims.[161]

**IT IS HEREBY FURTHER RECOMMENDED** that the Plaintiff's Motion to Bifurcate the Trial and Brief in Support thereof [Doc. 208] be **DENIED** as moot.[162]

*ORDER*

**IT IS HEREBY ORDERED** that Per–Se's Motion to Strike [Doc. 259–1] is hereby **GRANTED** and the Plaintiff's Cross–Motion for Summary Judgment and supporting documents [Doc. 240–1] are stricken from the record as untimely.

**IT IS FURTHER ORDERED** that the defendants' Notice of Objection to Plaintiff's Affidavit and Motion to Strike [Doc. 261] is hereby **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to Increase Page Limit for Response to Defendants' Motion for Summary Judgment [Doc. 254] is hereby **DENIED** as moot.

The Clerk of Court is **DIRECTED** to terminate referral of this action to the undersigned.

IT IS SO RECOMMENDED AND ORDERED.

September 12, 2006.

---

**160.** Because this Court has concluded that the Plaintiff failed to make out a *prima facie* case of intentional infliction of emotional distress against Moore, and because the Plaintiff's IIED claims asserted against Per–Se, Pead, and Dagher are derivative of his IIED claim against Moore and based on Moore's alleged conduct, Per–Se, Pead and Dagher are also entitled to summary judgment as to Plaintiff's IIED claims asserted against them.

**161.** As shown above, all federal claims in this case should be dismissed if the District Court adopts this Court's Report and Recommendation. Thus, the District Court must determine whether it will exercise its discretion and retain supplementary jurisdiction over the defendants' state law counterclaims. *See* 28 U.S.C. § 1367; *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Rosado v. Wyman,* 397 U.S. 397, 403–05, 90 S.Ct. 1207, 1213–14, 25

L.Ed.2d 442 (1970), *aff'd.* 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157 (1971). While the District Court has the power to resolve these state law counterclaims, it should decline to do so in the absence of any pending federal claim and in the interest of judicial economy. *Rhyne v. Henderson County,* 973 F.2d 386 (5th Cir., 1992), *reh'g denied.*

**162.** On February 8, 2006, this Court deferred the Plaintiff's Motion to Bifurcate to the District Court for a ruling [Doc. 233]. However, since this Court has recommended that all claims against the defendants be dismissed and that the District Court decline to exercise its supplemental jurisdiction over the defendants' state law counterclaims, this Court recommends that the District Court deny the Plaintiff's Motion to Bifurcate the Trial [Doc. 208] as moot.